SEAN K. KENNEDY (145632)
Sean_Kennedy@fd.org
Federal Public Defender
STATIA PEAKHEART (200363)
Statia_Peakheart@fd.org
C. PAMELA GOMEZ (233848)
Pamela_Gomez@fd.org
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California  90012-4202
Telephone   (213) 894-2854
Facsimile   (213) 894-0081

Attorneys for Petitioner
JAMES NELSON BLAIR

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| JAMES NELSON BLAIR, | NO. CV 06-4550-VAP |
| Petitioner, | **DEATH PENALTY CASE** |
| v. | **PETITIONER'S BRIEF IN RESPONSE TO COURT ORDER, DKT. NO. 73** |
| MICHAEL MARTEL, Warden, California State Prison at San Quentin, | |
| Respondent. | |

**TABLE OF CONTENTS**

PAGE(S)

I.     SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    BLAIR IS UNABLE TO ASSIST COUNSEL IN
       MOST OF THE CLAIMS IN HIS AMENDED
       HABEAS PETITION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

       A.    From the Noncapital Attempted Murder Trial to
             the Instant Proceedings, All Counsel Have Declared
             That Blair Is Unable to Assist. . . . . . . . . . . . . . . . . . . . . . . . . . . 7

             1.    Trial Counsel in the Attempted Murder Case. . . . . . . . . . . . . 7

             2.    Stand-by/associate/advisory counsel in the
                   capital murder case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

             3.    State appellate/habeas counsel for the capital
                   murder judgments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

             4.    Appellate counsel in the noncapital appeal of
                   the attempted murder judgments. . . . . . . . . . . . . . . . . . . . 11

             5.    Counsel in the noncapital competency proceeding
                   and in the capital habeas proceeding. . . . . . . . . . . . . . . . . 11

       B.    Blair's Ability to Communicate with Counsel Is
             Essential to the Meaningful Prosecution of His
             Extra-record Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

       C.    Several Record-based Claims Are Founded on
             an "'Extreme Malfunction[] in the State Criminal
             Justice System[]'" and Could Substantially Benefit
             from Blair's Assistance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

III.   OVERVIEW OF 28 U.S.C. § 2254(d). . . . . . . . . . . . . . . . . . . . . . . . . 23

       A.    28 U.S.C. § 2254(d)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

             1.    Clearly Established Federal Law. . . . . . . . . . . . . . . . . . . . 24

             2.    Two Ways to Overcome Section (d)(1). . . . . . . . . . . . . . . . 25

       B.    28 U.S.C. § 2254(d)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

       C.    The Claims Alleged in the Amended Petition
             Will Survive as a Matter of Law under
             the *Richter/Pinholster* Rubric. . . . . . . . . . . . . . . . . . . . . . . . . . 28

i

1

**TABLE OF CONTENTS**

PAGE(S)

IV.    THE STATE COURT'S FAILURE TO ISSUE AN ORDER
       TO SHOW CAUSE RESULTED IN AN UNREASONABLE
       PROCESS THAT IS NOT ENTITLED TO DEFERENCE............... 33

       A.    Introduction..................................... 33

       B.    California's Post-Conviction Procedures........................ 33

       C.    To the Extent That the Required Application of
             State-Law Presumptions Trumped the State Court's
             Merits Review of Blair's Federal Claims,
             28 U.S.C. § 2254(d) Does Not Apply.......................... 37

       D.    The State Court's Failure to Issue an Order to Show
             Cause When the Petitioner Establishes a Prima Facie
             Case for Relief Renders the State-Court Decision
             Objectively Unreasonable..................................... 41

       E.    The California Supreme Court's Treatment of Blair's
             Extra-Record-Based Claims Was Objectively Unreasonable
             Under 28 U.S.C. § 2254(d)(2). ............................ 43

V.     SECTION 2254(d) DOES NOT BAR RELIEF ...................... 47

       A.    Amended Petition Claim A.................................... 47

             1.    As a Threshold Matter, California's Competency
                   Standard is Contrary to Clearly Established Federal
                   Law.................................................... 49

             2.    A Reasonable Judge in the Trial Court's Position
                   Would Have Had a Bona Fide Doubt of Blair's
                   Competence, and Therefore the Trial Court Violated
                   Blair's Constitutional Rights by Failing to Hold a
                   Competency Hearing. ................................ 54

                   a.    Legal Principles............................. 54

                   b.    Evidence of Incompetence Before the Trial
                         Court......................................... 55

                   c.    2254 (D) Does Not Bar Relief Also Because
                         the CSC's Decision Was Both an Unreasonable
                         Application of Clearly Established Federal Law
                         and Based on an Unreasonable Determination
                         of the Facts................................... 62

             3.    Blair Was in Fact Incompetent to Stand Trial. .............. 66

ii

1

**TABLE OF CONTENTS**

PAGE(S)

2

3        4.   Blair was not competent to waiver counsel nor
              was he competent to represent himself at his
4             capital trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

   B.   Amended Petition Claim B.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88
5
        1.   AEDPA Does Not Bar Relief on this Claim. . . . . . . . . . 88
6
             a.   The California Supreme Court's Denial of
7                 this Claims Was Based on an Unreasonable
                  Determination of the Facts.. . . . . . . . . . . . . . . . 90
8
             b.   The California Supreme Court's Denial
9                 of this Claim Was an Unreasonable
                  Application of Clearly Established
10                Federal Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

11   C.   Amended Petition Claim C.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

12        1.   AEDPA Does not Apply to This Claim.. . . . . . . . . . . . . . . . 95

13   D.   Amended Petition Claim E . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

14        1.   The CSC's Rejection of This Claim Was
               Unreasonable Under § 2254(d). . . . . . . . . . . . . . . . . . . . . . 99
15
             a.   The CSC's Denial of this Claim was Contrary
16                to Clearly Established Federal Law. . . . . . . . . . . . . . . . 101

17        2.   The CSC's Denial of this Claim Was Predicated
               on Its Unreasonable Conclusion that Blair was
18             Competent to Waive His Right to Counsel and
               To Represent Himself. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102
19
          3.   Newman and Lucas Were Ineffective. . . . . . . . . . . . . . . . . . 102
20
             a.   Newman Was Absent For Most of the Trial. . . . . . . . . 104
21
             b.   Had Counsel Investigated Blair's Competence and
22                Requested a Competency Hearing, There is a
                  Reasonable Probability that Blair Would Have
23                Been Found Incompetent. . . . . . . . . . . . . . . . . . . . . . 107

24           c.   Newman and Lucas Were Ineffective Throughout
                  Pre-Trial, Guilt and Penalty Phase Proceedings. . . . . . 107
25
     E.   Amended Petition Claim F. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107
26
          1.   AEDPA Does Not Bar Relief on this Claim. . . . . . . . . . . . . 108
27

28

iii

1

**TABLE OF CONTENTS**

PAGE(S)

2

    2.    The State Court Decision Was Based on an

3

        Unreasonable Determination of the Facts. . . . . . . . . . . . . . . 109

4

        a.    The CSC Unreasonably Found That
              Advisory Counsel Newman and Lucas

5

              Were Acting on Blair's Behalf.. . . . . . . . . . . . . . . . . . . 109

6

        b.    The CSC Unreasonably Found That Blair's
              Access to His Investigator Was Adequate.. . . . . . . . . . . 110

7

        c.    The CSC Unreasonably Found That Blair

8

              Made No Showing That His Budget Was
              Inadequate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

9

    3.    The State Court Decision Was Based on an

10

        Unreasonable Application of Clearly Established
        Federal Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

11

  F.    Amended Petition Claim G . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

12

    1.    AEDPA does not apply to this Claim.. . . . . . . . . . . . . . . . 113

13

  G.    Amended Petition Claim H.. . . . . . . . . . . . . . . . . . . . . . . . . . . 115

14

    1.    AEDPA Does Not Apply to this Claim. . . . . . . . . . . . . . . . 115

15

  H.    Amended Petition Claim I.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

16

    1.    AEDPA Does Not Apply to this Claim. . . . . . . . . . . . . . . . 118

17

  I.    Amended Petition Claim L.. . . . . . . . . . . . . . . . . . . . . . . . . . . 123

18

    1.    AEDPA Does not Apply to This Claim. . . . . . . . . . . . . . . . 123

19

  J.    Challenge to Lethal Injection. . . . . . . . . . . . . . . . . . . . . . . . . . 128

20

21

  K.    Systemic Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

22

    1.    The California Statutory Scheme under
        Which Blair Was Sentenced to Death Is

23

        Unconstitutional (Claim K and Claim N). . . . . . . . . . . . . . 128

24

    2.    The California Supreme Court's Denial of
        Blair's Inter-Case and Intra-Case Proportionality

25

        Claim was Objectively Unreasonable. . . . . . . . . . . . . . . . . 132

26

VI.  CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

27

28

1

# TABLE OF AUTHORITIES

2

**FEDERAL CASES**                                                        **PAGE(S)**

3

*Abdul-Kabir v. Quarterman,*
    550 U.S. 233, 127 S. Ct. 1654, 167 L. Ed. 2d 585 (2007). . . . . . . . . . . . . . .  120

4

*Abney v. United States,*
5       431 U.S. 651, 97 S. Ct. 2034, 52 L. Ed. 2d 651 (1977). . . . . . . . . . . . . . . . .   95

6

*Agan v. Singletary,*
    12 F.3d 1012 (11th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  102

7

*Ake v. Oklahoma,*
8       470 U.S. 68, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985). . . . . .  106, 110, 112, 116

9

*Alcala v. Woodford,*
    334 F.3d 862 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

10

*Beck v. Alabama,*
11       447 U.S. 625, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1980). . . . . .  93, 97, 117, 118

12

*Benn v. Lambert,*
    283 F.3d 1040 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25, 97

13

*Bills v. Clark,*
14       628 F.3d 1092 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    3

15

*Black v. Romano,*
    471 U.S. 606, 105 S. Ct. 2254, 85 L. Ed. 2d 636 (1985). . . . . . . . . . . . . . . .   39

16

*Blazak v. Ricketts,*
17       1 F.3d 891 (9th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   53

18

*Bouchillon v. Collins,*
    907 F.2d 509 (5th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . .  103, 104

19

*Boumediene v. Bush,*
20       553 U.S. 723, 128 S. Ct. 2229, 171 L. Ed. 2d 41 (2008). . . . . . . . . . . . . . . .   44

21

*Boyde v. Brown,*
    404 F.3d 1159 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  47, 48

22

*Bradley v. Duncan,*
23       315 F.3d 1091 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

24

*Brady v. Maryland,*
    373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). . . . . . . . . . . . . . . . .   75

25

26

27

28

v

1

# TABLE OF AUTHORITIES

2

**FEDERAL CASES**                                                                                      **PAGE(S)**

3

*Brewer v. Williams*,
      430 U.S. 387, 97 S. Ct. 1232, 51 L. Ed. 2dd (1977). . . . . . . . . . . . . . . . . . . .   72

4

*Britt v. North Carolina*,
      404 U.S. 226, 92 S. Ct. 431, 30 L. Ed. 2d 400 (1971). . . . . . . . . .   106, 111, 112

5

*Brown v. Sternes*,
      304 F.3d 677 (7th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   103, 104

6

7

*Buhl v. Cooksey*,
      233 F.3d 783 (3d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   73, 74, 76

8

*Burden v. Zant*,
      498 U.S. 433, 111 S. Ct. 862, 112 L. Ed. 2d 962 (1991). . . . . . . . . . . . . . . .   43

9

10

*Caliendo v. Warden*,
      365 F.3d 691 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27

11

*Carriger v. Stewart*,
      132 F.3d 463 (9th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   91

12

13

*Carter v. Bradshaw*,
      644 F.3d 329 (6th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

14

*Chambers v. Mississippi*,
      410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973). . . . . . . . . . . . . . . .   22

15

16

*Coker v. Georgia*,
      433 U.S. 584, 97 S. Ct. 2861, 53 L. Ed. 2d 982 (1977). . . . . . . . . . . . . . .   136

17

*Cone v. Bell*,
      556 U.S. 449, 129 S. Ct. 1769, 173 L. Ed. 2d 701 (2009). . . . . . . . . . . . . .   23

18

19

*Cooper v. Oklahoma*,
      517 U.S. 348, 116 S. Ct. 1373, 134 L. Ed. 2d 498 (1996). . . . . .   50, 51, 52, 130

20

*Cullen v. Pinholster*,
      563 U.S.__, 131 S. Ct. 1388, 179 L. Ed. 2d 557 (2011). . . . . . . . . . . . . *passim*

21

22

*David Williams v. Woodford*,
      859 F. Supp. 2d 1154 (E.D. Cal. 2012). . . . . . . . . . . . . . . . . . . .   28, 70, 90, 131

23

*Davis v. Wechsler*,
      263 U.S. 22, 44 S. Ct. 13, 68 L. Ed. 143 (1923). . . . . . . . . . . . . . . . . . . . . .   38

24

25

*Deere v. Cullen*,
      713 F. Supp. 2d 1011 (C.D. Cal. 2010). . . . . . . . . . . . . . . . . . . . . . . .   103, 104

26

*Deere v. Woodford*,
      339 F.3d 1084 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   69

27

28

vi

1

# TABLE OF AUTHORITIES

2

**FEDERAL CASES**                                                    **PAGE(S)**

3

*Doody v. Ryan,*
    649 F.3d 986 (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . 61, 70, 107, 112

4

*Drope v. Missouri,*
    420 U.S. 162, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975). . . . . . . . . . . . . . . *passim*

5

6

*Duhaime v. Ducharme,*
    200 F.3d 597 (9th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

7

*Dusky v. United States,*
    362 U.S. 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960). . . . . . . . . . . . . . . . passim

8

9

*Early v. Packer,*
    537 U.S. 3, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002). . . . . . . . . . . . . . . 118

10

*Eddings v. Oklahoma,*
    455 U.S. 104, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982). . . . . . . . . . . . . . . 96, 120

11

12

*Edwards v. Arizona,*
    451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2378 (1981).. . . . . . . . . . . . 72, 73, 85

13

*Enmund v. Florida,*
    458 U.S. 782, 102 S. Ct. 3368, 73 L. Ed. 2d 1140 (1982). . . . . . . . . . . . . 136

14

*Estes v. Texas,*
    381 U.S. 532, 85 S. Ct. 1628, 14 L. Ed. 2dd (1965).. . . . . . . . . . . . . . . . 74, 75

15

16

*Evitts v. Lucey,*
    469 U.S. 387, 105 S. Ct. 830, 83 L. Ed. 2d 821 (1985). . . . . . . . . . . . . . 130

17

*Fare v. Michael C.,*
    442 U.S. 707, 99 S. Ct. 2560, 61 L. Ed. 2d 197 (1979). . . . . . . . . . . . . . . 72

18

19

*Faretta v. California,*
    422 U.S. 806, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975). . . . . . . . . . . . . . *passim*

20

*Fernandez v. Roe,*
    286 F.3d 1073 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

21

22

*Frantz v. Hazey,*
    533 F.3d 724 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 139

23

*Furman v. Georgia,*
    408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972). . . . . . . . . . . . . . *passim*

24

25

*Gaston v. Palmer,*
    417 F.3d 1030 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

26

*Godfrey v. Georgia,*
    446 U.S. 420, 100 S. Ct. 1759, 64 L. Ed. 2d 398 (1980). . . . . . . . . . . . . 134

27

28

vii

1

**TABLE OF AUTHORITIES**

2

**FEDERAL CASES**                                                    **PAGE(S)**

3

*Godinez v. Moran,*
    509 U.S. 389, 113 S. Ct. 2680, 125 L. Ed. 2d 321 (1993). . . . . . . . . . . . . *passim*

4

*Gonzales v. United States District Court,*
    623 F.3d 1242 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

5

6

*Gonzalez v. Duncan,*
    551 F.3d 875 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110, 116

7

*Gonzalez v. Pliler,*
    341 F.3d 897 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

8

9

*Greene v. Fisher,*
    132 S. Ct. 38, 181 L. Ed. 2d 336 (2011). . . . . . . . . . . . . . . . . . . . . . . . 79, 80

10

*Gregg v. Georgia,*
    428 U.S. 153, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976). . . . . . . . . . . . . . . . 134

11

12

*Griffin v. Illinois,*
    351 U.S. 12, 76 S. Ct. 585, 100 L. Ed. 891 (1956).. . . . . . . . . . . . . . . . . *passim*

13

*Hall v. Director of Correction,*
    343 F.3d 976 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . 27, 110, 115

14

15

*Haney v. Adams,*
    641 F.3d 1168 (9th Cir.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

16

*Harrington v. Richter,*
    131 S. Ct. 770, 178 L. Ed. 2d 624 (2011). . . . . . . . . . . . . . . . . . . . . . . *passim*

17

18

*Harris v. Reed,*
    489 U.S. 255, 109 S. Ct. 1038, 103 L. Ed. 2d 308 (1989). . . . . . . . . . . . . . 36

19

*Haskell v. Harris,*
    669 F.3d 1049 (9th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

20

21

*Hernandez v. Yst,*
    930 F.2d 714 (9th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

22

*Herrera v. Collins,*
    506 U.S. 390, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993). . . . . . . . . . 86, 91, 92

23

24

*Hitchcock v. Dugger,*
    481 U.S. 393, 107 S. Ct. 1821, 95 L. Ed. 2d 347 (1987). . . . . . . . . . . . . . . 96

25

*Holland v. Florida,*
    130 S. Ct. 2549, 177 L. Ed. 2d 130 (2010). . . . . . . . . . . . . . . . . . . . . . . . 2

26

27

*Holmes v. Levenhagen,*
    600 F.3d 756 (7th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

28

# TABLE OF AUTHORITIES

**FEDERAL CASES**                                            **PAGE(S)**

*Hovey v. Ayers,*
    458 F.3d 892 (9th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Howard v. Clark,*
    608 F.3d 563 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

*Hurles v. Ryan,*
    706 F.3d 1021 (9th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Illinois v. Allen,*
    397 U.S. 337, 90 S. Ct. 1057, 25 L. Ed. 2dd (1970).. . . . . . . . . . . . . . . . 74, 82

*Indiana v. Edwards,*
    554 U.S. 164, 128 S. Ct. 2379, 171 L. Ed. 2d 345 (2008). . . . . . . . . . . . *passim*

*Iowa v. Tovar,*
    541 U.S. 77, 124 S. Ct. 1379, 158 L. Ed. 2d 209 (2004). . . . . . . . . . . . . . . 73

*Jackson v. Virginia,*
    443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). . . . . . . . . . . . . . 86, 92

*Jaramillo v. Stewart,*
    340 F.3d 877 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

*Johnson v. Mississippi,*
    486 U.S. 578, 108 S. Ct. 1981, 100 L. Ed. 2d 575 (1988). . . . . . . . . . . . 54, 94

*Johnson v. Zerbst,*
    304 U.S. 458, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938).. . . . . . . . . . . . 71, 72, 73

*Kaplany v. Enemoto,*
    540 F.2d 975 (9th Cir. 1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Killian v. Poole,*
    282 F.3d 1204 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 43

*Kim v. Villalobos,*
    799 F.2d 1317 (9th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Kuhlmann v. Wilson,*
    477 U.S. 436, 106 S. Ct. 2616, 91 L. Ed. 2d 364 (1986). . . . . . . . . . . . . . . 91

*Lafferty v. Cook,*
    949 F.2d 1546 (10th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . 54, 63, 69

*Lafler v. Cooper,*
    132 S. Ct. 1376,,182 L. Ed. 2d 398 (2012).. . . . . . . . . . . . . . . . . . . . . . . 118

*Lambert v. Blodgett,*
    393 F.3d 943 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

1

**TABLE OF AUTHORITIES**

2

**FEDERAL CASES**                                                 **PAGE(S)**

3

*Laws v. Lamarque*,
    351 F.3d 919 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

4

5

*Lockett v. Ohio*,
    438 U.S. 586, 98 S. Ct.2954, 57 L. Ed. 2d 973 (1978). . . . . . . . 93, 97, 120, 136

6

*Lockyer v. Andrade*,
    538 U.S. 63, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). . . . . . . . . . . . . . . . 24

7

8

*Lowenfield v. Phelps*,
    484 U.S. 231, 108 S. Ct. 546, 98 L. Ed. 2d 568 (1988). . . . . . . . . . . . . . . . 134

9

*Machibroda v. United States*,
    368 U.S. 487, 82 S. Ct. 510, 7 L. Ed. 2d 473 (1962). . . . . . . . . . . . . . . . . . . 38

10

*Mak v. Blodgett*,
    970 F.2d 614 (9th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

11

12

*Maples v. Thomas*,
    132 S. Ct. 912, 181 L. Ed. 2d 807 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . 18

13

14

*Martinez v. Court of Appeal of Cal., Fourth Appellate District*,
    528 U.S. 152, 120 S. Ct. 684, 145 L. Ed. 2dd (2000). . . . . . . . . . . 74, 82, 94, 95

15

*Martinez v. Ryan*,
    132 S. Ct. 1309, 182 L. Ed. 2d 272 (2012). . . . . . . . . . . . . . . . . . . . . . . *passim*

16

17

*Maynard v. Cartwright*,
    486 U.S. 356, 108 S. Ct. 1853, 100 L. Ed. 2d 372 (1988). . . . . . . . . . . . . . 134

18

*McCleskey v. Kemp*,
    481 U.S. 279, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987). . . . . . . . . . . . . . . 138

19

20

*McCleskey v. Zant*,
    499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991). . . . . . . . . . . . . . . 29

21

*McGregor v. Gibson*,
    248 F.3d 946 (10th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54, 63

22

23

*McKane v. Durston*,
    153 U.S. 684, 14 S. Ct. 913, 38 L. Ed. 867 (1894). . . . . . . . . . . . . . . . . . . 129

24

*McKaskle v. Wiggins*,
    465 U.S. 168, 104 S. Ct. 944, 79 L. Ed. 2dd (1984). . . . . . . . . . 74, 80, 81, 101

25

26

*McPeters v. Chappell, Opinion*,
    2013 WL 360260 (E.D. Cal. Jan. 29, 2013). . . . . . . . . . . . . . . . . . . . . . . . . 3

27

*Medina v. California*,
    505 U.S. 437, 112 S. Ct. 2572, 120 L. Ed. 2dd (1992). . . . . . . . . . . . 50, 62, 64

28

1

**TABLE OF AUTHORITIES**

2

**FEDERAL CASES**                                                    **PAGE(S)**

3

*Mempa v. Rhay*,
    389 U.S. 128, 88 S. Ct. 254, 19 L. Ed. 2d 336 (1967). . . . . . . . . . . . . . . . . .  71

4

5

*Miles v. Martel*,
    696 F.3d 889 (9th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  105

6

*Miles v. Stainer*,
    108 F.3d 1109 (9th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13, 76

7

8

*Milke v. Ryan*,
    2013 WL 979127 (9th Cir. Mar. 14, 2013).. . . . . . . . . . . . . . . . . . . . . . . . *passim*

9

*Miller-El v. Cockrell*,
    37 U.S. 322, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003). . . . . . . . . . . . .  27, 61

10

*Miller-El v. Dretke*,
    545 U.S. 231, 125 S. Ct. 2317, 162 L. Ed. 2d 196  (2005).  . . . . . . . . . . . . .  60

11

12

*Moore v. United States*,
    464 F.2d 663 (9th Cir. 1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  77, 78

13

*Moran v. Godinez*,
    57 F.3d 690 (9th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  53, 74

14

15

*Morgan v. Illinois*,
    504 U.S. 719, 112 S. Ct. 2222, 119 L. Ed. 2d 492 (1992). . . . . . . . . . . . . .  121

16

*Mullaney v. Wilbur*,
    421 U.S. 684, 95 S. Ct. 1881, 44 L. Ed. 2d 508 (1975). . . . . . . . . . . . . . .  39

17

18

*North Carolina v. Butler*,
    441 U.S. 369, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979). . . . . . . . . . . . . . .  72

19

*Nunes v. Mueller*,
    350 F.3d 1045 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

20

21

*Odle v. Woodford*,
    238 F.3d 1084 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . .  14, 53, 62, 64

22

*Panetti v. Quarterman*,
    551 U.S. 930, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007). . . . . . . . . . . . *passim*

23

24

*Parle v. Runnels*,
    505 F.3d 922 (9th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

25

*Pate v. Robinson*,
    383 U.S. 375, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966). . . . . . . . . . . . . . . *passim*

26

27

*Payton v. Cullen*,
    658 F.3d 890 (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  132

28

1

# TABLE OF AUTHORITIES

2 **FEDERAL CASES**                                                    **PAGE(S)**

3 *Penry v. Johnson,*
        532 U.S. 782, 121 S. Ct. 1910, 150 L. Ed. 2d 9 (2001). . . . . . . . . . . . . . . .  120
4

*Pirtle v.Morgan,*
5        313 F.3d 1160 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

6 *Pulley v. Harris,*
        465 U.S. 37, 104 S. Ct. 871, 79 L. Ed. 2d 29 (1984). . . . . . . . . . . . . . .  138, 139
7

*Rees v. Peyton,*
8        384 U.S. 312, 86 S. Ct. 1505, 16 L. Ed. 2d 583 (1966). . . . . . . . . . . . . . . . .  2

9 *Rees v. Peyton,*
        386 U.S. 989, 87 S. Ct. 1310, 18 L. Ed. 2d 333 (1967). . . . . . . . . . . . . . . . .  2
10

*Rhines v. Weber,*
11        544 U.S. 269, 125 S. Ct. 1528, 161 L. Ed. 2d 440 (2005). . . . . . . . . . . . . . .  75

12 *Rivera v. Quarterman,*
        505 F.3d 349 (5th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41
13

*Rohan ex rel. Gates v. Woodford,*
14        334 F.3d 803 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

15 *Rompilla v. Beard,*
        545 U.S. 374, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005). . . . . . . . . . . . . . .  23
16

*Ross v. Moffitt,*
17        417 U.S. 600, 94 S. Ct. 2437, 41 L. Ed. 2d 341 (1974). . . . . . . . . . . .  106, 111

18 *Ryan v. Gonzales,*
        133 S. Ct. 696, 181 L. Ed. 2d 528 (2013). . . . . . . . . . . . . . . . . . . . . . .  2, 3, 4, 30
19

*Savage v. Estelle,*
20        924 F.2d 1459 (9th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  74

21 *Schriro v. Landrigan,*
        550 U.S. 465, 127 S. Ct. 1933, 167 L. Ed. 2d 836 (2007). . . . . . . . . . . . . . .  96
22

*Sell v. United States,*
23        539 U.S. 166, 123 S. Ct. 2174, 156 L. Ed. 2dd (2003).. . . . . . . . . . . . . . . . .  82

24 *Shafer v. Bowersox,*
        329 F.3d 637 (8th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  72, 73, 78
25

*Silva v. Woodford,*
26        279 F.3d 825 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  43

27 *Skipper v. South Carolina,*
        476 U.S. 1, 106 S. Ct. 1669, 90 L. Ed. 2d 1 (1986). . . . . . . . . . . . . . . . . .  120

28

1

# TABLE OF AUTHORITIES

2

**FEDERAL CASES**                                                    **PAGE(S)**

3
*Speedy v. Wyrick,*
    748 F.2d 481 (8th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

4

*Stanley v. Cullen,*
5
    633 F.3d 852 (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . 3, 25, 102, 103

6
*Stone v. Powell,*
    428 U.S. 465, 96 S. Ct. 3037, 49 L. Ed. 2d 1067 (1976). . . . . . . . . . . . . . . 44

7

8
*Strickland v. Washington,*
    466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). . . . . . . . . . . . . *passim*

9
*Taylor v. Maddox,*
    366 F.3d 992 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

10

*Taylor v. Withrow,*
11
    288 F.3d 846 (6th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

12
*Torres v. Prunty,*
    223 F.3d 1103 (9th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

13

14
*In re Troy Davis,*
    130 S. Ct. 1, 174 L. Ed. 2d 614 (2009). . . . . . . . . . . . . . . . . . . . . . . . . 92

15
*Johnson v. Williams,*
    2013 WL 610199 (U.S. Feb. 20, 2013). . . . . . . . . . . . . . . . . . . . . . . . . 23

16

17
*United States v. David,*
    167 U.S. App. D.C. 117, 511 F.2d 355 (1975). . . . . . . . . . . . . . . . . . . . . 62

18
*United States ex rel. Roth v. Zelker,*
    455 F.2d 1105 (2nd Cir. 1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

19

20
*United States v. Balough,*
    820 F.2d 1485 (9th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

21
*United States v. Berry,*
    624 F.3d 1031 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

22

23
*United States v. Boigegrain,*
    155 F.3d 1181 (10th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

24
*United States v. Cronic,*
    466 U.S. 648, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984). . . . . . . . . . . . 99, 100

25

26
*United States v. Farhad,*
    190 F.3d 1097 (9th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

27
*United States v. Hemsi,*
    901 F.2d 293 (2d Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

28

# TABLE OF AUTHORITIES

**FEDERAL CASES** **PAGE(S)**

*United States v. Navarro-Garcia,*
  926 F.2d 818 (9th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Von Moltke v. Gillies,*
  332 U.S. 708, 68 S. Ct. 316, 92 L. Ed. 2d 309 (1948). . . . . . . . . . . . . . . 73, 76

*Wade v. Calderon,*
  29 F.3d 1312 (9th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . 134

*Wade v. Terhune,*
  202 F.3d 1190 (9th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Wainwright v. Witt,*
  469 U.S. 412, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985). . . . . . . . . . . . . . 120

*Weaver v. Thompson,*
  197 F.3d 359 (9th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . 26, 27, 43

*Weems v. United States,*
  217 U.S. 349, 30 S. Ct. 544, 54 L. Ed. 793 (1910).. . . . . . . . . . . . . . . . . 136

*Wellons v. Hall,*
  558 U.S. 220, 130 S. Ct. 727, 175 L. Ed. 2d 684 (2010). . . . . . . . . . . . . . . 44

*Wheat v. United States,*
  486 U.S. 153, 108 S. Ct. 1692, 100 L. Ed. 2dd (1988).. . . . . . . . . . . . . *passim*

*Wiggins v. Smith,*
  539 U.S. 510, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003). . . . . . . . . . . . *passim*

*Wiley v. Epps,*
  625 F.3d 199 (5th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . 41, 42

*Wilkins v. Bowersox,*
  145 F.3d 1006 (8th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . 73, 76, 78

*Williams (Terry) v. Taylor,*
  529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). . . . . . . . . . . *passim*

*Williams v. Woodford,*
  384 F.3d 567 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . 28, 47, 71, 90

*Williamson v. Ward,*
  110 F.3d 1508 (10th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . 103

*Winston v. Pearson,*
  683 F.3d 489 (4th Cir. 2012). . . . . . . . . . . . . . . . . . . 28, 70, 90, 131

*Woodson v. North Carolina,*
  428 U.S. 280, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976). . . . . . . . . . . . 96, 137

xiv

# TABLE OF AUTHORITIES

**FEDERAL CASES**                                              **PAGE(S)**

*Wright v. West*,
    505 U.S. 277, 112 S. Ct. 2482, 120 L. Ed. 2d 225 (1992). . . . . . . . . . . . . . .  44

*Ybarra v. McDaniel*,
    656 F.3d 984 (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

*Ylst v. Nunnemaker*,
    501 U.S. 797, 111 S. Ct. 2590, 115 L. Ed. 2d 706 (1991). . . . . . . . . .  23, 37, 46

*Zant v. Stephens*,
    462 U.S. 862, 103 S. Ct. 2733, 77 L. Ed. 2d 235 (1983). . . . . . . . . . . . . . .  134

**STATE CASES**

*Corenevsky v. Superior Court*,
    36 Cal. 3d 307, 682 P.2d 360, 204 Cal. Rptr. 165 (1984). . . . . . . . . . .  110, 116

*In re Bower*,
    38 Cal. 3d 865, 700 P.2d 1269, 215 Cal. Rptr. 267 (1985). . . . . . . . . . . . . .  34

*In re Clark*,
    5 Cal. 4th 750, 855 P.2d 729, 21 Cal. Rptr. 2d 509 (1993). . . . . . . . . . .  33, 37

*In re Hochberg*,
    2 Cal. 3d 870, 471 P.2d 1, 87 Cal. Rptr. 681 (1970). . . . . . . . . . . . .  24, 35, 36

*In re Ibarra*,
    34 Cal. 3d 277, 666 P.2d 980, 193 Cal. Rptr. 538 (1983). . . . . . . . . . . . . .  33

*In re Lawler*,
    23 Cal. 3d 190, 588 P.2d 1257, 151 Cal. Rptr. 833 (1979). . . . . . . . . . . . . .  33

*In re Lewallen*,
    23 Cal. 3d 274, 590 P.2d 383, 152 Cal. Rptr. 528 (1979). . . . . . . . . . . . . .  35

*In re  Sassounian*,
    9 Cal. 4th 535, 887 P.2d 527, 37 Cal. Rptr. 2d 446 (1995). . . . . .  35, 36, 37, 39

*In re Serrano*,
    10 Cal. 4th 447, 895 P.2d 936, 41 Cal. Rptr. 2d 695 (1995). . . . . . . . . .  34, 35

*In re Swain*,
    34 Cal. 2d 300 (1949). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  34

*Morales v. Cal. Department of Corrections & Rehabilitation*,
    168 Cal. App. 4th 729, 85 Cal. Rptr. 3d 724 (2008). . . . . . . . . . . . . . . . .  131

*People v. Bacigalupo*,
    6 Cal. 4th 457, 862 P.2d 808, 24 Cal. Rptr. 2d 808 (1993). . . . . . . . . . . . .  139

1

**TABLE OF AUTHORITIES**

2

**STATE CASES**                                                     **PAGE(S)**

3    *People v. Blair*,
          36 Cal. 4th 686, 115 P.3d 1145, 31 Cal. Rptr. 3d 485 (2005). . . . . . . . . . *passim*
4
     *People v. Bloom*,
5          48 Cal. 3d 1194, 774 P.2d 698, 259 Cal. Rptr. 669 (1989). . . . . . . . . . . . . . 98

6    *People v. Crittenden*,
          9 Cal. 4th 83, 885 P.2d 887, 36 Cal. Rptr. 2d 474 (1994). . . . . . . . . . . . . . 137
7
     *People v. Doane*,
8          200 Cal. App. 3d 852. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

9    *People v. Duvall*,
          9 Cal. 4th 464, 886 P.2d 1252, 37 Cal. Rptr. 2d 259 (1995). . . . . . . . . . . *passim*
10
     *People v. Frierson*,
11         25 Cal. 3d 142, 599 P.2d 587, 158 Cal. Rptr. 281 (1979). . . . . . . . . . . . . . 44

12   *People v. Kelly*,
          1 Cal. 4th 495, 822 P.2d 385, 3 Cal. Rptr. 2d 677 (1992). . . . . . . . . 1, 128, 130
13
     *People v. Mattison*,
14         4 Cal. 3d 177, 481 P.2d 193, 93 Cal. Rptr. 185 (1971). . . . . . . . . . . . . . . . . 87

15   *People v. Melton*,
          44 Cal. 3d 713, 750 P.2d 741, 244 Cal. Rptr. 867 (1988). . . . . . . . . . . . . . 137
16
     *People v. Pope*,
17         23 Cal. 3d 412, 590 P.2d 859, 152 Cal. Rptr. 732 (1979). . . . . . . . . . . . . . 45

18   *People v. Romero*,
          8 Cal. 4th 728, 883 P.2d 388, 35 Cal. Rptr. 2d 270 (1994). . . . . . 33, 34, 35, 36
19
     *People v. Skinner*,
20         39 Cal. 3d 765, 704 P.2d 752, 217 Cal. Rptr. 685 (1985). . . . . . . . . . . . . . 87

21   *People v. Williams*,
          16 Cal. 4th 635, 941 P.2d 752, 66 Cal. Rptr. 2d 573 (1997). . . . . . . . . . . . . 87
22
     *Quinn v. City of Los Angeles*,
23         84 Cal. App. 4th 472, 100 Cal. Rptr. 2d 914 (2000). . . . . . . . . . . . . . . . . . 34

24   *State v. Carter*,
          2000 Ohio 5935 (Ohio Ct. App. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
25

26   **DOCKETED CASES**

27   *Blair v. Woodford*,
          9th Cir. Case No. 01-99003, Dkt. No. 124. . . . . . . . . . . . . . . . . . . . . . . . . . 1
28

1

# TABLE OF AUTHORITIES

2

**DOCKETED CASES**                                                                    **PAGE(S)**

3

*Detrich v. Ryan*,
    No. 08-99001 (9th Cir.).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

4

*Frye v. Warden*,
    No. CV-0628-LKK-CKD. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  135

5

6

*Huggins v. Chappell*,
    No. 06-CV-07254-YGR (E.D. Cal.). . . . . . . . . . . . . . . . . . . . . . . . . . .  3

7

*In re Blair on Habeas Corpus*,
    Case No. S2144759. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

8

9

*In re James Nelson Blair*,
    Case No. S190217. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  42

10

*People v. Blair*,
    Case No. A757679. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7, 30, 63

11

12

*People v. James Nelson Blair*,
    CSC Case No. S011636. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

13

*Riel v. Warden*,
    No. CV-0507-LKK-DAD. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  135

14

15

*Stanley v. Chappell*,
    No. 07-CV-04727-EMC (E.D. Cal.). . . . . . . . . . . . . . . . . . . . . . . . . . .  3

16

**FEDERAL STATUTES**

17

18 U.S.C. § 3599. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

18

18 U.S.C. § 4241(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

19

21 U.S.C. § 848(q)(4)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

20

28 U.S.C. § 2241. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

21

28 U.S.C. § 2255(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 92

22

**STATE STATUTES**

23

Cal. Const., art. I, § 17.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  137

24

Cal. Code Regs. tit. 15 §§ 3349 et seq. . . . . . . . . . . . . . . . . . . . . . . . . . .  131

25

Cal. Penal Code § 187. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86, 87, 95

26

Cal. Penal Code § 1367. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49, 51

27

Cal. Penal Code § 1480. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  35

28

1

# TABLE OF AUTHORITIES

2

**STATE STATUTES**                                                                    **PAGE(S)**

3

Cal. Penal Code § 1484. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   35

4

Cal. Pen. Code § 190.2(a)(19). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

5

Cal. R. Ct., Rules 8.387(b)(2)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   36

6

Cal. R. Ct., Rule 8.532(b)(2)(C). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   39

7

**MISCELLANEOUS**

8

*Incompetency to Stand Trial,*
      81 Harv. L. Rev. 454, 457-59 (1967). . . . . . . . . . . . . . . . . . . . . . . . .   14, 62

9

*Shatz & Rivkind, "The California Death Penalty Scheme: Requiem for Furman?"*
*("Shatz & Rivkind, The California Death Penalty Scheme"),*

10

      72 N.Y.U. L. Rev. 1283, 1286 (1997). . . . . . . . . . . . . . . . . . . . . . . . .   134

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT IN SUPPORT OF**

**PETITIONER'S BRIEF IN RESPONSE TO**

**COURT ORDER, DKT. NO. 73**

A.   *James Nelson Blair on Habeas Corpus*, CSC Case No. S144759, Opinion Denying Petition for Writ of Habeas Corpus, 09/09/2009

B.   *People v. James Nelson Blair*, CSC Case No. S011636, Order, Motion to Determine Appellant's Competency, Denied, 09/07/2005

C.   *James Nelson Blair on Habeas Corpus*, CSC Case No.  S190217, Docket

D.   *Huggins v. Chappell*, USDC Case No. C 06-07254 YGR, Order Docket No. 43, 03/06/2013

E.   *McPeters v. Chappell*, Opinion, 2013 WL 360260 (E.D. Cal. Jan. 29, 2013)

F.   *Stanley v. Chappell*, USDC Case No. C-07-4727 EMC), Order Dkt. No. 81, 01/22/2013

G.   Declaration of David Baldus 11/18/2010

H.   Declaration of Donald Heller 01/27/2010

I.   Declaration of Steven F. Shatz 09/12/2011

J.   Declaration of Gerald F. Uelmen 10/30/2009

K.   Amended Declaration of George Woodworth, PhD 11/04/2012

1

**I.**

2

**SUMMARY OF ARGUMENT**

3       On July 28, 2005, the California Supreme Court ("CSC") issued its opinion

4 affirming the judgments concerning Blair's conviction and death sentence. *People v.*

5 *Blair*, 36 Cal. 4th 686, 115 P.3d 1145, 31 Cal. Rptr. 3d 485 (2005). On August 2,

6 2005, state counsel filed a motion to determine Blair's competency. In a letter to

7 counsel, the CSC ordered Respondent to file a response to Blair's "Motion to

8 Determine Appellant's Competency." On August 16, 2005, Respondent filed its

9 Opposition. On August 18, 2005, the CSC issued an order stating that "[f]inality of

10 the opinion in this case is hereby extended to and including September 23, 2005." On

11 September 7, 2005, the CSC denied the motion "without prejudice to renewal in

12 conjunction with, or following, the filing of a petition for writ of habeas corpus by

13 counsel. (*People v. Kelly* (1992) 1 Cal. 4th 495, 545-47.)"

14       As this Court knows, on December 9, 2005, the Ninth Circuit issued an order

15 for a judicial determination as to Blair's competency to assist counsel in a then-

16 pending appeal challenging the unreasonable delay in Blair's ongoing state direct

17 appeal.[1] *Blair v. Calderon*, No. 01-99003 (appeal and denial of petition in Case No.

18 CV 99-6859-VAP-OP (C.D. Cal.).) The Ninth Circuit issued the order after appellate

19 counsel filed a report informing the Court that state habeas counsel had filed a motion

20 for competency proceedings at the state level and made such motion part of the record

21 on appeal. (*Blair v. Woodford*, 9th Cir. Case No. 01-99003, Dkt. No. 124.)

22       There was never a hearing at the state level concerning Blair's competence to

23 assist in developing and presenting evidence to challenge his conviction and sentence

24 of death. Instead, on September 9, 2009, the CSC summarily denied all of Blair's

25 claims alleged in his state petition. (*Ex. A, In re Blair on Habeas Corpus Case No.*

26 _____

27       [1] Because, by its own order, the CSC had extended the finality of its opinion
until September 23, 2005, Blair's state direct appeal was pending when the Ninth
28 Circuit issued its order.

1

1    S144759.)  In denying his state habeas claim that Blair was incompetent to assist

2    habeas counsel, Justice Moreno was of the opinion an order to show cause should be

3    issued.

4        Despite federal habeas counsel's best efforts and exercise of due diligence, the

5    claims presented in the Amended Petition are unavoidably incomplete, for all the

6    reasons stated here, but also due to two external factors beyond Blair's and counsel's

7    control which inherently preclude the full investigation and development of

8    potentially meritorious habeas corpus claims that entitle Blair to habeas corpus relief:

9    a) Blair's serious mental illness and inability to rationally understand and assist in

10   these proceedings in the investigation and presentation of the Amended Petition; and

11   b) the impossibility of being able to thoroughly investigate and develop the

12   underlying facts in support of potentially meritorious issues because (a) Blair was

13   allowed to represented himself at trial, (b) the crucial and constitutionally-relevant

14   facts underlying his claims are exclusively within his knowledge, and (c) he is

15   currently too mentally ill to recall, relate, articulate, understand, assess, explain or

16   otherwise impart to counsel – or to the Court on his own behalf – the critical and

17   indispensable facts that lie at the heart of those claims.

18       Blair is currently incompetent to assist federal habeas counsel and therefore it

19   is within this Court's discretion to stay the federal habeas action to determine Blair's

20   competency and whether such competency may be restored.  In the event Blair is not

21   competent, he is entitled to equitable tolling of the statute of limitations (or its

22   equivalent) to allow his habeas counsel to present additional claims or facts in a

23   reasonable time once Blair's ability competence is restored.  *Ryan v. Gonzales*, __

24   U.S. __, 133 S. Ct. 696, 709, 181 L. Ed. 2d 528 (2013);  *Rees v. Peyton*, 384 U.S.

25   312, 86 S. Ct. 1505, 16 L. Ed. 2d 583 (1966) (per curiam) ("*Rees I*"); *Rees v. Peyton*,

26   386 U.S. 989, 87 S. Ct. 1310, 18 L. Ed. 2d 333 (1967) ("*Rees II*");  *Holland v.*

27   *Florida*, __ U.S. __, 130 S. Ct. 2549, 2562, 177 L. Ed. 2d 130 (2010) (recognizing

28

that a habeas petitioner is entitled to equitable tolling of AEDPA's one-year statute of limitations upon showing (1) that some extraordinary circumstance stood in the way of his timely filing, and (2) that he has pursued his rights diligently); *Laws v. Lamarque*, 351 F.3d 919, 923 (9th Cir. 2003) (finding that because mental incompetency can be an extraordinary circumstance beyond the petitioner's control, it can justify equitable tolling); *Bills v. Clark*, 628 F.3d 1092, 1093 (9th Cir. 2010) (mental illness constitutes an extraordinary circumstance when "a petitioner can show a mental impairment so severe that the petitioner was unable personally either to understand the need to timely file or prepare a habeas petition, and that impairment made it impossible under the totality of the circumstances to meet the filing deadline despite petitioner's diligence").

Further, because as explained below, "there is a possibility that the claims in the Amended Petition will survive as a matter of law under the *Richter/Pinholster* rubric," Order Dkt. No. 73, this Court should grant a temporary stay so that the issues concerning Blair's competency may be resolved.  *(See* Exs. D, E, F (Orders in *Huggins*, *McPeters*, and *Stanley*).)[2]

---

[2]  Three district courts have issued orders in light of the *Ryan v. Gonzales* decision.  One court did not immediately request briefing post-*Gonzales*, choosing instead to finish other matters that were pending.  *See Stanley v. Chappell*, No. 07-CV-04727-EMC (E.D. Cal.), January 22, 2013 order attached hereto as Ex. F. Another district court issued an order allowing the current stay to remain in place pending a determination of whether the petitioner is actually incompetent.  *See Huggins v. Chappell*, No. 06-CV-07254-YGR (E.D. Cal.), March 6, 2013 order attached hereto as Ex. D.  Yet another district court issued a published opinion ordering the parties to settle the case.  *See McPeters v. Chappell*, 2013 WL 360260 (E.D. Cal. January 29, 2013), attached hereto as Ex. E.  In that case, given the petitioner's continued incompetency, the district court directed "the Warden to meet and confer with the District Attorney of Fresno County (where McPeters was convicted) to discuss a course of action that brings the interests of the litigants, the Court, and the tax payers to the forefront."  *McPeters*, WL 360260 at *11.

1

**II.**

2

**BLAIR IS UNABLE TO ASSIST COUNSEL IN MOST**

3

**OF THE CLAIMS IN HIS AMENDED HABEAS PETITION.**

4      Applying the Ninth Circuit's opinion in *Gonzales v. United States District*

5  *Court*, 623 F.3d 1242 (9th Cir. 2010), this Court ordered the parties to "undertake a

6  claim specific inquiry in order to determine whether the petitioner's ability to

7  communicate with counsel was essential to meaningful prosecution of each claim."

8  (Dkt. 73, p. 13 (citing *Gonzales*, at 1245).)  The Supreme Court's subsequent grant of

9  *certiorari* and reversal in *Gonzales* in no way alters this Court's litigation plan.

10      In the Supreme Court's *Gonzales* case, the Ninth and the Sixth Circuits had

11  each granted a habeas petitioner a stay of his proceedings because he was

12  incompetent.  *Gonzales* considered whether these stays were appropriate under the

13  sources of statutory authority applied by each court.  *Ryan v. Gonzales*, 133 S. Ct. 696

14  (2013).  In entertaining Mr. Gonzales' petition for writ of mandamus seeking a stay,

15  the Ninth Circuit had applied 18 U.S.C. § 3599[3] to find "a statutory right to

16  competence" in habeas proceedings.  133 S. Ct. at 701.  The Sixth Circuit had found

17  that the district court erred in both dismissing Mr. Carter's habeas petition and tolling

18  its statute of limitations because he was incompetent.  Rather, the Sixth Circuit held

19  that, in applying the import of *Rohan ex rel. Gates v. Woodford*, the district court

20  should have instead stayed Mr. Carter's habeas proceedings under 18 U.S.C.

21  § 4241(d).  *See Carter v. Bradshaw*, 644 F.3d 329, 336-37 (6th Cir. 2011).

22      The *Gonzales* Court rejected both Circuits' statutory authority for staying the

23  habeas proceedings based on the petitioners' mental incompetence.  *Gonzales*, at 702-

24

---

25      [3]  The Ninth Circuit's *Gonzales* opinion cited *Rohan ex rel. Gates v. Woodford*,
26  334 F.3d 803 (9th Cir. 2003), as the authority for granting Mr. Gonzales a stay of his
   habeas proceedings.  *Gates* interpreted 21 U.S.C. § 848(q)(4)(B), which provided a
27  prisoner a statutory right to counsel in his federal habeas proceeding, as permitting
   the stay.  *Gates*, at 814.  Section 848(q)(4)(B) is now codified as 18 U.S.C.
28  § 3599(a)(2)).

1   06 (rejecting § 3599), 706-08 (rejecting § 4241).[4]  Concurrently, however, it cited the

2   power of district courts to manage their dockets in rejecting any argument that a stay

3   based on the petitioner's present incompetence was *never* available.[5]  Such a stay was

4   appropriate where the habeas claim under entertainment "could substantially benefit

5   from the petitioner's assistance. . . ."  *Id*. at 709.  And, it cautioned that district courts

6   should "take into account the likelihood that the petitioner will regain competence in

7   the foreseeable future."  *Id*.  In the event the petitioner *could* regain competence, a

8   stay was appropriate.

9       *Gonzales* also indicated that a stay for incompetence was appropriate where a

10  *record-based* claim was founded on an "'extreme malfunction[] in the state criminal

11  justice system[].'"  *Gonzales*, at 708.  Although the Court declined to define what

12  constituted an "extreme malfunction," it recognized that neither Gonzales' nor

13  Carter's claims fit this exception.  Those reasons are distinguishable from certain of

14  Blair's record-based claims; in fact, the factual and legal bases in support of those

15  record-based claims show that Blair's state proceedings resulted in an "extreme

16  malfunction" of the justice system such that he is entitled to a stay for those claims.

17      First, it bears noting that, since the state court had adjudicated three of Carter's

18  four claims on the merits, the *Gonzales* Court observed that they were subject to

19  review under § 2254(d), meaning that "[a]ny extra record evidence that Carter might

20  have concerning these claims would therefore be inadmissible."  *Gonzales*, at 708.  It

21  decided the same for Gonzales' claims.  *Id*.  Consequently, neither Gonzales nor

22  Carter was entitled to a stay of the proceedings.  As discussed in Part III and V,

23

24      [4]  The *Gonzales* Court pointed out that Carter essentially conceded during the
    certiorari proceedings that there was no statutory basis to support the stay.  *Gonzales*,
25  at 707.

26      [5]  *Compare Gonzales*, at 708 ("[T]he decision to grant a stay, like the decision
    to grant an evidentiary hearing, is 'generally left to the sound discretion of district
27  courts'"), *with Rohan ex rel. Gates v. Woodford*, 334 F.3d 803, 817 (9th Cir. 2003)
    ("District courts have inherent authority to stay proceedings before them. . . .").
28

1    *supra*, many claims in Blair's amended habeas petition cannot be reviewed under §

2    2254 because the state courts denied Blair the ability to develop an adequate record

3    and because Blair was incompetent during the state postconviction proceedings.

4         None of Carter's claims indicated that there was an "extreme malfunction[] in

5    the state criminal justice system[]" warranting a stay of the proceedings.  Unlike

6    Blair's trial, the trial court had Carter evaluated by mental health experts and held two

7    hearings to determine Carter's competency to stand trial.  *State v. Carter*, 2000 Ohio

8    5935, at *11-*13 (Ohio Ct. App. 2000).  And, unlike Blair's trial, Carter's trial

9    counsel investigated and presented evidence to mitigate the death sentence, thus trial

10   counsel met the minimum standard of performance under *Strickland v. Washington*,

11   466 U.S. 668 (1984).  *State v. Carter*, at *9-*10.

12        In Blair's case, no counsel represented him at trial.  Instead, the trial court

13   allowed Blair to proceed *in propria persona and* failed to evaluate Blair's

14   competence before doing so, although the court was aware that his trial counsel had

15   questioned Blair's ability to assist him and had requested a continuance of the trial so

16   that he could obtain Blair's psychiatric records.  Blair's associate/stand-by counsel

17   declared that Blair was unprepared throughout the guilt phase.  (*In re Blair*, Case No.

18   S144759, Petition for Habeas Corpus, Ex. 52, R. Newman Decl., ¶¶ 3-5.)  His stand-

19   by/advisory counsel (who replaced the previous standby counsel) subsequently

20   declared that Blair was incompetent to proceed or to represent himself.  (*In re Blair*,

21   Case No. S144759, Petition for Habeas Corpus, Ex. 90, L. Lucas Decl., ¶ 5, ¶¶ 12-

22   15.)  Lucas declared that the penalty phase and resulting judgment of death could

23   have been avoided had he declared a doubt to the trial court that Blair was mentally

24   incompetent to stand trial and to represent himself.  (Ex. 90, L. Lucas Decl., ¶¶ 20-

25   22.)

26        In rejecting any basis for a stay for Gonzales, the *Gonzales* Court also

27   emphasized that Gonzales' federal habeas counsel made the stay request "more than

28

1    six years after initiating his habeas petition," during which years counsel had "ample

2    time . . . to research and present the claims" with Gonzales' assistance. *Gonzales*, at

3    706.  In contrast, since Blair's trial for the attempted murder of the two victims

4    through the instant proceedings, his counsel consistently concluded that he was,  and

5    remains, unable to assist them.[6]

6    **A.    From the Noncapital Attempted Murder Trial to the Instant Proceedings,**

7    **All Counsel Have Declared That Blair Is Unable to Assist.**

8          **1.    Trial Counsel in the Attempted Murder Case.**

9          The Los Angeles City Superior Court appointed County Public Defender

10   Dennis G. Cohen to represent Blair for the two attempted murder charges. *People v.*

11   *Blair*, No. A757679.  Against Blair's wishes, the court granted Cohen continuances

12   so that Cohen could (1) obtain medical records about Blair (these were Blair's records

13   from Atascadero State Hospital, where he was sent in 1971 after being found not

14   guilty by reason of insanity in a different matter); and (2) have two mental health

15   experts appointed to evaluate Blair for purposes of an not guilty by reason of insanity

16   defense *and* because Cohen believed Blair was incompetent to stand trial.

17   (01/15/1985 Pretrial RT, *People v. Blair*, No. A757679).  After the Court of Appeal

18   heard Blair's writ challenging the continuances, it determined that Cohen showed

19   "good cause for the defense continuance in order to investigate possibility of an

20   insanity defense." (05/21/1985 RT 1-2, No. A757679.)

21         As it turned out, apparently Blair refused to meet with the two experts, and

22   Cohen was compelled to state that the insanity defense had no basis.  Then, without a

23   hearing on Cohen's assertions that Blair was incompetent, the trial court granted

24   Blair's motion to represent himself and relieved Cohen as counsel. (05/21/1985 RT 2-

25   9.)

26

27         [6]  Indeed, Blair's 1971 conviction resulted in a finding that he was not guilty by

28   reason of insanity.

1    After the victim in the noncapital case died, the same trial court allowed Blair,

2    without any colloquy, to proceed *pro se* in the capital case as well.

3    **2.    Stand-by/associate/advisory counsel in the capital murder case.**

4    In November 1989, the superior court appointed Ray Newman as associate and

5    stand-by counsel for Blair.  (*In re Blair*, Case No. S144759, Petition for Habeas

6    Corpus, Ex. 52, R. Newman Decl., ¶ 2.)  Newman attempted to work with, and for,

7    Blair for four months, then his caseload prevented him from attending most of the

8    guilt trial.  Newman tried to help Blair in the evenings.  (Ex. 52, ¶ 4.)  Although

9    Newman had been absent for most of the guilt case, Blair asked Newman to give the

10   closing argument, which he did.  Then, "after the guilt phase verdicts had been

11   returned, [Newman] informed the trial court that [he] thought Mr. Blair was not

12   competent to proceed."  (Ex. 52, ¶ 5.)  Nothing happened with Newman's concern;

13   Newman did not attend the rest of the trial.

14   Because Newman was unavailable during the trial, the court appointed another

15   stand-by or associate counsel, Lonzo Lucas.  Lucas had no time to prepare because he

16   was appointed when the jury selection was about to begin.  (Ex. 90, ¶ 3.)  Lucas and

17   Newman did not talk about the case.  When Lucas read that Blair's judge in the

18   attempted murder case noted that Blair was likely mentally ill, Lucas attempted to

19   persuade Blair to submit to psychiatric evaluations, but Blair refused.  (Ex. 90, ¶ 5.)

20   Blair rejected Lucas' suggestions to investigate whether the alcohol bottle

21   given to the victims was adulterated but Blair refused, instead focusing on his writs

22   and motions.  Blair also rejected Lucas' suggestion to focus on causation of the

23   victim's death.  (Ex. 90, ¶ 6.)

24   Lucas described in detail how unprepared and unfocused Blair was during the

25   capital trial.  (Ex. 90, ¶¶ 7-18.)  Lucas has declared,

26            On reflection now, I now wish that I had not waited until

27            after the guilt verdict to say something about the ongoing

28

8

1          problem with Mr. Blair's incompetency to stand trial

2          representing himself.  I wish I had said something about

3          how unprepared and incapable he was during the trial, and

4          how a psychiatrist was needed to examine him.

5    (Ex. 90, ¶ 20.)

6          **3.      State appellate/habeas counsel for the capital murder judgments.**

7          During the appellate proceedings, counsel David Nickerson submitted a motion

8    for a determination of Blair's competency on appeal.  *People v. Blair*, No. S011636

9    (Cal. Supr. Ct. 2005).

10         Nickerson described Blair's relationship with Blair's first state appellate

11   counsel, Gregor Guy-Smith:

12             As a result of Blair's mental illness, Blair has been unable to

13             rationally communicate with or assist present or previous

14             appellate/habeas counsel.  Over a ten-year period, . . . on the

15             few occasions that Blair met with prior counsel, Mr. Guy-

16             Smith, Blair exhibited overtly psychotic behavior.  During

17             these meetings between Blair  and Mr. Guy-Smith, no

18             substantive discussion of either the automatic appeal, the

19             habeas proceeding, or any habeas investigation ever took

20             place.  On numerous other occasions, Blair refused to meet

21             with Mr. Guy-Smith at all.  The lack of cooperation between

22             former appellate/habeas counsel and Blair was the product

23             of Blair's mental illness.  No significant habeas

24             investigation was conducted by former appellate/habeas

25             counsel as a result of Blair's inability to cooperate.

26   (*People v. Blair*, Case No. S011636, Excerpt from Motion to Determine Appellant's

27   Competency at 119-20.)

28

9

1    Nickerson also described his relationship with Blair:

2          [I have] met with Blair on only one occasion.  On numerous

3          other occasions, Blair has declined to meet with counsel

4          after counsel arrived at the state prison.  On the single

5          occasion when Blair agreed to meet with present counsel,

6          Blair was operating under the delusion that he was to be

7          released from prison shortly and would be returning to Los

8          Angeles. He indicated that the only reason he accepted the

9          visit with counsel was because he thought counsel was there

10          to discuss his imminent release.  Blair did not discuss

11          potential habeas issues or habeas investigation with present

12          appellate/counsel in any manner and was only concerned

13          with obtaining documents which Blair believed he would

14          need when he returned to Los Angeles in order to sue the

15          Los Angeles Police Department for false arrest.  During this

16          meeting Blair also exhibited overtly psychotic behavior,

17          including a very evident germ phobia and ritualistic

18          behaviors.

19    (*Id.* at 120)  The motion was supported by numerous exhibits.

20          Ultimately, the CSC denied the competency motion without prejudice to file as

21    a claim in the imminent habeas petition. (Ex. B.)  After the court affirmed the

22    judgments, Nickerson filed a petition for writ of habeas corpus.  Claim 4 raised

23    Blair's incompetency to assist counsel.  It also stated that the petition was incomplete

24    because Blair was unable to help counsel.  (*In re Blair*, Case No. S144759, Petition

25    for Habeas Corpus at 120.)

26          The CSC denied Claim 4 on its merits, with Justice Moreno opining that the

27    court should issue on order to show cause on Claim 4.  (Ex. A.)

28

10

1    **4.    Appellate counsel in the noncapital appeal of the attempted murder**
2    **judgments.**

3    While Blair's state postconviction proceedings were ongoing in the California

4    Supreme Court, a noncapital appeal from a petition for writ of habeas corpus he had

5    filed *pro se* in this Court was also ongoing in the Ninth Circuit. The court had

6    appointed appellate counsel for Blair, Karyn Bucur. During the appeal, Bucur

7    likewise declared a doubt about Blair's ability to assist her:

8    [During my seven years of representing] Mr. Blair, I came

9    to conclude that I was unable to communicate to Mr. Blair

10    the nature of the proceedings before the Ninth Circuit and

11    he did appear to have a rational or factual understanding of

12    those proceedings. I have concluded that he was unable to

13    provide me with meaningful assistance information related

14    to the issues before the Court.

15    (*See* Competency Hearing Exhibit 26, K. Bucur Decl., ¶ 15, comprising direct

16    examination testimony in *Blair v. Woodford*, No. CV 99-6859-VAP(OP); *see also*

17    K. Bucur competency hearing testimony on February 19, 2009.)

18    **5.    Counsel in the noncapital competency proceeding and in the capital**

19    **habeas proceeding.**

20    The Ninth Circuit appointed the Office of the Federal Public Defender to

21    conduct the competency hearing in Blair's noncapital appeal. During that

22    proceeding, the Office also came to represent Blair in the instant capital habeas

23    proceeding.

24    Undersigned federal habeas counsel attempted to gain Blair's assistance in

25    investigating and preparing a petition for writ of habeas corpus for filing in this

26    Court. Like Blair's counsel before, undersigned counsel concluded that he was

27    unable to assist:

28

11

1          Mr. Blair cannot communicate rationally with his counsel

2          (or anybody) about his case.  Our visits are pleasant, or at

3          least not tense, but they are not meaningful.  Mr. Blair

4          cannot understand what the proceedings are about, he

5          cannot stay focused on issues that are not the few that he is

6          convinced his case is truly about (despite what the Circuit

7          Court, this Court, Respondent and counsel inform about the

8          actual issues). Mr. Blair is unable to engage in a dialogue

9          with counsel, which is not to say that we do not talk during

10         the visits; rather, we talk but it is as if we have not because

11         he does not appear to take in or respond to what we say and

12         more often than not he simply repeats what he was saying.

13   (*See* Competency Hearing Exhibit 27, S. Peakheart Decl., ¶ 17, comprising direct

14   examination testimony in *Blair v. Woodford*, Case No. CV 99-6859-VAP(OP); *see*

15   *also* S. Peakheart competency hearing testimony on February 19, 2009.)

16        All of Blair's trial counsel were consistent in their descriptions of his inability

17   to help them.  The standard for determining competency to proceed to trial set out by

18   the Supreme Court more than forty years ago has remained firmly established:

19         it is not enough for the district judge to find that the

20         defendant (is) oriented to time and place and (has) some

21         recollection of events, but that the test must be whether he

22         has sufficient present ability to consult with his lawyer with

23         a reasonable degree of rational understanding – and whether

24         he has a rational as well as factual understanding of the

25         proceedings against him.

26

27

28

1   *Dusky v. United States*, 362 U.S. 402, 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960)

2   (internal quotations omitted).[7]

3        "Competence is defined as the ability to understand the proceedings and to

4   assist counsel in preparing a defense." *Miles v. Stainer,* 108 F.3d 1109, 1112 (9th

5   Cir. 1997) (citing *Dusky,* 362 U.S. at 402; *Godinez v. Moran,* 509 U.S. at 396).

6   Incumbent upon trial counsel is that she:

7                 engage in a continuing interactive dialogue with the client

8                 concerning all matters that might reasonably be expected to

9                 have a material impact on the case, such as:

10                    1.  the progress of and prospects for the factual

11                 investigation, and what assistance the client might provide

12                 to it;

13                    2.  current or potential legal issues;

14                    3.  the development of a defense theory;

15                    4.  presentation of the defense case;

16                    5.  potential agreed-upon dispositions of the case;

17                    6.   litigation deadlines and the projected schedule of

18                 case-related events; and,

19                    7.  relevant aspects of the client's relationship with

20                 correctional, parole, or other governmental agents (e.g.,

21                 prison medical providers or state psychiatrists).

22   Guideline 10.5, Relationship with the Client, American Bar Association Guidelines

23   for the Appointment and Performance of Defense Counsel in Death Penalty Cases

24

25

26

27        [7]  As discussed elsewhere in this Brief, the State of California's statute for

28   determination of competency does not meet constitutional requirements.

1   (rev. ed. February 2003).[8]  "[C]ompetence to stand trial does not consist merely of

2   passively observing the proceedings.  Rather, it requires the mental acuity to see, hear

3   and digest the evidence, and the ability to communicate with counsel in helping

4   prepare an effective defense."  *Odle v. Woodford*, 238 F.3d 1084, 1089 (9th Cir.

5   2001) (citing *Dusky,* 362 U.S. at 402; Note, *Incompetency to Stand Trial*, 81 Harv. L.

6   Rev. 454, 457-59 (1967)).  Newman's and Lucas' descriptions of Blair's behavior

7   during the trial and the evenings between court days indicate that Blair could not hear

8   or digest the evidence, much less prepare his defense.

9       Applying the guidance provided to counsel by the 2003 ABA Guidelines, all of

10   Blair's postconviction counsel have declared that prosecuting the capital habeas

11   petition filed in the California Supreme Court (Case No. S144759); the Ninth Circuit

12   noncapital appeal (Case No. 01-99003); and the instant amended federal habeas

13   petition, Case No. 06-4550, adequately "[w]ould substantially benefit" from Blair's

14   assistance.  And, as for the instant proceedings, nothing in *Gonzales* altered the *Gates*

15   holding that,

16       [Habeas c]ounsel's assistance [] depends in substantial

17       measure on the petitioner's ability to communicate with

18       him.  And if meaningful assistance of counsel is essential to

19       the fair administration of the death penalty and capacity for

20       rational communication is essential to meaningful assistance

21       of counsel, it follows that Congress's mandate cannot be

22       faithfully enforced *unless courts ensure that a petitioner is*

23       *competent.*

24   *Gates*, 334 F.3d at 813 (emphasis added).

25

26

_____

27       [8]  Because the 2003 ABA guidelines became effective prior to the filing of
Blair's state habeas petition, such guidelines direct state habeas counsel's

28   responsibilities in investigating and presenting Blair's habeas petition.

14

1    *Gonzales* permits this Court to consider a stay of the proceedings.  Next,

2    counsel show how Blair — were he able to communicate — would be essential to the

3    meaningful prosecution of certain extra-record and record-based claims.

4    **B.    Blair's Ability to Communicate with Counsel Is Essential to the**

5    **Meaningful Prosecution of His Extra-record Claims.**

6    Counsel require Blair's assistance on the following extra-record claims.  *Gates*

7    cautioned that counsel should not held to an exacting and thorough report of how the

8    petitioner could assist his counsel:

9              We can only speculate what evidence [the petitioner] might

10             offer.  But that doesn't detract from the probability that

11             *some* corroborating evidence within his private knowledge

12             exists.  By forcing [the petitioner] to proceed

13             notwithstanding his incompetence, the trial court would

14             effectively prevent him from ever presenting that evidence

15             to a federal tribunal.

16   *Gates*, at 118 (emphasis in original).  In fact, *Gates* admonished against such a

17   requirement because it amounted to requiring that the petitioner make a showing of

18   "prejudice," which he cannot do while incompetent.  *Id.*

19   **Claim A:  Because Blair was allowed to represent himself throughout the**

20   **pretrial and trial proceedings, his trial was rendered fundamentally unfair in**

21   **violation of the United States Constitution.  (Amended Petition at 83-118.)**

22   As in *Gates*, here, counsel's principal claim is that Blair was incompetent to

23   represent himself at his capital trial.

24   Before the trial court relieved him, Blair's trial counsel Cohen located Blair's

25   records from Atascadero State Hospital, where Blair was sent after he was found not

26   guilty by reason of insanity in 1971.  (Amended Petition at 22-23.)  Then, after

27   Blair's competency was restored, counsel know next-to-nothing about Blair for the

28

15

1    next fourteen years of his life, from his discharge in 1971 until October 2, 1984, when

2    police arrested Blair for the attempted murder of Dorothy Green and Rhoda Miller.

3          Given the nature of the capital offense,[9] and Cohen's declarations of doubt

4    about Blair's competency, it is likely that, were Blair able to assist, he could direct

5    counsel to further evidence about his mental illness for those 14 years.  *See Gates*, at

6    818.  Furthermore, Blair's "testimony about his former state of incompetence, for

7    example, would . . . support [t]his position."

8    **Claim B:  Blair did not form the intent necessary to commit the charged crimes.**

9    **(Amended Petition at 119-21.)**

10         Before the trial court permitted Blair to represent himself during the noncapital

11   case, even Blair admitted that there was no defense to the attempted murder charges

12   except some type of mental state defense.  (01/15/1985 RT 4.)  Yet, during both trials,

13   Blair attempted to establish his innocence and/or to refute the prosecution's case.

14   While a defendant may be entitled to the defense of his choice, during his two trials,

15   Blair regularly defeated his own innocence "defense" by conceding the elements that

16   ultimately assured his conviction and sentence.[10]  Blair's testimony about his mental

17   state at the time of the offense would support this claim.  He could also direct counsel

18   to other, "circumstantial evidence of his [impairment] at the time."  *See Gates*, at 818.

19

20   _____

21         [9]  The Ninth Circuit has compared a crime of passion with a defendant's bizarre
     offense — his participation in the gang rape of his own wife — and suggested that the
22   circumstances or nature of the crime may indicate, or support, the need for a
     competency determination at trial.  *Hernandez v. Yst*, 930 F.2d 714, 718 (9th Cir.
23   1991) (comparing the crime-of-passion offense in *Speedy v. Wyrick*, 748 F.2d 481,
     486 (8th Cir. 1984), with the capital crime in *Drope v. Missouri*, 420 U.S. 162, 95 S.
24   Ct. 896, 43 L. Ed. 2d 103 (1975).)  It appears that besides Blair, only one other
     defendant has been sentenced to death after the jury found true the special
25   circumstance of murder-by-poison.  Cal. Pen. Code § 190.2(a)(19).

26         [10]  For example, although Blair did not want a mental state defense presented,
     he refused stand-by counsel's suggestion that he investigate the causation of the
27   victim's death and whether the bottle of alcohol was adulterated before Blair
     purchased it.
28

                                            16

**Claim C: Because of his incompetency at trial, Blair was permitted to prevent the presentation of any mitigating evidence during the one-day penalty phase except some few pages of education transcripts the prosecution had obtained and presented through its witness (Amended Petition at 122-35.); Claim E:  Stand-by counsel provided ineffective assistance at the guilt and penalty phases (Amended Petition at 139-68).**

In *Gates*, the Ninth Circuit considered the petitioner's claim that his trial counsel provided ineffective assistance for presenting "inadequate mitigating evidence."  The reasons why Ninth Circuit found that Gates could assist his counsel apply here as well:  Blair "is better positioned than anyone to identify aspects of his personal history that should have been, but were not, [presented at the penalty phase]."  *See Gates*, at 118.  Moreover, the prosecution of this claim requires Blair's assistance since he used many aliases (Dkt. 48, p. 6 n.2, p. 24) and he was transient during most of his life (*id*., p. 25).  Without this identifying information, counsel can not access all documents about his life history without knowing what name he used and where he lived.  Blair could direct counsel to this evidence.  *See Gates*, at 818.

**Claim D:  The prosecution suppressed substantial evidence of Blair's mental illness (Amended Petition at 35-39.)**

Blair's state habeas petition raising this issue is pending in the California Supreme Court.  (Ex. C.)  Blair reasserts his request for a stay of the proceedings pending disposition of this claim by the California Supreme Court.

**Claim F:  The trial court denied Blair access to reasonable ancillary defense resources (Amended Petition at 168-98).**

The amended petition describes in detail how, for example, the trial court (*i.e.*, the several judges during the pretrial proceedings) unfairly limited funding to Blair for his defense, denied him access to an investigator until close to trial then left him without one for another eight months; and permitted the prosecution to withhold

1  providing Blair's experts with key evidence.  Blair could assist in prosecuting this

2  claim, were he competent, because he "is better positioned than anyone to identify

3  aspects" of the offense and the necessary investigation that should have been but was

4  not accomplished.  *See Gates*, at 118.

5  **Claim L:  Blair was not mentally competent to assist state counsel and is and has**

6  **been mentally incompetent to assist federal habeas counsel (Amended Petition at**

7  **246-52).**

8       As Nickerson, state habeas counsel argued, he needed Blair's assistance to

9  prosecute this and all other claims alleged in his petition.  Counsel need Blair to

10  ascertain what happened at the time of the homicide.  Counsel for example, have not

11  been able to ascertain the underlying facts of the case against Blair, including how

12  long he lived in the same apartment complex as the victim, how long he had known

13  the victim, or whether he knew her at all.  Similarly, because of Blair's incompetence,

14  counsel cannot ascertain whether Blair formed the specific required mental state to

15  effectuate the capital offense.  Further, counsel need access to records, as well as

16  information on where to search for those records to obtain circumstantial evidence as

17  to Blair's incompetence at trial.  If Blair were competent today, he could provide

18  information to further support this claim.  Counsel need access to records that predate

19  Blair's trial because "the history and course of the mental illness, when it predates the

20  onset of litigation, provides important evidence to overcome the suspicion that the

21  litigation is providing an incentive to malinger."  Internal Journal of Law and

22  Psychiatry 32 (2009) 127-133, at 129.

23       Finally, because as the principal, Blair will bear the risk of counsel negligent

24  conduct, if any, as Blair's agent, counsel have the ethical as well as the professional

25  responsibility to ensure Blair has the capacity required of a principal under agency

26  theory.  *Maples v. Thomas*, 132 S. Ct. 912, 922, 181 L. Ed. 2d 807 (2012) (finding

27

28

1    that under "well-settled principles of agency law, the principal bears the risk of

2    negligent conduct on the part of his agent.)

3         If Blair were competent, he could assist in prosecuting this claim because he "is

4    better positioned than anyone to identify aspects" of his life history, the offense, and

5    the trial that state habeas counsel could have investigated in support of the claims for

6    relief.  *See Gates*, at 118.  For these reasons, as well as the reasons alleged through

7    out this brief, Petitioner's assistance is needed to prosecute this claim.

8    **C.**    **Several Record-based Claims Are Founded on an "'Extreme Malfunction[]**

9            **in the State Criminal Justice System[]'" and Could Substantially Benefit**

10           **from Blair's Assistance.**

11        The trial court violated the Constitution by allowing Blair to represent himself

12   during the capital trial without the necessary safeguards.  Then, the California

13   Supreme Court unreasonably applied Federal law when it affirmed the judgments on

14   appeal and denied state habeas petition, *and* ignored several counsel's declarations

15   that Blair was incompetent during the postconviction proceedings.  Consequently, the

16   bases of several claims resulted from that "extreme malfunction[] in the state criminal

17   justice system[]."  *Gonzales*, at 708; *Cf. Panetti v. Quarterman*, 551 U.S. at 953

18   (discussing where state court's adjudication depended on an antecedent unreasonable

19   application of federal law).  Those claims are as follows.  Counsel describes how

20   these claims could benefit from Blair's assistance, *infra*.

21   **Claim G:  The trial court denied Blair's request to instruct the jury on**

22   **second-degree murder (Amended Petition at 198-202).**

23        While counsel may not need Blair's assistance to further develop this claim,

24   rules of professional conduct, agency theory as well as the ABA Guidelines suggest

25   counsel do need to consult with Blair to ascertain how to move forward in

26   prosecuting this claim.  *See Holmes v. Levenhagen*, 600 F.3d 756, 758 (7th Cir.

27   2010).

28

1        The question whether to plead incompetence at all, or

2      to go for broke, is the most obvious question on which input

3      from the petitioner would be important to the lawyers'

4      decision . . . .

5        [W]hether to plead incompetence . . . or to press for a

6      new trial even at the risk of another conviction and another

7      death sentence, becomes all-important, and it is a question

8      on which input from the petitioner is vital.  It's not really a

9      lawyer's decision at all, though the lawyer can advise on the

10      likelihood that habeas corpus relief will be granted and, if

11      so, that the petitioner will again be sentenced to death and

12      perhaps have then no basis for seeking relief.

13  *Id*. at 758-59.  Thus, counsel may need a competent petitioner in order to ascertain

14  how to proceed in the prosecution of this claim.

15  **Claim H:  The trial court failed to excuse for cause jurors who stated that they**

16  **would always vote for death (Amended Petition at 202-06).**

17      According to Lucas, Blair actually did not have an opportunity to review the

18  questionnaires from the potential jurors since "some days, because Mr. Blair was

19  transported without having received the questionnaires to take with him, he did not

20  have them to review overnight." (Ex. 90,¶ 10.)  Lucas also believed that even if he

21  had them, Blair was not reading them.  (*Id*.)  Only Blair can tell counsel, and this

22  Court, whether he comprehended the voir dire process and whether as Lucas declares,

23  Blair was transported in some days without having received the questionnaires to

24  review them overnight, or whether, as Lucas suspected, Blair did not read the

25  questionnaires.  (*Id*.)  According to Lucas, Blair did not know how to conduct voir

26  dire, so Lucas would try to prompt Blair with follow-up questions after Lucas tried to

27  read the questionnaires overnight.  (*Id*. ¶¶ 7-8.)  Only Blair can tell counsel, and this

28

1 Court, whether he could comprehend the suggestions that Lucas would give him.

2 Thus, Blair's assistance is needed in prosecution this claim.

3 **Claim I:  The trial court admitted the testimony of Emily Maverick at the**

4 **penalty phase (Amended Petition at 206-13).**

5    In the declaration before the CSC, Lucas states:

6         I was trying, but in retrospect I don't think I met, the

7         requirement that I be a "diligent, conscientious advisor,"

8         which is language from a case (*People v. Doane*, 200 Cal.

9         App.3d 852) that I quoted to the court after the guilt phase

10        verdict.  Now, I wish I had raised the mental competency

11        issue more strongly, to the point of asking for an order that

12        Mr. Blair be evacuated before we went any further.  Or, I

13        should have refused to participate unless he agreed to see a

14        psychiatrist.  These were mistakes on my part, given that he

15        had asked me to handle the mitigation argument and I was

16        taking more responsibility for what was presented.  Most of

17        all, I wish that I had confronted him more, and managed to

18        persuade him, of the need to have an attorney represent him

19        at trial.

20        I did not think then, and still do not think now, that

21        the quality of the trial Mr. Blair had was such that he should

22        be executed based on its result.

23 (Ex. 90, ¶¶ 21-22.)

24 **Claim P: Cumulative error from extra-record and the record-based claims**

25 **(Amended Petition at 259-61).**

26    Habeas relief is required when the combined prejudice of multiple

27 constitutional errors "that might not be so prejudicial as to amount to a deprivation of

28

21

1    due process when considered alone . . . cumulatively produce a trial setting that is

2    fundamentally unfair." *Alcala v. Woodford*, 334 F.3d 862, 883 (9th Cir. 2003)

3    (quotation marks omitted).  The errors forming the basis of relief on this due process

4    theory can be solely trial court errors, *see, e.g.*, *Parle v. Runnels*, 505 F.3d 922, 929,

5    932-34 (9th Cir. 2007)), or a combination of trial court errors and errors resulting

6    from the ineffective assistance of counsel.  *See, e.g., Mak v. Blodgett*, 970 F.2d 614,

7    616, 621-22, 625 (9th Cir. 1992).

8        *Chambers v. Mississippi*, 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297

9    (1973), is "the seminal cumulative error case." *Parle*, 505 F.3d at 927 & n.5, 928 &

10    n.8, 934. "The Supreme Court has clearly established that the combined effect of

11    multiple trial court errors violates due process where it renders the resulting criminal

12    trial fundamentally unfair." *Id*. at 927.  "The cumulative effect of multiple errors can

13    violate due process even where no single error rises to the level of a constitutional

14    violation or would independently warrant reversal." *Id*.  "Furthermore, the

15    cumulative nature of the challenged evidence does not necessarily render its inclusion

16    (or exclusion) harmless." *Id*. at 928.

17        No error "'so infect[s] the trial with unfairness as to make the resulting

18    conviction a denial of due process'" (*Parle*, at 927), as requiring a defendant to

19    proceed at trial *in propria persona* while incompetent.  By missing the "modest aim"

20    of requiring a criminal defendant to be competent (*Godinez v. Moran*, 509 U.S. 389,

21    402, 113 S. Ct. 2680, 125 L. Ed. 2d 321 (1993)), the trial court denied Blair his

22    constitutional rights.

23        If Blair were competent, he could assist in prosecuting this cumulative error.

24    He "is better positioned than anyone to identify aspects" of his life history, the

25    offense, and the trial that state habeas counsel could have investigated in support of

26    the claims for relief. *See Gates*, at 118.  For these reasons, as well as the reasons

27

28

22

1  alleged through out this brief, Petitioner's assistance is needed to prosecute this

2  claim.

3  

### III.

4  

### OVERVIEW OF 28 U.S.C. § 2254(d)

5  The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"),

6  codified at 28 U.S.C. § 2241 et seq., prevents relief on claims "adjudicated on the

7  merits" by the state court unless that adjudication

8  (1) resulted in a decision that was contrary to, or involved

9  an unreasonable application of, clearly established Federal

10  law, as determined by the Supreme Court of the United

11  States; or

12  (2) resulted in a decision that was based on an unreasonable

13  determination of the facts in light of the evidence presented

14  in the State court proceeding.

15  28 U.S.C. § 2254(d).  A petitioner overcomes this limitation on relief by satisfying

16  either § 2254(d)(1) or (d)(2).  *Id.*

17  In applying AEDPA analysis, a federal court may look through a summary

18  denial and look at the last reasoned decision regarding a claim "when there is reason

19  to think some other explanation for the state court's decision is more likely."

20  *Harrington v. Richter*, __ U.S. ___, 131 S. Ct. 770, 785,  178 L. Ed. 2d 624 (2011)

21  (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04, 111 S. Ct. 2590, 115 L. Ed. 2d 706

22  (1991); *Johnson v. Williams*, 2013 WL 610199 (U.S. Feb. 20, 2013) (same).  "[T]he

23  phrase '[adjudicated] on the merits' requires that the [state court's] grant or denial rest

24  on substantive, rather than procedural, grounds."  *Lambert v. Blodgett*, 393 F.3d 943,

25  966 (9th Cir. 2004).  When a claim or an element of a claim has not been "adjudicated

26  on the merits" by the state court, a federal court reviews the claim *de novo*.  *Cone v.*

27  *Bell*, 556 U.S. 449, 472, 129 S. Ct. 1769, 1784, 173 L. Ed. 2d 701 (2009); *Rompilla v.*

28

23

1   *Beard*, 545 U.S. 374, 390, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005) (reviewing *de*
2   *novo* the prejudice prong of the two-part ineffective assistance of counsel test because
3   the state court never reached that issue).

4        If a claim has been adjudicated on the merits by a state court, petitioner must
5   overcome the limitation of § 2254(d)(1) on the record that was before that state court
6   when it ruled on the claim.  *See Cullen v. Pinholster*, 563 U.S.__, 131 S. Ct. 1388,
7   1400, 179 L. Ed. 2d 557 (2011).  The state-court record "includes both the
8   'allegations of [the] habeas corpus petition . . . and . . . 'any matter of record
9   pertaining to the case.'"  *Id.* at 1403 n.12 (citing *In re Hochberg*, 2 Cal. 3d 870, 874
10  n.2, 471 P.2d 1, 3-4 n.2, 87 Cal. Rptr. 681 (1970)); *see also Ybarra v. McDaniel*, 656
11  F.3d 984, 994 n.4 (9th Cir. 2011) (considering evidence presented in post-conviction
12  as part of the relevant state-court record).

13  **A.   28 U.S.C. § 2254(d)(1)**

14       **1.   Clearly Established Federal Law**

15       The requirement of "clearly established federal law" refers to "the governing
16  legal principle or principles set forth by the Supreme Court at the time the state court
17  renders its decision."  *Lockyer v. Andrade*, 538 U.S. 63, 71-72, 123 S. Ct. 1166, 155
18  L. Ed. 2d 144 (2003).  Circuit-court decisions are persuasive authority in determining
19  what law is clearly established.  *Duhaime v. Ducharme*, 200 F.3d 597, 600 (9th Cir.
20  2000).

21       "That [a legal] standard is stated in general terms does not mean the application
22  was reasonable.  AEDPA does not require state and federal courts to wait for some
23  nearly identical factual pattern before a legal rule must be applied." *Panetti v.*
24  *Quarterman*, 551 U.S. 930, 953, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007) (internal
25  quotations omitted); *Taylor v. Withrow*, 288 F.3d 846, 852 (6th Cir. 2002) ("The
26  [Supreme] Court has made clear that its relevant precedents include not only
27  bright-line rules but also the legal principles and standards flowing from precedent.");
28

1   *see also Bradley v. Duncan*, 315 F.3d 1091, 1101 (9th Cir. 2002) (petitioner "need

2   not produce a 'spotted calf' on the precise issue . . . to warrant habeas relief").

3        Where, as with all of the claims now in the amended petition, the state court

4   "reaches a decision on the merits but provides no reasoning to support its conclusion,

5   this Court must "independently review the record."  *Stanley v. Cullen*, 633 F.3d 852,

6   860 (9th Cir. 2011) (citing *Pirtle v.Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002)).

7   "In such instances 'the habeas petitioner's burden still must be met by showing there

8   was no reasonable basis for the state court to deny relief.'"  *Stanley*, 633 F.3d at 860

9   (citing *Harrington v. Richter*, 131 S. Ct. at 777.

10        **2.      Two Ways to Overcome Section (d)(1)**

11        "Section 2254(d)(1) defines two categories of cases in which a state prisoner

12   may obtain federal habeas relief with respect to a claim adjudicated on the merits in

13   state court."  *Williams* (*Terry*) *v. Taylor*, 529 U.S. 362, 404, 120 S. Ct. 1495, 146 L.

14   Ed. 2d 389 (2000).  The first category challenges decisions as being  "contrary to"

15   clearly established federal law; the second challenges a decision as being an

16   unreasonable application of such law.  *Id*. at 404-05.

17        A state-court decision is contrary to clearly established federal law if it applies

18   a legal rule that contradicts a prior Supreme Court holding or if it reaches a different

19   result from a Supreme Court case presenting indistinguishable facts.  *Williams*, 529

20   U.S. at 404-05.  "The addition, deletion, or alteration of a factor in a test established

21   by the Supreme Court also constitutes a failure to apply controlling Supreme Court

22   law under the 'contrary to' clause of AEDPA."  *Benn v. Lambert*, 283 F.3d 1040,

23   1051 n.5 (9th Cir. 2002) (citing *Williams*, 529 U.S. at 405-06).  Thus, when a state

24   court mischaracterizes clearly established federal law, its decision is "contrary to"

25   clearly established federal law under § 2254(d)(1).  *Williams*, 529 U.S. at 397.

26        A state-court decision involves an unreasonable application of clearly

27   established federal law if it identifies the correct legal principle but applies it to the

28

25

1    particular facts before it in an unreasonable manner.  *Williams*, 529 U.S. at 407.  A

2    state-court decision is also an unreasonable application if it unreasonably extends a

3    legal principle to a new context or unreasonably refuses to extend one to a context

4    where it should apply.  *Williams*, 529 U.S. at 407.  For example, when a state court

5    fails to consider a foundational principle in a Supreme Court opinion, the resulting

6    decision can be an unreasonable application under section 2254(d)(1).  *See Wiggins v.*

7    *Smith*, 539 U.S. 510, 527-28, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003) (finding an

8    unreasonable application of *Strickland* when the state court failed to follow the

9    principle announced in that case that the reasonableness of strategic choices by

10   counsel is limited by the reasonableness of curtailing the underlying investigation that

11   led to such choices); *Panetti*, 551 U.S. at 948 (holding the state court's failure to

12   provide constitutionally required procedures in a competence proceeding, even where

13   "the precise limits that due process imposes" had not been previously defined, was an

14   unreasonable application).

15        State-court decisions can also be unreasonable if, in reaching its decision, the

16   court erred in analyzing the facts.  For instance, failing to give appropriate

17   consideration and weight to the entirety of available evidence renders a decision

18   objectively unreasonable.  *Williams*, 529 U.S. at 397-98 (holding the state-court

19   decision unreasonable because it "failed to accord appropriate weight to the body of

20   evidence" supporting the claim); *Wiggins*, 539 U.S. at 527-28 (finding unreasonable

21   state-court's assumption that investigation was adequate where evidence showed the

22   contrary).

23   **B.    28 U.S.C. § 2254(d)(2)**

24        The "unreasonable determination" clause of § 2254(d)(2) relates to the state

25   court's factual findings.  *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004).

26   Satisfaction of (d)(2) can be premised on numerous theories, including that (1) the

27   state's factual finding is not supported by sufficient evidence; (2) no factual finding

28

26

1  was made by the state court at all; or (3) the state-court process is defective.  *Taylor*,

2  366 F.3d at 999 (citing *Weaver v. Thompson*, 197 F.3d 359, 363 (9th Cir. 1999); *cf.*

3  *Wiggins*, 539 U.S. at 528-30.

4      "[T]he simplest [means of satisfying (d)(2)] is the situation where the state

5  court should have made a finding of fact but neglected to do so."  *Taylor*, 366 F.3d at

6  1000.  In such a case, "the state-court factual determination is perforce unreasonable .

7  . . ."  *Id.* (citing *Wiggins*, 539 U.S. at 528-30; *Nunes v. Mueller*, 350 F.3d 1045, 1055)

8  (9th Cir. 2003); *Killian v. Poole*, 282 F.3d 1204, 1208 (9th Cir. 2002); *Weaver*, 197

9  F.3d at 363).  Conversely, if "a state court makes evidentiary findings without holding

10  a hearing and giving petitioner an opportunity to present evidence, such findings

11  clearly result in an 'unreasonable determination' of the facts."  *Taylor*, 366 F.3d at

12  1001; *see Hurles v. Ryan*, 706 F.3d 1021, 1338 (9th Cir. 2013)[11] (holding that state-

13  court factual determinations were unreasonable in the absence of a hearing); *Nunes*,

14  350 F.3d at 1054-55 (finding it unreasonable for state court to find petitioner had not

15  pled a prima facie case when there was evidence in the record to support the

16  allegations and the state court held no evidentiary hearing).

17      A state-court factual finding is unreasonable if "the state court does make

18  factual findings, but does so under a misapprehension as to the correct legal

19  standard."  *Taylor*, 366 F.3d at 1001 (citing *Caliendo v. Warden*, 365 F.3d 691, 698

20  (9th Cir. 2004); *Fernandez v. Roe*, 286 F.3d 1073, 1077 (9th Cir. 2002); *Wade v.

21  Terhune*, 202 F.3d 1190, 1197 (9th Cir. 2000)).  A petitioner also satisfies (d)(2) by

22  showing that the state court "plainly misapprehend[ed] or mistate[d] the record in

23  making their findings, and the misapprehension goes to a material factual issue that is

24  central to petitioner's claim . . . ."  *Taylor*, 366 F.3d at 1001 (citing *Wiggins*, 539 U.S.

25

26      [11]  The Ninth Circuit has stayed its ruling on the Warden's petition for rehearing *en banc* and
27  Hurles' motion for remand pursuant to *Martinez v. Ryan*, pending disposition of *Detrich v. Ryan*,
No. 08-99001 (9th Cir.), which appears to be considering Detrich's motion for partial remand in
28  light of *Martinez*.

27

1   at 526-29; *Hall v. Dir. of Corr.*, 343 F.3d 976, 983 (9th Cir. 2003)).  "And, as the

2   Supreme Court noted in *Miller-El v. Cockrell*, [537 U.S. 322, 346, 123 S. Ct. 1029,

3   154 L. Ed. 2d 931 (2003)], the state-court fact-finding process is undermined where

4   the state court has before it, yet apparently ignores, evidence that supports petitioner's

5   claim." *Taylor*, 366 F.3d at 1001.

6       Finally, a state-court decision can also satisfy (d)(2) when it is based upon an

7   inadequate record.  *Milke v. Ryan*, __F.3d__, 2013 WL 979127 (9th Cir. Mar. 14,

8   2013).  When the record is incomplete not because of "anything petitioner did or

9   failed to do," the defects in the process satisfy (d)(2).  *Id.* at *8.

10  **C.    The Claims Alleged in the Amended Petition Will Survive as a Matter of**

11  **Law Under the *Richter/Pinholster* Rubric.**

12      Because of Blair's incompetence, and because the CSC's denial of Blair's 2005

13  motion for a competency determination prevented Blair from developing the record

14  below, the claims alleged in the Amended Petition survive the *Richter/Pinholster*

15  rubric.  *Winston v. Pearson*, 683 F.3d 489, 502 (4th Cir. 2012) (*Winston II*) (state

16  court's refusal to allow petitioner to develop record, combined with material nature of

17  evidence to be produced, rendered decision "unbefitting of classification as an

18  adjudication on the merits"), Warden's *petition for certiorari denied*, No. 12-492

19  (2013).  *See also, e.g.*, *Hurles*, 706 F.3d at 1021 (finding that the state court

20  fact-finding process was fundamentally flawed when it makes factual determinations

21  or credibility findings without granting the petitioner an evidentiary hearing or other

22  opportunity to develop his claim); *Milke v. Ryan*, 2013 WL 979127, *8  (finding that

23  when the record is incomplete not because of "anything petitioner did or failed to do,"

24  the defects in the process satisfy (d)(2)); *David Williams v. Woodford*, 859 F. Supp.

25

26

27

28

28

1    2d 1154, 1161 (E.D. Cal. 2012)[12] (Kozinski, Chief Circuit Judge, sitting by

2    assignment) ("*Pinholster* isn't relevant where, as here, Petitioner surmounts section

3    2254(d) because he was not allowed to develop the record in state court"). *Hurles*,

4    *Milke*, and *Williams* were decided after *Pinholster*, and all three affirmed that

5    *Pinholster* left intact the long-standing Ninth Circuit precedent that where, as here, "a

6    state court makes factual findings without an evidentiary hearing or other opportunity

7    for the Petitioner to present evidence, 'the fact-finding process itself is deficient' and

8    not entitled to [§ 2254(d)(2)] deference." *Hurles*, 706 F.3d at 1038 (citing and

9    quoting *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004)).  Thus, because Blair

10   was incompetent during the state proceedings challenging his state conviction and

11   sentence of death, and because the state denied Blair the ability to develop a

12   constitutionally adequate record,  28 U.S.C. § 2254 (d) does not bar relief on the

13   claims alleged in the  Amended Petition.

14          Further, Blair's claims pertaining to competency on habeas in this Court, and

15   earlier during direct appeal and state habeas, include reliance upon the constitutional

16   guarantees of (1) the effective assistance of counsel, (2) due process, (3) heightened

17   capital case due process and (4) equal protection during State and federal habeas

18   proceedings.  In support of these claims, Blair relies on the Fifth, Sixth, Eighth and

19   Fourteenth Amendments to the Untied States Constitution.

20          Because a mentally incompetent condemned habeas petitioner may not be able

21   to assist counsel in investigating and presenting claims for federal habeas relief, such

22   mental incapacity may lead to a passive waiver of habeas claims.  This is the

23   functional equivalent of the active waiver attempted by the petitioner in *Rees*, at

24   313 when Melvin Rees directed his counsel to withdraw his petition for writ of

25   certiorari.

26

27          [12]  On April 11, 2012, the State of California informed the district court that it intends to

28   retry Williams.  (Dkt. 46 in *Williams v. Woodford*, No. CV 05-00980 (E.D. Cal.).)

                                              29

1    Modern habeas corpus precedent generally holds that claim alleged in a second
2  in time federal petition may be subject to procedural bar if not presented in the initial
3  federal petition.  *See generally McCleskey v. Zant*, 499 U.S. 467, 111 S. Ct. 1454, 113
4  L. Ed. 2d 517 (1991).  However, a mentally incompetent petitioner may be unable to
5  communicate rationally factual information that if investigated, might lead to claims
6  which might be pled and included in an initial habeas petition.  That lack of
7  communication would result in a passive waiver due to the incompetent petitioner's
8  particular mental illness symptoms, as compared with the attempted active waiver by
9  Melvin Rees, whose mental illness manifested in directing his counsel to withdraw
10  his certiorari petition.  The result is the same – habeas claims are waived due to
11  mental illness and mental incompetency.

12    The Supreme Court's recent decision in *Ryan v. Gonzales*, __ U.S. __, 133 S.
13  Ct. 696 (2013) does not address Blair's situation because neither of the inmates there
14  raised competency in federal court until after their federal petitions had been filed.
15  *See Gonzales*, 133 S. Ct. at 700, 701.  By contrast, here, Blair's competency was
16  questioned at the state level:  Blair was adjudicated not guilty by reason of insanity in
17  another state court case on February 22, 1971; Blair's competency to stand trial was
18  also questioned on January 15, 1985 by Dennis Cohen, the public defender who was
19  first appointed to represent Blair in the attempted murder case that ultimately led to
20  Blair's capital trial, *People v. Blair*, Case No. A757679, 136; Blair's incompetency
21  was alleged both during direct appeal and in state habeas proceedings, as well as in
22  his federal petition and in competency litigation in Case No. CV 99-06859-VAP-OP.
23  As noted below, Blair's assistance is needed in prosecuting each and every claim or
24  sub-claim identified below.  However, the number of claims not identified or pled at
25  all due to Blair's mental incompetency remain unknown.

26    Petitioner's arguments are not limited to Claim L's assertion regarding his
27  current competency to proceed before this Court, but extend to all other claims
28

30

1   presented in the Amended Petition.  These claims encompass whether Blair was
2   competent to assist counsel during the first round of state review, including both
3   direct appeal and state habeas, of his capital conviction and death sentence, and the
4   state court's failures to allow Blair to develop the facts concerning the constitutional
5   guarantees violated at trial.  The Los Angeles County Superior Court, California
6   Court of Appeal and the CSC each refused to initiate competency proceedings, or to
7   stay the proceedings, and refused to authorize state counsel to investigate all related
8   matters, or to appoint qualified mental health experts to examine Blair and determine
9   his then-current competency, his competency at trial, and sanity at the time of the
10  crimes alleged.  Additionally, these courts failed to determine whether Blair was
11  mentally incompetent at the time of the state habeas, failed to order psychiatric
12  treatment, and failed to stay proceedings pending restoration of competency.  *See In*
13  *re Blair*, S144759, Informal Reply in Support of Petition For Writ of Habeas Corpus,
14  at 66-67.  Notably, state habeas counsel Nickerson specifically stated in his Motion to
15  Determine Appellant's Competency filed in the CSC by state counsel on August 2,
16  2005, that he believed Blair to then be mentally incompetent, described the reasons
17  why he so believed, believed that it was necessary to suspend those proceedings
18  pending a competency determination, and that he believed there were other factual
19  matters requiring investigation which could not be developed due to Blair's inability
20  to rationally assist, and the state court system's denial of funds. (*People v. James*
21  *Nelson Blair*, Case No. S011636, Appellant's Motion To Determine Competency.).
22       Recently, in *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), the United States
23  Supreme Court held that "[i]nadequate assistance of counsel at initial-review
24  collateral proceedings may establish cause for a prisoner's procedural default of a
25  claim of ineffective assistance at trial." 132 S. Ct. at 1315.  The importance of this
26  holding to the right to effective counsel in state habeas proceedings was not lost on
27  Justice Scalia, who (joined by Justice Thomas) complained that the majority's
28

31

1  opinion was "precisely the same" as taking the "radical step" of creating a Sixth
2  Amendment right to the effective assistance of counsel during an initial state habeas
3  proceeding, *id*., at 1321, and that such holding could not be limited to failures
4  involving ineffective assistance at trial.  *Id*., at 1322.

5          Thus, *Martinez* necessarily bolsters each of the claims here discussed regarding
6  Blair's mental incompetency during the state habeas proceedings.  If Blair had the
7  right to effective assistance of state habeas counsel, however characterized, then Blair
8  necessarily had a right to be competent during those proceedings and provide rational
9  information to that counsel for investigation, claim development and presentation,
10 which right was necessarily violated.  If a state habeas petitioner was incompetent
11 during the pendency of state habeas proceedings, especially where, as here, habeas
12 counsel raises claims that the petitioner may have had a potential mental state defense
13 at trial and/or that he was not guilty by reason of insanity, the petitioner's
14 incompetency precludes full, fair and reliable state court development of claims and
15 the record.  As stated in *Gonzales*' terms, subsequent federal counsel will not receive
16 a record which would allow "back-ward looking" review because the state
17 petitioner's mental incompetency prevented development of that record.  This is
18 especially true when, as argued above, the CSC was on notice that the record both on
19 direct appeal and during state habeas proceedings was not complete due to Blair's
20 inability to assist counsel.  Although the information was before the CSC, the state
21 court chose to ignore it in adjudicating Blair's direct appeal.  (*See* August 18, 2005
22 CSC Order extending finality of the Opinion until September 23, 2005.)  The only
23 avenue to obtain the rights afforded in *Martinez* is by restoration of competency, so
24 that the Blair may assist in identifying facts supporting existing claims or identifying
25 new claims in support of his federal petition.

26

27

28

## IV.

## THE STATE COURT'S FAILURE TO ISSUE AN ORDER TO SHOW CAUSE RESULTED IN AN UNREASONABLE PROCESS THAT IS NOT ENTITLED TO DEFERENCE

### A.   Introduction

California law provides special procedures geared toward the efficient resolution of capital habeas corpus claims.  Thus, while this Court's review under § 2254(d) focuses on "what the state court knew and did," *Cullen v. Pinholster*, 563 U.S. __ ,131 S. Ct. 1388, 1392, 179 L. Ed. 2d 557 (2011), this Court must examine not only the state-court record, but also the unique set of state laws that govern the state's habeas process.  *See, e.g.*, *Nunes v. Mueller*, 350 F.3d 1045, 1054 (9th Cir. 2003).  As demonstrated below, Blair satisfies 28 U.S.C. § 2254(d) because the state-court process and analysis of his claims were unreasonable in light of California's special procedures for resolving habeas petitions.

### B.   California's Post-Conviction Procedures

In California, "a habeas corpus proceeding begins with the filing of a verified petition for a writ of habeas corpus."  *People v. Romero*, 8 Cal. 4th 728, 737, 883 P.2d 388, 35 Cal. Rptr. 2d 270 (1994).  Under California law, the petition serves a "limited function."  *In re Lawler*, 23 Cal. 3d 190, 194, 588 P.2d 1257, 151 Cal. Rptr. 833 (1979).  Its purpose is to "allege unlawful restraint, name the person by whom the petitioner is so restrained, and specify the facts on which he bases his claim that the restraint is unlawful."  *Id.*  At this stage, the single question for the court is "whether, assuming the petition's factual allegations are true, the petitioner would be entitled to relief."  *People v. Duvall*, 9 Cal. 4th 464, 474-75, 886 P.2d 1252, 37 Cal. Rptr. 2d 259 (1995); *see also In re Clark*, 5 Cal. 4th 750, 769 n.8, 855 P.2d 729, 21 Cal. Rptr. 2d 509 (1993); *Pinholster*, 131 S. Ct. at 1403 (citing *Duvall*).

33

1    For assistance in determining the petition's sufficiency, the state court may

2    request an informal response. *Romero*, 8 Cal. 4th at 737. The informal response "is

3    not a pleading, does not frame or join issues, and does not establish a 'cause' in which

4    a court may grant relief." *Id.* at 741. Rather, it serves a screening function, similar to

5    that of a demurrer or a complaint, by which the respondent "may demonstrate, by

6    citation of legal authority and by submission of factual materials, that the claims

7    asserted in the habeas corpus petition lack merit and that the court therefore may

8    reject them summarily, without requiring formal pleadings (the return and traverse) or

9    conducting an evidentiary hearing." *Id.* at 742. When an informal response is filed,

10   the petitioner is entitled to file an informal reply and allege additional factual

11   allegations and evidence in support of the claims raised in the petition. *See, e.g.*, *In re

12   Ibarra*, 34 Cal. 3d 277, 283 n.2, 666 P.2d 980, 193 Cal. Rptr. 538 (1983). "If the

13   petitioner successfully controverts the factual materials submitted with the informal

14   response, or if for any other reason the informal response does not persuade the court

15   that the petition's claims are lacking in merit, then the court must proceed to the next

16   stage by issuing an order to show cause . . . ." *Romero*, 8 Cal. 4th at 742.

17   When determining whether an order to show cause ("OSC") is warranted, the

18   CSC is *required* to assume the truth of the petitioner's allegations to assess whether a

19   petition states a prima facie cause for relief, and those allegations become the state-

20   court factual record in cases of summary denial.[13] *Pinholster*, 131 S. Ct. at 1402 n.12

21   (and cases cited therein); *see also In re Bower*, 38 Cal. 3d 865, 872, 215 700 P.2d

22

---

23   [13] The state court "'does not accept wholly conclusory allegations.'"
     *Pinholster*, 131 S. Ct. at 1403 n.12 (citing *Duvall*, 9 Cal. 4th at 474). "[W]holly
24   conclusory allegations" are those instances where the petitioner either failed to
     provide "any explanation of the basis for the allegations," or failed to state "fully and
25   with particularity the facts on which relief is sought." *Duvall*, 9 Cal. 4th at 474.
     There is no indication that the CSC used such reasoning in Blair's case. *Gaston v.
26   Palmer*, 417 F.3d 1030 (9th Cir. 2005) (noting that citations in state-habeas denials to
     *In re Swain*, 34 Cal. 2d 300 (1949) and *Duvall*, 9 Cal. 4th 464 indicate a failure to
27   state a claim with sufficient particularity). Moreover, any such denial is not a
     decision on the merits. *Kim v. Villalobos*, 799 F.2d 1317, 1319 (9th Cir. 1986).
28

1    1269, 215 Cal. Rptr. 267 (1985).  Thus, the court may not make credibility

2    determinations adverse to the petitioner unless "the court's own records contradict the

3    undisputed facts alleged in the petition."  *In re Serrano*, 10 Cal. 4th 447, 456, 895

4    P.2d 936, 41 Cal. Rptr. 2d 695 (1995).  The CSC must also set aside the possibility of

5    contradictions or impeachment and draw all legitimate inferences in favor of a prima

6    facie case.  *See, e.g.*, *Quinn v. City of Los Angeles*, 84 Cal. App. 4th 472, 479-80, 100

7    Cal. Rptr. 2d 914 (2000).

8         California law gives the phrase "prima facie" its usual legal meaning – i.e., a

9    claim is reviewed only to determine whether it is "sufficient on its face."  *Romero*, 8

10   Cal. 4th at 737; *compare* Black's Law Dictionary (Ninth ed.) (prima facie means "[a]t

11   first sight; on the first appearance; on its face but subject to further evidence or

12   information".  "If no prima facie case for relief is stated, the court will summarily

13   deny the petition.  If, however, the court finds the factual allegations, taken as true,

14   establish a prima facie case for relief, the court will issue an OSC."  *Duvall*, 9 Cal. 4th

15   at 475.

16        Only upon the issuance of an OSC is a true "cause" created, *Serrano*, 10 Cal.

17   4th at 455, transforming the habeas process in ways that are critical to full, fair,

18   reliable, and accurate fact-development.  It not only "afford[s] the petitioner an

19   opportunity to present evidence in support of the allegations . . . [but also] institute[s]

20   a *proceeding* in which issues of fact are to be framed and *decided*."  *In re Hochberg*,

21   2 Cal. 3d 870, 876 n.4, 471 P.2d 1, 87 Cal. Rptr. 681 (1970) (emphasis in original).  It

22   creates a cause of action which, under Article VI, Section 14 of the California

23   Constitution, requires a written, reasoned resolution.  *Romero*, 8 Cal. 4th at 740.

24        The OSC also triggers the rights, broad powers, and duties set forth in

25   California Penal Code sections 1480-84.  For example, the OSC authorizes the court

26   "to do and perform all other acts and things necessary to a full and fair hearing and

27   determination of the case."  Cal. Penal Code § 1484.  Additionally, upon issuance of

28

35

1   an OSC the state must file a return that meets enumerated statutory and decisional

2   requirements, Cal. Penal Code § 1480; *Duvall*, 9 Cal. 4th at 475-76, 479-80, and the

3   petitioner is permitted to file a traverse, *Duvall*, 9 Cal. 4th at 476-77.  The disputed

4   factual and legal issues are then joined for resolution by the return and traverse.  *In re*

5   *Lewallen*, 23 Cal. 3d 274, 277-78, 590 P.2d 383, 152 Cal. Rptr. 528 (1979).

6   Thereafter, "if the return and traverse reveal that petitioner's entitlement to relief

7   hinges on the resolution of factual disputes, then the court should order an evidentiary

8   hearing."  *Romero*, 8 Cal. 4th at 739-40; *see also Serrano*, 10 Cal. 4th at 456.

9        While the issuance of an OSC is a vital step in the habeas process, it still has

10   significant limitations.  The CSC has repeatedly stressed that OSCs reflect only a

11   "*preliminary assessment* that the petitioner would [or would not] be entitled to relief

12   if his factual allegations are proved."  *Duvall*, 9 Cal. 4th at 475 (emphasis in original).

13   The determination of facial sufficiency that leads to an OSC, "it must be emphasized,

14   is truly 'preliminary':  it is only initial and tentative, and not final and binding."  *In re*

15   *Sassounian*, 9 Cal. 4th 535, 547, 887 P.2d 527, 37 Cal. Rptr. 2d 446 (1995).  It "is not

16   equivalent to a final appellate court decision of questions of law in favor of petitioner

17   under the doctrine of law of the case."  *Hochberg*, 2 Cal. 3d at 876 n.4, *disapproved*

18   *on other grounds by In re Fields*, 51 Cal. 3d 1063, 1070 n.3, 800 P.2d 862, 275 Cal.

19   Rptr. 384 (1990).  Rather, once a petitioner meets his "heavy burden initially to *plead*

20   sufficient grounds for relief," he must still meet his equally heavy burden "later to

21   *prove* them."  *Duvall*, 9 Cal. 4th at 474 (emphasis in original).

22        In contrast, a summary denial is a final determination that the petitioner has not

23   alleged a prima facie case for relief, thereby ending the proceedings to that claim, or

24   even an entire petition.  *Romero*, 8 Cal. 4th at 737; *see also Sassounian*, 9 Cal. 4th at

25   547.  There are no procedures through which a petitioner can change this

26   determination and it is procedurally final.  *See* Cal. R. Ct., Rules 8.387(b)(2)(A) and

27

28

36

1  8.532(b)(2)(C).  No petition for rehearing is permitted.  *See* Cal. R. Ct., Rules
2  8.268(a)(1), 8.532(b), 8.536(a).

3  **C.    To the Extent That the Required Application of State-Law Presumptions**
4  **Trumped the State Court's Merits Review of Blair's Federal Claims, 28**
5  **U.S.C. § 2254(d) Does Not Apply**

6  Section 2254(d) applies only to claims that were adjudicated on the merits
7  under the applicable *federal* law.  *Pinholster*, 131 S. Ct. at 1399-1400 (distinguishing
8  case where federal claims were procedurally defaulted such that § 2254(d) did not
9  apply); *see also Harrington v. Richter*, 131 S. Ct. 770, 784, 178 L. Ed. 2d 624 (2011).
10 As the Supreme Court recently restated,

11          When a federal claim has been presented to a state court and
12          the state court has denied relief, it may be presumed that the
13          state court adjudicated the claim on the merits in the
14          absence of any indication or state-law procedural principles
15          to the contrary.  *Cf. Harris v. Reed,* 489 U.S. 255, 265, [109
16          S. Ct. 1038, 103 L. Ed. 2d 308] (1989) (presumption of a
17          merits determination when it is unclear whether a decision
18          appearing to rest on federal grounds was decided on another
19          basis).  [¶]  The presumption may be overcome when there
20          is reason to think some other explanation for the state
21          court's decision is more likely.  *See, e.g.*, *Ylst v.*
22          *Nunnemaker*, 501 U.S. 797, 803, [111 S. Ct. 2590, 115 L.
23          Ed. 2d 706] (1991).

24 *Richter*, 131 S. Ct. at 784-86.  In Blair's case, there is "reason to think some other
25 explanation for the state court's decision"—i.e., the application of state-law
26 presumptions apart from, or in addition to, federal law—is a more likely explanation
27 for its summary denial.  Thus, § 2254(d) does not apply.

28

37

California law expressly states that when a state court reviews a habeas claim for facial sufficiency (i.e., whether a prima facie claim has been stated), it must also determine whether the claim overcomes state law "presumptions [that] favor the truth, accuracy, and fairness of the conviction and sentence." *Duvall*, 9 Cal. 4th at 474 ("We presume the regularity of proceedings that resulted in a final judgment, and . . . the burden is on the petitioner to establish grounds for his release") (internal citation omitted); *see also Clark*, 5 Cal. 4th at 764 (discussing the "extraordinary nature of habeas corpus relief from a judgment which, *for this purpose, is presumed valid*") (emphasis added). That is, a prima facie case is one in which the petitioner's pleading is sufficient on its face to overcome these presumptions. When a petition is denied without an OSC, it signifies that the petitioner "failed to carry his burden of allegation" with respect to these presumptions. *Sassounian*, 9 Cal. 4th at 547. Yet in addition to the *Duvall* presumptions regarding the "truth, accuracy, and fairness of the conviction and sentence," the court must also presume the truth of petitioner's habeas claims, *Pinholster*, 131 S. Ct. at 1402 n.12—claims which almost always rely upon federal law to attack the "truth, accuracy, and fairness," *Duvall*, 9 Cal. 4th at 474, of the underlying proceedings. Thus, a summary denial in California amounts to both a procedural ruling and a ruling on the merits: it means that (1) the state court applied substantive law and concluded that the allegations were insufficient on their face to deserve (2) the procedural mechanisms, which are available only through an OSC, to prove his claims.

Where a petitioner, like Blair, has pleaded facially sufficient claims that are presumed to be true, are supported by documentary evidence, and are unrefuted by the record, an OSC should issue. The fact that no OSC was granted in this case suggests that the CSC construed allegations against Blair[14]—in other words, the CSC

---

[14] The CSC could have improperly construed allegations against Blair in a number of ways, including giving his allegations less weight than those of the state, viewing the facts in the light more favorable to the state, considering inferences to be

1  presumed the regularity of the proceedings over the truthfulness of his allegations,

2  thereby holding him to a higher standard than is required for the establishment of a

3  prima facie claim under federal law.  California's application of the presumption of

4  regularity therefore imposes a burden on habeas petitioners that does not exist under

5  federal law, where review for facial sufficiency breaks a federal claim down into its

6  substantive parts and then views the facts in the light most favorable to the party that

7  ultimately carries the burden of proof.  *See, e.g.*, 28 U.S.C. § 2255(b); *Machibroda v.*

8  *United States*, 368 U.S. 487, 495-96, 82 S. Ct. 510, 7 L. Ed. 2d 473 (1962); *Hovey v.*

9  *Ayers*, 458 F.3d 892, 920 (9th Cir. 2006) ("On summary judgment, we must draw all

10 reasonable inferences in favor of Hovey.").  To the extent that the state presumption

11 of the regularity of the proceedings interferes with the establishment of a prima facie

12 federal claim, such presumption runs afoul of long-standing, clearly established

13 federal law.  *See, e.g.*, *Davis v. Wechsler*, 263 U.S. 22, 24, 44 S. Ct. 13, 68 L. Ed. 143

14 (1923) (forbidding states from imposing pleading requirements that burden a

15 petitioner's ability to obtain a full and fair adjudication of federal claims in state

16 courts beyond the standards of federal law).

17      The application of this presumption is complicated by the curious distinction

18 that the California procedures make between OSC grants and summary denials.  As

19 noted in Part VI, both outcomes result from the same perfunctory process, in which

20 the only question for the court is "whether, assuming the petition's factual allegations

21 are true, the petitioner would be entitled to relief."  *Duvall*, 9 Cal. 4th at 474-75;

22 *Pinholster*, 131 S. Ct. at 1403 (citing *Duvall*).  Thus, OSC denials should be given no

23 more weight by the federal courts than the state courts give OSC grants.  Yet

24 California's procedures create a striking imbalance: though all petitions receive the

25 same limited review for facial sufficiency, the CSC views a finding of sufficiency as

26

27

28

conclusory allegations, or declining to draw inferences favorable to the petitioner.
*See* further discussion *infra* at Part VI.

39

1    tentative and non-binding, while a finding of insufficiency strengthens the underlying

2    conviction and sentence and is unreviewable and binding.  *See* Cal. R. Ct., Rule

3    8.532(b)(2)(C); *see also Sassounian*, 9 Cal. 4th at 547; *Pinholster*, 131 S. Ct.  at

4    1402, 1403 n.12 (viewing CSC summary denial as the equivalent of an adjudication

5    on the merits that in conjunction with the habeas pleadings establish the state-court

6    record).  This illogical distinction between the weight accorded OSC grants versus

7    summary denials also implies that the CSC favors the *Duvall* presumptions and

8    improperly construes allegations against petitioners.

9          In Blair's case, absent some evidence to the contrary, this Court is required to

10   assume that the CSC applied the *Duvall* presumptions to his habeas claims.  *See*

11   *Mullaney v. Wilbur*, 421 U.S. 684, 691, 95 S. Ct. 1881, 44 L. Ed. 2d 508 (1975)

12   (holding that absent evidence of arbitrary or discriminatory action, federal habeas

13   courts are bound by state supreme-court decisions on state law); *see also Black v.*

14   *Romano*, 471 U.S. 606, 615, 105 S. Ct. 2254, 85 L. Ed. 2d 636 (1985) (federal courts

15   must presume state-court judges follow state procedural rules in reaching their

16   decisions).  As established in Part VI, *infra*, Blair pleaded facially sufficient federal

17   claims.  Under the Supreme Court's rationale in *Richter*, in order to find that §

18   2254(d) does not apply, federal courts must find only that it is more likely than not

19   that the application of the *Duvall* presumptions—in other words, the application of

20   *state-law* pleading requirements—explains the state court's decision.  There is no

21   reason to believe that the state court did not apply these presumptions in this case.

22   Indeed, the fact that Blair presented sufficient allegations to make a prima facie case

23   and the CSC summarily found that he did not suggests that application of the *Duvall*

24   presumptions, rather than analysis of Blair's claims under the applicable federal law,

25   was determinative.  To the extent the state court did not base its decision denying

26   habeas relief on a merits determination, § 2254(d) does not apply to the state-court

27   decisions below, and this Court may review Blair's claims *de novo*.

28

**D.    The State Court's Failure to Issue an Order to Show Cause When the Petitioner Establishes a Prima Facie Case for Relief Renders the State-Court Decision Objectively Unreasonable**

As the Ninth Circuit made clear in *Nunes v. Mueller*, when a California appellate court fails to issue an OSC despite being presented with allegations that state a prima facie case for relief, that decision constitutes an unreasonable interpretation and application of clearly established federal law under § 2254(d)(1). *Nunes*, 350 F.3d at 1054-55.  In that case, the petitioner asserted that trial counsel provided ineffective assistance because he failed to fully inform the petitioner about the actual terms of a plea offer made by the prosecution.  *Id.* at 1050.  The California Court of Appeal held that the petitioner failed to make out a prima facie case for prejudice because he did not show that but for counsel's deficient performance he would have accepted the plea bargain.  *Id.*  The Ninth Circuit found this decision objectively unreasonable.

The Ninth Circuit began its analysis of the state court's decision by observing that:

> Under the AEDPA standard of review, it is entirely appropriate—even necessary—that federal courts ask whether the state court applied correct legal principles (in this case, the *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)] analysis) in an objectively unreasonable way ([*Williams* (*Terry*) *v. Taylor*, 529 U.S. 362, 404-06, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000)]), an inquiry that requires analysis of the state court's *method* as well as its result.

*Nunes*, 350 F.3d at 1054 (emphasis in original).  It then concluded that the state court's failure to issue an OSC and hold an evidentiary hearing was based on an

41

1   unreasonable application of clearly established federal law because, "[w]ith Nunes'

2   claims being taken at face value as the state court claimed it had done," his assertions

3   "certainly suffice[d] to support an ineffective assistance claim, and there was ample

4   evidence in the record before the state court to support those assertions." *Id.* at 1054;

5   *see also Wiley v. Epps*, 625 F.3d 199, 207 (5th Cir. 2010) ("Thus, when a petitioner

6   makes a prima facie showing of mental retardation, a state court's failure to provide

7   him with an opportunity to develop his claim deprives the state court decision of the

8   deference ordinarily due under the AEDPA."); *Rivera v. Quarterman*, 505 F.3d 349,

9   357-58 (5th Cir. 2007) (same).

10      Thus, this Court must review the reasonableness of the CSC's decision that

11   Blair did not allege a prima facie case for relief on *any* of his claims.  This Court is

12   not reviewing a state-court decision that Blair failed to *prove* his claims.  Rather, as

13   explained above, the state-court decision resulted from a preliminary assessment: the

14   decision not to grant an OSC and instead to deny all claims in the petition represents

15   a determination that, taking all of Blair's allegations as true and credible, he failed to

16   state a prima facie case for relief.  *Duvall*, 9 Cal. 4th at 474.

17      Blair filed an initial state habeas petition with the CSC in 2006.  *In re James*

18   *Nelson Blair*, No. S1444759.  The petition was denied entirely on the merits by the

19   CSC on September 9, 2009; one justice was of the opinion that an OSC should be

20   issued as to Claim Four, and another justice was of the opinion an OSC should be

21   issued as to Claims Two and Three.  *In re Blair on Habeas Corpus*, Case No.

22   S2144759, Opinion  (Sept. 9, 2009).  Blair filed a second state habeas petition to

23   exhaust a previously unexhausted claim on January 31, 2011, *In re James Nelson*

24   *Blair*, Case No. S190217  (*See* Ex. C.)  Such petition is currently pending before the

25   CSC.

26      As set forth in the state and federal habeas petitions, and as will be elaborated

27   in Section VI. below, Blair's claims included adequate allegations, supported by

28

42

1   unchallenged evidence – which, under state law, entitled him to an OSC.  The CSC's

2   summary denials signal its determination that Blair failed to make a prima facie case

3   for each of his claims.  *Duvall*, 9 Cal. 4th at 475.  But his allegations were adequate

4   and there was ample evidence in the record before the state court to support those

5   allegations.  Thus, under California's procedures, the CSC should at least have issued

6   an OSC as to such claims.  Its failure to do so renders its decision unreasonable under

7   § 2254(d)(1).  *See Nunes*, 350 F.3d at 1054-55; *Wiley*, 625 F.3d at 207; *see also*

8   *Vuong v. Hall*, No. CV 07-5317 (C.D. Cal. Oct. 25, 2011) (order granting in part

9   petitioner's request for an evidentiary hearing after finding under *Nunes* that

10  petitioner satisfied § 2254(d)).

11  **E.    The California Supreme Court's Treatment of Blair's Extra-Record-Based**

12  **      Claims Was Objectively Unreasonable Under 28 U.S.C. § 2254(d)(2)**

13          Under California law, the issuance of an OSC is a prerequisite to resolving

14  disputes over factual allegations that are outside of and not determined by the trial

15  record.  *See, e.g.*, *Duvall*, 9 Cal. 4th at 474-75.  And, as explained above, it is well

16  established that when the California Supreme Court denies a habeas corpus petition

17  without issuing an OSC, it has "assum[ed] the petition's factual allegations are true."

18  *Id.*

19          In a case like this one, where an OSC was not issued, application of

20  California's rules means that this Court must infer one of two things about the state

21  court's summary denials: (1) that the state court "found" as true the facts as alleged in

22  the petitions unless and to the extent they were directly contradicted by the record,

23  *Pinholster*, 131 S. Ct. at 1402 n.12; or (2) that the state court did not determine the

24  necessary facts.  *Silva v. Woodford,* 279 F.3d 825, 835 (9th Cir. 2002) (summary

25  disposition of claims meant "factual basis for these claims was never fully

26  adjudicated").  To the extent the California Supreme Court's assumption of the truth

27  of Blair's allegations constituted a "factual determination," that determination is

28

43

1   entitled to a presumption of correctness.  28 U.S.C. § 2254(e)(1); *Burden v. Zant*, 498
2   U.S. 433, 436, 111 S. Ct. 862, 112 L. Ed. 2d 962 (1991).

3       If the state court based its denial of Blair's extra-record-based claims on factual
4   findings or credibility determinations counter to Blair's allegations and evidence,
5   however, its decision was an unreasonable determination of facts under § 2254(d)(2).
6   *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004) ("If, for example, a state court
7   makes evidentiary findings without holding a hearing . . . such findings clearly result
8   in an 'unreasonable determination' of the facts.").  As the Ninth Circuit explained in
9   *Nunes*, federal courts need not defer to state-court fact-findings made in the absence
10  of an evidentiary hearing:

11              State court findings are generally presumed correct unless
12              they are rebutted by clear and convincing evidence or based
13              on an unreasonable evidentiary foundation ([28 U.S.C. §§]
14              2254(e)(1) and (d)(2);
15              *Gonzalez v. Pliler*, 341 F.3d 897, 903 (9th Cir. 2003)). But
16              with the state court having refused Nunes an evidentiary
17              hearing, we need not of course defer to the state court's
18              factual findings—if that is indeed how those stated findings
19              should be characterized—when they were made without
20              such a hearing.  *Killian v. Poole*, 282 F.3d 1204, 1208 (9th
21              Cir. 2002); *Weaver v. Thompson*, 197 F.3d 359, 363 (9th
22              Cir.1999)).
23  *Nunes*, 350 F.3d at 1055.

24      The Supreme Court recently confirmed that AEDPA does not require blind
25  deference to inadequate state-court fact-findings:

26              Indeed, it would be bizarre if a federal court had to defer to
27              state-court factual findings, made without any evidentiary

28

44

1    record, in order to decide whether it could create an

2    evidentiary record to decide whether the factual findings

3    were erroneous.  If that were the case, then almost no habeas

4    petitioner could ever get an evidentiary hearing:  So long as

5    the state court found a fact that the petitioner was trying to

6    disprove through the presentation of evidence, then there

7    could be no hearing. AEDPA does not require such a

8    crabbed and illogical approach to habeas procedures . . . .

9  *Wellons v. Hall*, 558 U.S. 220, 130 S. Ct. 727, 730 n.3, 175 L. Ed. 2d 684 (2010).

10      The state court's process is particularly unreasonable in the context of Blair's

11  extra-record-based claims, particularly his claim that he was incompetent to stand

12  trial, and his claim that he was denied his constitutional right to the effective

13  assistance of counsel at both guilt and penalty phases of trial.  Under California law,

14  an evidentiary hearing is the proper procedural remedy for adjudicating counsel's

15  competence.[15]  *See People v. Frierson*, 25 Cal. 3d 142, 161, 599 P.2d 587, 158 Cal.

16  Rptr. 281 (1979) ("[I]f the record fails affirmatively to disclose counsel's

17  incompetence . . . [an] evidentiary hearing is the proper procedural remedy by which

18  to test the competency issue"); *People v. Pope*, 23 Cal. 3d 412, 426, 590 P.2d 859,

19  152 Cal. Rptr. 732 (1979).  Indeed, on direct appeal, the CSC recognized that its

20

21      [15]  A full and fair hearing is compelled by due process, and the failure to
22  provide a petitioner with one raises serious constitutional problems.  Many Supreme
    Court opinions note that, at a minimum, persons alleging federal challenges to their
23  detentions are entitled to at least one full and fair review of their claims. *See Wright*
    *v. West*, 505 U.S. 277, 299, 112 S. Ct. 2482, 120 L. Ed. 2d 225 (1992) (O'Connor, J.,
24  concurring); *Stone v. Powell*, 428 U.S. 465, 494-95 & n.37, 96 S. Ct. 3037, 49 L. Ed.
    2d 1067 (1976); *Boumediene v. Bush*,  553 U.S. 723, 786, 128 S. Ct. 2229, 2270
25  (2008) ("Federal habeas petitioners long have had the means to supplement the record
    on review, even in the post conviction habeas setting.") (citing *Townsend v. Sain*, 372
26  U.S. 293, 313, 83 S. Ct. 745, 9 L. Ed. 2d 770 (1963), overruled in part by *Keeney v.*
27  *Tamayo–Reyes*, 504 U.S. 1, 5, 112 S. Ct. 1715, 118 L. Ed. 2d 318 (1992).)

28

45

1   decision to affirm Blair's conviction was in part, based on the ineffectiveness of trial
2   and appellate counsel.

3               Nonetheless, neither Newman nor Lucas submitted to the
4               court any records or other evidence to substantiate" claims
5               concerning "defendant's incompetence to stand trial . . . .
6               The Atascadero records are not before us in the record on
7               appeal.  We thus have no way to determine whether those
8               records would have caused the trial court to declare a doubt
9               concerning defendant's competence to stand trial or to
10              waive counsel.  Accordingly, we reject defendant's
11              contention.

12  *People v. Blair*,  36 Cal. 4th 686, 729, 115 P.3d 1145, 31 Cal Rptr. 3d (2005).
13  Yet despite detailed and factually-supported allegations, the CSC unreasonably
14  denied Blair this procedural mechanism.  While there may be instances where the
15  state court can determine without a hearing that a petitioner's allegations are entirely
16  without credibility or that the allegations would not justify relief even if proved, that
17  was not the case here.  *See, e.g.*, *United States v. Navarro-Garcia*, 926 F.2d 818, 822
18  (9th Cir. 1991) (explaining under what circumstances an evidentiary hearing must be
19  held on a juror-misconduct claim).  Taken at face value, the evidence introduced by
20  Blair in support of his claims—which included copious documentation and
21  declarations from lay witnesses and respected experts—was credible, and in most
22  cases, uncontroverted.  Accordingly, to the extent the state court rested its decision on
23  impermissible credibility determinations and factual findings, its decision was
24  objectively unreasonable.

25          California's unreasonable procedure denied Blair the opportunity to fully and
26  fairly develop the facts necessary to obtain meaningful review of his federal
27  constitutional claims.

28

46

## V.

## SECTION 2254(d) DOES NOT BAR RELIEF

**A.     Amended Petition Claim A**.

Claim A of Blair's Amended Petition alleges that Blair's constitutional rights were violated because he was incompetent to stand trial.[16]  (Amended Petition at 83-119.)  He specifically alleges: (1) Blair was incompetent to stand trial; (2) Blair was incompetent to waive counsel; (3) Blair was incompetent to represent himself; (4) Blair's waiver of his right to counsel was not knowing, intelligent and voluntary; (5) the trial court failed to conduct the constitutionally required inquiry into Blair's competency to waive his right to counsel and to stand trial, and failed to hold the constitutionally required competency hearing in light of the evidence of Blair's incompetence; (6) the trial court committed reversible error at the penalty phase by failing to conduct a hearing into Blair's continued competency to stand trial and to continue his self-representation; and (7) trial counsel rendered ineffective assistance by failing to raise a doubt of Blair's competence and by failing to present evidence of Blair's incompetence to the trial court; and that (8) advisory counsel rendered ineffective assistance by failing, after the court allowed Blair to represent himself, to raise a doubt of Blair's continued competence and by failing to present evidence of his incompetence to the trial court.  *Id*. at 83-84.

As shown below, the court's denial of this claim is both "contrary to" and an "unreasonable application" of clearly established federal law, 28 U.S.C. § 2254(d)(1), and is based on an unreasonable determination of the facts.  *Id*. § 2254(d)(2).

---

[16]  This claim was presented as Claim Two and Claim Three in Blair's petition for writ of habeas corpus.  The CSC summarily denied these claims, without issuing an order to show cause  The CSC summarily denied these claims on the merits.  The part of the claim alleging a procedural due process violation was also presented to the CSC in the direct appeal as Sections III, IV, VII and X and was denied in a published opinion.  *Blair*, 36 Cal. 4th at 709-20.  The direct appeal opinion is the operative decision for purposes of federal habeas review under the "look through" doctrine of *Ylst v. Nunnemaker*, 501 U.S. 797, 806, 111 S. Ct. 2590, 115 L. Ed. 2d. 706 (1991).

1    Because the state court decision runs afoul of § 2254(d), this Court reviews the claim

2    *de novo*.  *Panetti v. Quartermann*, 551 U.S. 930, 953, 127 S. Ct. 2842, 168 L. Ed. 2d

3    662 (2007); *Frantz v. Hazey*, 533 F.3d 724 (9th Cir. 2008) (en banc).  As we also

4    show below, under *de novo* review, Blair is entitled to relief.

5         The gist of Blair's claim is that he lacked "'sufficient present ability to consult

6    with his lawyer with a reasonable degree of rational understanding'" and "'a rational

7    as well as factual understanding of the proceedings against him.'" *Godinez v. Moran*,

8    509 U.S. 389, 396, 113 S. Ct. 2680, 125 L. Ed. 2d 321 (1993) (quoting *Dusky v.*

9    *United States*, 362 U.S. 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960) (per curiam)); *see*

10   *also Drope v. Missouri*, 420 U.S. 162, 171, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975);

11   *Pate v. Robinson*, 383 U.S. 375, 385, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966).  AP at

12   83-84.  Being tried while incompetent is a structural error that requires the grant of a

13   new guilt trial.  *Pate*, 383 U.S. at 386.

14        Blair asserts both procedural (*Infra* 2) and substantive (*Infra* B) incompetency

15   claims.  In evaluating a procedural incompetency claim, the issue is not whether the

16   defendant was in fact incompetent at the time of trial, but whether the trial judge had

17   evidence before him that should reasonably have caused him to doubt the defendant's

18   competence; if so, the failure to hold a competency hearing violated due process.

19   *Pate*, 383 U.S. at 385-86; *Williams v. Woodford*, 384 F.3d 567, 604 (9th Cir. 2004)

20   ("In reviewing whether a state trial judge should have *sua sponte* conducted a

21   competency hearing, a federal court may consider only the evidence that was before

22   the trial judge."); *Boyde v. Brown*, 404 F.3d 1159, 1165 n.6 (9th Cir. 2005)

23   (explaining difference between procedural and substantive incompetency claims).  If,

24   in light of the record before him, the trial judge should have held a competency

25   hearing but did not, Petitioner is entitled to a new trial. *Pate*, 383 U.S. at 386

26   ("Having determined that Robinson's constitutional rights were abridged by his

27   failure to receive an adequate hearing on his competence to stand trial, we direct that

28

1   the writ of habeas corpus must issue and Robinson be discharged, unless the State
2   gives him a new trial within a reasonable time.").  As shown below, the trial judge
3   should have had a bona fide doubt of Blair's competence in light of the evidence
4   before him, and 2254(d) does not bar relief on the claim.

5        A substantive incompetency claim alleges that the defendant was, in fact,
6   incompetent at trial and therefore his due process rights were violated regardless of
7   whether a competency hearing was held; this claim may be based on post-trial
8   evidence.  *Drope*, 420 U.S. at 172; *Boyde*, 404 F.3d at 1165 & n.6 ("Even if the
9   evidence before the trial judge was insufficient to raise a good faith doubt with
10  respect to defendant's competency, he would still be entitled to relief if it now
11  appears that he was in fact incompetent.").  As shown below, Blair was in fact
12  incompetent at the time of trial, as demonstrated by the evidence in the trial record
13  and by post-trial declarations and other documents submitted in habeas, and 2254(d)
14  does not bar relief on the claim.

15       **1.   As a Threshold Matter, California's Competency Standard is**
16            **Contrary to Clearly Established Federal Law**
17  It is clearly established federal law that,

18            [T]he Constitution does not permit trial of an individual
19            who lacks "mental competency."  *Dusky* defines the
20            competency standard as including both (1) "whether" the
21            defendant has "a rational as well as factual understanding of
22            the proceedings against him" and (2) whether the defendant
23            "has sufficient present ability *to consult with his lawyer*
24            with a reasonable degree of rational understanding."  *Id*. at
25            165.  *Drope* repeats that standard, stating that it "has long
26            been accepted that a person whose mental condition is such
27            that he lacks the capacity to understand the nature and

28

                                        49

1     object of the proceedings against him, *to consult with*

2     *counsel, and to assist in preparing his defense* may not be

3     subjected to a trial."

4 *Indiana v. Edwards*, 554 U.S. 164, 169-70, 128 S. Ct. 2379, 171 L. Ed. 2d 345 (2008)

5 (citing *Dusky*, 362 U.S. 402; and *Drope*, 420 U.S. 162 (emphasis in original).)

6   Unlike the federal constitutional standard, the California competency standard

7 requires a finding that the defendant suffers "a mental disorder or developmental

8 disability" before a defendant can be found to be incompetent to stand trial.  In

9 California,

10     (a) A person cannot be tried or adjudged to punishment

11     while that person is mentally incompetent.  A defendant is

12     mentally incompetent for purposes of this chapter if, as a

13     result of a mental disorder or developmental disability, the

14     defendant is unable to understand the nature of the criminal

15     proceedings or to assist counsel in the conduct of a defense

16     in a rational manner.

17 Cal. Penal Code § 1367; *People v. Blair*, 36 Cal. 4th at 711, 712 n.8,

18   The Supreme Court has already found that a test focusing on an inquiry

19 surrounding a mental illness is very different from the *Dusky/Drope* inquiry.

20     [O]ur decision in *Donaldson* makes clear that due process

21     requires at a minimum a showing that the person is mentally

22     ill and either poses a danger to himself or others or is

23     incapable of "surviving safely in freedom."  The test for

24     competence to stand trial, by contrast, is whether the

25     defendant has the present ability to understand the charges

26     against him and communicate effectively with defense

27     counsel.  *Dusky v. United States*, 362 U.S., at 402, 80 S. Ct.,

28

50

1         at 788-89.  Even if we were to uphold Oklahoma's

2         imposition of the clear and convincing evidence rule in

3         competency proceedings, the comparable standards in the

4         two proceedings would not guarantee parallel results.

5 *Cooper v. Oklahoma*,  517 U.S. 348, 368, 116 S. Ct. 1373, 1383 - 84 (1996) (internal

6 citations omitted.)

7       Rather than focusing on whether a defendant suffers a mental disorder or

8 developmental disability like the California state rule, the federal Constitutional

9 "mental competency cases set forth a standard that focuses directly upon a

10 defendant's present ability to consult with his lawyer." *Indiana*, 554 U.S. at 174

11 citing *Dusky*, 362 U.S. at 402; *Drope*, 420 U.S. at 171.

12       There is no question that the right of a criminal defendant not to be tried while

13 incompetent is a fundamental constitutional right.  The Supreme Court has

14 "repeatedly and consistently recognized that 'the criminal trial of an incompetent

15 defendant violates due process." *Cooper v. Oklahoma*,  517 U.S. at 354 (citing

16 *Medina v. California*, 505 U.S. 437, 453, 112 S. Ct. 2572, 2581, 120 L. Ed. 2dd 353

17 (1992); *Drope*, 420 U.S. at 171-72; *Pate*, 383 U.S. at 378.)  The significance of this

18 right is not open to dispute.

19         Competence to stand trial is rudimentary, for upon it

20         depends the main part of those rights deemed essential to a

21         fair trial, including the right to effective assistance of

22         counsel, the rights to summon, to confront, and to

23         cross-examine witnesses, and the right to testify on one's

24         own behalf or to remain silent without penalty for doing so.

25 *Cooper v. Oklahoma*,  517 U.S. at 354, *citing Riggins v. Nevada*, 504 U.S. 127,

26 139-40, 112 S. Ct. 1810, 1817-18, 118 L. Ed. 2dd 479 (1992) (Kennedy J, concurring

27 in judgment).  And as the Supreme Court has found, "[f]or a defendant, the

28

1  consequences of an erroneous determination of competence are dire." *Cooper*, 517
2  U.S. at 364.

3         The CSC summarily denied this claim on state habeas.  (Ex. A.)  However,
4  because there is no indication that the CSC used a different standard that what it used
5  on direct appeal, this court must look through the CSC summary denial to the CSC's
6  decision on direct appeal as the last reasoned state decision to determine how the
7  CSC analyzes competency issues.  *Harrington v. Richter*, __ U.S. ___, 131 S. Ct. 770,
8  785,  178 L. Ed. 2dd 624 (2011) (holding that In applying AEDPA analysis, a federal
9  court may look through a summary denial and look at the last reasoned decision
10  regarding a claim "when there is reason to think some other explanation for the state
11  court's decision is more likely.") (citing *Ylst*, 501 U.S. at 803-04; *Johnson v.*
12  *Williams*, 2013 WL 610199 (U.S. Feb. 20, 2013) (same).

13         In Blair's case, although the CSC used both references to Cal. Penal Code §
14  1367 and the *Dusky/Drope* standard interchangeable, *People v. Blair*, 36 Cal. 4th at
15  686, 711, 712 n.8 115 P.3d 1145, 31 Cal. Rptr. 3d 485 (2005), in denying Blair's
16  competency claims on direct appeal, it is clear the CSC applied the stricter California
17  standard requiring a  mental disorder or developmental disability rather than the
18  federal constitutional standard.  The CSC repeatedly emphasized the absence of a
19  mental illness diagnosis at the time of trial.  In discrediting the relevance of Blair's
20  commitment in Atascadero, the CSC mentioned that such commitment was more than
21  "12 years before the present crimes took place, and there was nothing in the record of
22  this case pertaining to the period between 1972 and 1987 to indicate that defendant
23  might be mentally ill at the time of the capital trial." *Id*. at 714.  The CSC went on to
24  state:  "Moreover, even a history of serious mental illness does not necessarily
25  constitute substantial evidence of incompetence that would require a court to declare
26  a doubt concerning a defendant's competence and to conduct a hearing on that issue."
27  *Id*.

28

1    There is good reason why the federal standard for competency focuses on a

2 defendant's present ability to consult with counsel with a reasonable degree of

3 rational understanding:

4          Mental illness itself is not a unitary concept.  It varies in

5          degree.  It can vary over time.  It interferes with an

6          individual's functioning at different times in different ways.

7          . . .  In certain instances an individual may well be able to

8          satisfy *Dusky*'s mental competence standard, for he will be

9          able to work with counsel at trial, yet at the same time he

10         may be unable to carry out the basic tasks needed to present

11         his own defense without the help of counsel.

12    *Indiana v. Edwards*,  554 U.S. at 175-76.

13    Because California's competency standard requires that a defendant show he

14 has a mental disorder or developmental disability, it demands more than what the

15 constitution requires, making California's procedures for guaranteeing this

16 fundamental constitutional right not sufficiently protective of that right.  *See, e.g.*

17 *Cooper v. Oklahoma*,  517 U.S. at 367-68.  Thus, because California's standard for

18 competency is not only contrary to clearly established federal law, but also

19 unconstitutional, 28 U.S.C. § 2254 (d) does not bar relief on Blair's claim that he was

20 incompetent to stand trial, or on his related claims, and the court reviews those claims

21 *de novo*.  *Panetti*, 551 U.S. at 953 (finding that when "state court's adjudication of a

22 claim is dependent on an antecedent unreasonable application of federal law, the

23 requirement set forth in §2254 (d)(1) is satisfied" and thus, a "federal court must then

24 resolve the claim without the deference AEDPA otherwise requires.")

25

26

27

28

53

2.     **A Reasonable Judge in the Trial Court's Position Would Have Had a Bona Fide Doubt of Blair's Competence, and Therefore the Trial Court Violated Blair's Constitutional Rights by Failing to Hold a Competency Hearing**

a.     **Legal Principles**

"Due process requires a court to conduct a competency hearing on its own motion, before permitting a defendant to waive constitutional rights, whenever a reasonable judge would be expected to have a bona fide doubt as to the defendant's competence." *Moran v. Godinez*, 57 F.3d 690, 695 (9th Cir. 1994) (emphasis deleted).  "A 'bona fide doubt' has also been expressed as 'sufficient doubt,' 'good faith doubt,' 'genuine doubt,' 'reasonable doubt,' and 'substantial question'; these all describe the same constitutional standard." *Blazak v. Ricketts*, 1 F.3d 891, 893 n.1 (9th Cir. 1993).  A 'trial judge must conduct a competency hearing whenever the evidence before him raises a bona fide doubt about the defendant's competence to stand trial, even if defense counsel does not ask for one." *Odle*, 238 F.3d at 1087. Federal habeas courts "review the record to determine whether evidence before the state trial court raised a 'bona fide doubt' that [Petitioner] was competent to stand trial." *Id*.  "If a reasonable judge would have had such a doubt, [Petitioner] was entitled to a competency hearing at the time of trial and the failure to hold such a hearing violated his right to due process." *Id*.; *de Kaplany v. Enemoto*, 540 F.2d 975, 983 (9th Cir. 1976) ("The question to be asked by the reviewing court is whether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial."). *Drope*, 420 U.S. at 172-73; *Pate*, 383 U.S. at 385-86. Failure to conduct such a hearing also deprives the defendant of his right to due process and a fair trial. *Drope v. Missouri*, 420 U.S. at 162; *Pate v. Robinson*, 383 U.S. at 385.

54

1    "Even when a defendant is competent at the commencement of trial, a trial

2    court must always be alert to circumstances suggesting a change that would render

3    the accused unable to meet the standards of competence to stand trial." *Drope*, 420

4    U.S. at 181; *McGregor v. Gibson*, 248 F.3d 946, 952 (10th Cir. 2001); *Lafferty v.*

5    *Cook*, 949 F.2d 1546, 1555 n.10 (10th Cir. 1992) ("the state court's duty to inquire as

6    to competency continues throughout trial").

7        In the context of the penalty phase of a capital trial, failure to determine a

8    defendant's competency to proceed after a reasonable doubt as to competency has

9    been raised also deprives the proceedings of the heightened level of reliability

10   necessary in capital proceeding under the Eight Amendment. *Johnson v. Mississippi*,

11   486 U.S. 578, 584, 108 S. Ct. 1981, 100 L. Ed. 2d 575 (1988).

12       A reasonable judge in the judge's position at Blair's trial would have had a

13   bona fide doubt of Blair's competence based on the information before him.

14   Individually, and cumulative, the information summarized below should have raised a

15   bona fide doubt of Blair's competence.  All of this evidence was before the CSC

16   when it denied the procedural incompetence claim on direct appeal.

**b.    Evidence of Incompetence Before the Trial Court**

18       The issue of Blair's competency at the penalty phase of trial first came up in

19   the context of Blair's competency to represent himself.

20       Ray Newman was appointed as stand-by or associate counsel on November 4,

21   1986.  On May 4, 1987, his role changed to advisory counsel.  On March 17, 1989,

22   when Blair and Newman appeared in Norwalk for trial, Newman made clear that he

23   was "engaged in a trial in downtown Los Angeles" that would take another four to

24   five months.  (2 RT 1001-02.)  The court insisted that Blair's trial proceed anyway.

25   The day before jury selection began, the court appointed Lonzo Lucas as "co-advisory

26   counsel."  (2 RT 1025.)  On April 17, 1989, the prosecution gave its opening

27   statement.  (IV CT 969.)

28

55

On May 8, 1989, after the guilty verdict had been announced, and after the prosecution announced its intent to have Blair's chemistry teacher testify at the penalty phase, the trial court held an ex parte hearing.  Blair explained he needed a continuance because an investigator was "investigating our defense for the penalty phase . . . he is in collecting records and mitigation of the – for the penalty phase." (15 RT 4169-70.)  Asked what the investigator was getting, Blair replied:  "Records from the state prison.  He is interviewing family members.  We might possibly put on family members.  There may – there may be records from Atascadero State Hospital." (15 RT 4170.)  At that point, Lucas interceded:

> One other thing that Mr. Blair possibly has forgotten, your honor, is we are at this point preparing to have psychiatrists talk to Mr. Blair and take a look at Mr. Blair.
>
> I have reviewed extensively now the files, procedural files; and I can't find where anybody – any Judge really sat down and took a look at Mr. Blair to see whether or not he could represent himself.
>
> I know I'm a lawyer – this Court has been a Municipal Court Judge and Appellate Judge and Superior Court Judge and learned lawyer – and if this court were on trial for the death penalty, I would be willing to bet a fat cow against 10 skinny monkeys that this court would not represent itself and anybody who undertakes this, in my opinion, there's a problem.  So one of the things that – that the investigator is looking into – in fact, has looked into – we're having a psychiatrist examine Mr. Blair in that regard –
>
> . . . .

56

1          Again, as I said, in looking at the records I know that was

2          basically a cursory inquiry when this case first started – you

3          read *Faretta*.  You know – you likened fight Mohammed

4          Ali and that's a – basically the extent of the inquiry.

5          But to determine whether or not Mr. Blair has the ability to

6          represent himself – and sitting here watching him for the

7          last couple of months, I am confident that he doesn't have

8          that – I would like to have a psychiatrist look at him, and

9          that's one of the things that he requested the investigator to

10         do.

11         Mr. Blair has had some problems; been in Atascadero

12         before; spent time there.  Apparently there is some

13         emotional problems that would probably have some bearing

14         as far as mitigation.  And that would be overwhelming

15         factor.

16         I suspect and have suspected for some period of time that

17         probably if the psychiatrist spoke to Mr. Blair, there's a

18         good chance they might have found him really not capable

19         of standing trial here to some extent.

20    (15 RT 4171-4172.)

21         From these statements, the CSC found that Lucas "informed the court that the

22    defense was preparing to have a psychiatrist interview defendant.  Lucas added that

23    he believed defendant might not be competent to represent himself or to stand trial."

24    *People v. Blair*, 36 Cal. 4th at 716.

25         On May 10, before the prosecutor, both advisory/stand-by counsel raised the

26    issue of Blair's mental state during the proceedings.  Lucas stated he had doubts that

27    Blair had the "legal competency" to represent himself, but stopped short from saying

28

57

that Blair "has a mental problem at this point."  (15 RT 4230.)  Newman, who had

been appointed as advisory counsel about two years prior to trial,  stated that "[o]ver

Mr. Blair's objection, I'm sure, I would ask the court to declare doubt."  The court

then replied that the court had "no doubt as to his competency, his mental capacity

and his sanity." (15 RT 4232.)

| | | |
|---|---|---|
| Newman: | I would point out also for the record – since we're on this issue – I approached Mr. Blair throughout the years about having a psychiatrist consult with him.  Mr. Blair has refused such up until this point. |

Monaghan: Well, the statement "up until this point," is that a veiled request?

Newman:   Yes.  He hasn't talked to one as of yet.

After a pause in the proceedings, the prosecutor stated:

Monaghan: I think the court should inquire of Mr. Blair.  He is the attorney.

The Court:  Are you requesting me to appoint a psychiatrist?

[Blair]:    No.

I made my position clear –

The Court:  Okay.

[Blair]:    – to both advisory counsel, that I am not – I'm not raising a incompetency hearing nor an insanity – nor an insanity issued.

(15 RT 4232-33.)

Outside the presence of the prosecutor, during an in camera hearing, advisory/stand-by counsel further pressed their point.  Both Newman and Lucas stated that although they had tried, repeatedly, to explain to Blair the need to present some mitigating evidence, and the availability of a viable defense at the guilt phase,

Blair had instead focused, almost exclusively, "in writing and thinking [about] briefs." (May 10, 1989 *in camera* hearing.)

Newman stated:

> I've all along felt that Mr. Blair might have some mental deficiency that would have been to the benefit at least as to the guilt phase and definitely of some benefit as to the penalty phase, and his insistence that not be raised and not be brought up and his being pro per has not allowed us to do anything in that regard.

*Id*.

Lucas was more specific:

> Most of my comments would go along the line of what Mr. Newman has said. The only thing I would add, Mr. Blair, from what I've seen, has spent 95 percent [of] his time writing, writing and thinking writs. He has spent absolutely no significant time in preparation of this case.
>
> And specifically some of the advice that I gave him regarding bringing in experts for a defense evolved from the fact one of the witnesses that he did call called me out in the hallway and he was very adamant about the fact that no way did this woman die of cyanide. One of the Doctors.
>
> That statement disturbed me, and I brought that back to Mr. Blair and pointed out to him how he could bring in another expert that had been suggested to me by another Doctor that could assist him. In order to do that and because of the time I informed Mr. Blair that he would have

1          to cease the writing of his writs and proceed with his

2          defense.

3                    Being his own attorney, he chose to ignore that

4          advice and, of course, would not allow me to send the

5          investigator to San Bernardino to get the medical evidence

6          needed in order to prepare this witness.  He chose to allow

7          that investigator to go to the Supreme Court or the Court of

8          Appeal, I forget which one, and file his writs.

9   *Id.*

10       When the court inquired from Blair, Blair stated:

11          The Court:  Any comments, Mr. Blair,

12          [Blair]:    Well, not – not – there's nothing new.  I have already

13                      indicated to the court that I have no intention of

14                      raising a diminished capacity defense and I have no

15                      intention of –

16       However, although the court tried to explain that "diminished capacity" was a

17   different concept at the guilt phase than at the penalty phase, Blair could not grasp the

18   distinction:

19          [Blair]:    Yes.  I have instructed both attorneys that I do

20                      not want to even use [the Atascadero] records.

21                      For one, they would be of no benefit in raising

22                      a diminished capacity defense, and that is not

23                      my defense.  I have no intention of raising a

24                      diminished capacity or an insanity defense.

25          The Court:  Is there going to be any mitigating evidence

26                      presented at the penalty phase?

27

28

60

| | |
|---|---|
| 1 | [Blair]:  I am not sure.  I have to do some research on |
| 2 | that, just what is mitigating evidence.  It may |
| 3 | be my defense will be that the district attorney |
| 4 | shouldn't be allowed to put on the aggravating |
| 5 | evidence.  I'm not sure what mitigating |
| 6 | evidence would be – there would be.  I do |
| 7 | know that the – the insanity or diminished |
| 8 | capacity is out, and I do know that – that the |
| 9 | compelling my family members to – to attend is |
| 10 | out. |

11 *Id*.

12    When Lucas tried to press the importance of being allowed to present anything,

13 in spite of Blair's stand:

| | |
|---|---|
| 14 | Lucas:  But that not withstanding, there still are some |
| 15 | mitigating factors, as I see it, that I intend to |
| 16 | bring up to Mr. Blair that he might go along |
| 17 | with it.  And again, with Mr. Blair and Mr. |
| 18 | Newman, when I see him on Friday, so we can |
| 19 | at least have him to put on a defense.  Rather |
| 20 | than just a mockery, there will be something of |
| 21 | some substance. |

22 *Id*.

23    Still proceeding in *propria persona*, Blair called no penalty phase witnesses.

24 By stipulation, he introduced just one defense exhibit:  a transcript of his grades from

25 Los Angeles City College, which the prosecutor had obtained.  (15 RT 4311.)

26

27

28

1
2
3
4

       **c.**      **2254 (D) Does Not Bar Relief Also Because the CSC's Decision Was Both an Unreasonable Application of Clearly Established Federal Law and Based on an Unreasonable Determination of the Facts**

5
6
7
8

      Even assuming the California competency standard passes constitutional muster, the denial of Blair's claims on direct appeal constituted both an unreasonable application of clearly established federal law and an unreasonable determination of the facts because California misapplies the *Dusky/Drope* standard.

9
10
11
12
13
14
15
16
17
18
19
20

      As the Supreme Court has stated, while the standard articulated in § 2254 is demanding, it is "not insatiable," and "deference does not by definition preclude relief.'" *Miller-El v. Dretke*, 545 U.S. 231, 240, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005) (*Miller-El II*) (granting habeas relief under AEDPA). Neither comity nor AEDPA demand that a federal court abdicate its responsibility to ensure a state conviction and sentence of death are constitutional. *Doody v. Ryan*, 649 F.3d 986, 1003, 1006-07 (9th Cir. 2011) (en banc), *cert denied*, *Ryan v. Doody*, 132 S. Ct. 414 (U.S. 2011). Neither AEDPA nor comity require that a federal court "simply parrot the findings made during the state court proceedings and call it a day." *Id*. As the Ninth Circuit, en banc, stated, for if "we succumb to the temptation to abdicate our responsibility on habeas review, we might as well get ourselves a big, fat rubber stamp, pucker up, and kiss The Great Writ good-bye." *Id*. at 1003.

21
22
23
24
25
26
27

          [C]omity does not command abdication. Rather, as Article III judges, we have a responsibility to grant habeas relief if Supreme Court precedent has been unreasonably applied. *See Miller–El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) ("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by

28

1   definition preclude relief.  A federal court can disagree with

2   a state court's . . .  determination and, when guided by

3   AEDPA, conclude the decision was unreasonable . . .")

4   *Id*. at 1006-07.

5       Assuming the California statute incorporated the *Dusky/Drope* standard, the

6   CSC's decision in denying Blair's claim was both an unreasonable application of

7   clearly established federal law and based on an unreasonable determination of the

8   facts.

9       Rather than focus on whether a defendant suffers a mental disorder or

10   developmental disability, the federal constitutional "mental competency cases set

11   forth a standard that focuses directly upon a defendant's present ability to consult

12   with his lawyer." *Indiana*, 554 US at 174 (citing *Dusky*, 362 US., at 402; *Drope*, 420

13   U.S., at 171.)    Contrary to clearly established federal law, the CSC failed to give

14   proper weight to counsel's statements, and instead relied on the trial court's

15   observations concerning Blair.  While a trial court's own observations are relevant,

16   clearly established Supreme Court authority emphasizes the importance of trial

17   counsel's observations in this type of inquiry.  *Medina v. California*, 505 U.S. at 450

18   ("Although an impaired defendant might be limited in his ability to assist counsel in

19   demonstrating incompetence, the defendant's inability to assist counsel can, in and of

20   itself, constitute probative evidence of incompetence, and defense counsel will often

21   have the best-informed view of the defendant's ability to participate in his defense.")

22   (citing E.g., *United States*, 167 U.S. App. D.C. 117, 122, 511 F.2d 355, 360 (1975);

23   *United States ex rel. Roth v. Zelker*, 455 F.2d 1105, 1108 (2nd Cir. 1972), *cert.*

24   *denied*, 408 U.S. 927, 92 S. Ct. 2512, 33 L. Ed. 2dd 340 (1972); *see e.g Odle*,  238

25   F.3d 1084 ("[C]ompetence to stand trial does not consist merely of passively

26   observing the proceedings.  Rather, it requires the mental acuity to see, hear and

27   digest the evidence, and the ability to communicate with counsel in helping prepare

28

63

1   an effective defense") (citing *Dusky*, 362 U.S. at 402; and Note, Incompetency to

2   Stand Trial, 81 Harv. L.Rev. 454, 457-59 (1967).)[17]  In spite of these clearly

3   established federal law, and as Lucas predicted, Blair's trial, both at guilt and at

4   penalty, became a mockery.

5        As shown above, by May 10, 1989, the court was not only aware that Lucas

6   and Newman doubted Blair's competency, the court was also aware that Blair was not

7   going to present any mitigating evidence and that Blair did not even know what

8   "mitigating evidence" was. (May 10 *in camera* hearing.)  Furthermore, because the

9   trial court had been appraised by advisory counsel that Blair seemed not to

10  comprehend their suggestions as to the investigation necessary to mount a defense,

11  both during the guilt and the penalty phase of trial, there was a reasonable doubt that

12  Blair's mental condition was such that he lacked "the capacity to understand the

13  nature and object of the proceedings against, to consult with counsel, and to assist in

14  preparing hid defense." *Drope*, 420 U.S. at 171.

15       Given this information from Newman and Lucas, the court should have

16  conducted a hearing to determine Blair's competency to stand trial and to represent

17  himself.  A court's duty to inquire into defendant's competence continues throughout

18  trial. *See Drope*, 420 U.S. at 181; *McGregor*, 248 F.3d at 952; *Lafferty*, 949 F.2d at

19  1555 n.10.  The court should have determined why Blair had been incarcerated at

20  Atascadero, how long ago he was incarcerated, and what diagnosis had been made of

21  Blair at that time.  The court should have determined whether Blair's desire not to

22  have any psychiatric evidence presented was, in fact, the product of a psychiatric

23  problem itself.  The court should have determined whether Blair's desire "not to get

24  other people involved" was itself the product of a psychiatric problem.  The court

25  should have at least reviewed the records from Atascadero to determine what

26

27        [17] *Drope* too cites approvingly to Note, Incompetency to Stand Trial.  420 U.S.

28  at 172.

64

1    psychiatric problems Blair had experienced.  Had the court bothered to examine the

2    records of the 1985 trial, it would have noticed that another counsel, Cohen, the

3    probation officer and the judge agreed that Blair was mentally ill.  (*In re Blair on*

4    *Habeas Corpus*, Case No. S144759, Ex. 23, RT, *People v. Blair*, Case No. A757679,

5    133-141; Ex. 26, Probation Officer's Report, *People v. Blair*, Case No. A757679,

6    177-193.)

7         Instead, the court asked Blair what he wanted to do.  Blair, of course, wanted

8    nothing to do with the issue of his own competency.  The court's conduct, asking the

9    defendant if he wanted the court to inquire into the defendant's own mental

10   competency, when that mental competency itself was in doubt, was absurd.  The court

11   should have conducted an independent inquiry into Blair's competency, and its

12   failure to do so requires that penalty relief be granted.

13        Additionally, and independently, the court erred when it permitted Blair to

14   determine whether or not there should be a competency hearing.  As noted above,

15   Newman stated:  "Over Mr. Blair's objection, I'm sure, I would ask the court to

16   declare a doubt" about Blair's competency.  (15 RT 4232.)  When Newman further

17   pointed out that Blair had refused to speak to a psychiatrist, the prosecutor suggested

18   that the court "should inquire of Mr. Blair.  He is the attorney."  (15 RT 4233.)  The

19   court then asked of Blair:  "Are you requesting me to appoint a psychiatrist?"  Blair

20   responded:  "No.  I made my position clear –."  (15 RT 4233.)

21        A defendant "who may be incompetent cannot knowingly or intelligently waive

22   his right to have the court determine his capacity to stand trial, nor should he be

23   presumed to possess sufficient intelligence that he will be able to adduce evidence of

24   his incompetency which might otherwise be within his grasp."  *Odle v. Woodford*,

25   238 F. 3d at 1089 n.5 (*quoting Pate v. Robinson*, 383 U.S. at 384, and *Medina v.*

26   *California*, 505 U.S. at 450.  Yet that is exactly what happened to Blair.  The court

27   asked him if he wanted a psychiatrist appointed to examine his competency.  His

28

answer was, of course, that he wanted no such inquiry.  He wanted no one to question his competency.  The CSC unreasonable applied clearly established federal law when it concluded that no competency hearing was required based on Blair's opinion.

Newman and Lucas brought sufficient information to the court's attention to warrant a hearing to determine Blair's competency to stand trial and to represent himself at the penalty phase.  The court failed to conduct such a hearing, leaving the decision to Blair himself.  The court's failure to conduct a hearing into Blair's competency to stand trial at the penalty phase and to represent himself at the penalty phase requires reversal of the penalty phase judgment.

The trial court's failure, in the face of this evidence, to inquire into Blair's competency to stand trial deprived Blair of his constitutional rights to due process and a fair trial.  *See Torres v. Prunty*, 223 F.3d 1103, 1109 (9th Cir. 2000) (granting procedural competency claim under AEDPA where "defendant's unusual and self-defeating behavior in the courtroom suggested that an inquiry into competence was required").

### 3.    Blair Was in Fact Incompetent to Stand Trial

Evidence presented post-conviction establishes that Blair was incompetent to stand trial.  This conclusion is bolstered when viewed in conjunction with the record-based evidence noted above, which is incorporated herein by reference as though set forth in full.  The state supreme court denied this substantive incompetency claim in post-card denials without an opinion, discovery or an evidentiary hearing, and therefore this Court independently reviews the record to assess whether the state court decision passes muster under § 2254(d).  *Haney v. Adams*, 641 F.3d 1168, 1171 (9th Cir.), *cert. denied*, 132 S. Ct. 551, 181 L. Ed. 2d 411 (2011).

In addition to the evidence of Blair's incompetence from the trial record, the following evidence – all of which was submitted to the CSC – supports the claim that

66

1  Petitioner was in fact incompetent to stand trial and therefore habeas relief is

2  required:

3          In support of this claim, Blair submitted to the CSC documentation from lay

4  witnesses and one expert pleading enough facts to make a prima facie case.  In

5  addition to lay witness declarations detailing signs of Blair's mental illness, including

6  during early childhood, Dkt. No. 48, at 14-17, state habeas counsel also included a

7  declaration from Lonzo Lucas, Blair's advisory/stand-by counsel.  Lucas states that in

8  reading the files he was given, that he believed Blair "was not competent to represent

9  himself." (*In re Blair on Habeas Corpus*, Case No. S144759, Ex. 90, Lucas, L.

10  Decl.¶ 5.)  Lucas further states,

11              In particular I remember reading what Judge Nelson said

12              when he sentenced him in the attempted murder case, about

13              how he probably was mentally ill.  I asked Mr. Blair to meet

14              with two psychiatrist whom I had contacted and had

15              standing by.  He refused to meet with them.  I had

16              represented clients with mental illness over the years.  I

17              thought Mr. Blair was the kind who was sick, but faking

18              wellness.  It was not obvious immediately.  However, as I

19              sat watching him fumble through his trial, with him not

20              realizing that he was making mistakes and not seeming to

21              care what was happening, I became even more convinced

22              that there was something wrong with him mentally.  I

23              suspect a trained psychiatrist would be able to identify what

24              it is.  I do not know what his illness is, however, since he

25              would never submit to an examination.

26  (*Id.* ¶ 5.)

27

28

67

As Lucas declares, it was clear to him Blair did not have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding-and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky*, 362 U.S. at 402.  Because Lucas knew of other cases involving adulterated bottles of alcohol, Lucas suggested to Blair "that an investigator follow up on other cases involving adulterated bottles of alcohol."  (*Id*. ¶ 6.)  However, Blair "refused, preferring to rely on his motions and writs instead." (*Id*.¶ 6.)  Lucas also thought "we should investigate the issue of causation, which he understood, had not been done."  *Id*.  According to Lucas, Blair "refused this suggestions as well."  In spite of Lucas's suggestions, Blair "had no alternative plan for his defense beyond what I provided him at the trial."  *Id*.

Lucas's declaration also shows that Blair "did not know how to develop a theme for the voir dire or the trial, much less prepare initial questions or follow-up questions that would develop such a theme."  (*Id*. ¶¶ 9-10.)  Lucas declaration also implies Lucas's believed that Blair may not have even be aware of the importance of preparing for voir dire since it seemed to Lucas that Blair "did not seem to be reviewing" the jury questionnaires.  (*Id*. ¶ 10.)

Lucas also states that Blair "had no theme or cohesive plan to bring out particular points in an orderly way" when Lucas talked to Blair in the morning about the witnesses that would be testifying that day.  (*Id*. ¶ 11.)  According to Lucas, Blair "never had any questions planned, never had an idea of how to handle a prosecution witness, and never knew what points he should be trying to make through each individual prosecution witness."  *Id*.  Even though Lucas tried to help Blair by writing out questions for him to ask,

> Mr. Blair often stumbled when he asked questions I had
> written for him, with the wrong inflection and the wrong
> tone.  The way it came out, it sounded like he didn't

1       understand what he was asking, and it was true, he didn't.

2       Then, because he didn't know what he was doing, didn't

3       have a plan for how to handle the witness, and didn't know

4       how he should run the trial,  Mr. Blair couldn't ask follow-

5       up questions on his own, or even try to work with the

6       witness if the witness didn't give him the answer he needed.

7 *(Id.* ¶ 12.)  To Lucas, Blair's performance was such an spectacle that it "was so

8 painful to watch that more than once [Lucas] got up and left the courtroom because

9 [Lucas] couldn't stand to see what was happening." *Id.  See Wheat v. United States*,

10 486 U.S. 153, 160, 108 S. Ct. 1692, 100 L. Ed. 2dd 140 (1988) (holding that trials

11 mus not only be fair, they must also "appear fair to all who observe them.")

12 According to Lucas, others besides him, including Blair's capital jurors, wondered

13 whether "something was wrong with Mr. Blair."  (*Id.* ¶ 14.)  Lucas recalls that:

14       [S]ometime during the trial, feeling that the jury realized

15       that there was something wrong with Mr. Blair.  They

16       looked at him oddly.  I recall one juror inquiring whether

17       Blair was a lawyer, in a way that sounded like she wondered

18       why he was being allowed to represent himself.

19 *Id.*

20      Lucas's declaration also shows that Blair "lack[ed] the capacity to understand

21 the nature and object of the proceedings against him, to consult with counsel, and to

22 assist in preparing his defense." *Drope*, 420 U.S. at 171.  As Lucas declares, that

23 even before the verdict in the guilt phase, Lucas was talking to Blair "about the need

24 to prepare mitigation for the penalty phase but, again, he ignored and refused [his]

25 suggestions."  Blair would not undergo a psychiatric examination; he would not allow

26 his mother to even sit in the audience during his trial for his life.  (*Id.* ¶ 17.)

27

28

1    Lucas wishes he "had raised the mental competency issue more strongly, to the

2    point of asking for an order that Mr. Blair be evaluated before we went further." *(Id.*

3    ¶ 21.)

4              On reflection now, I wish that I had not waited until after

5              the guilt verdict to say something about the ongoing

6              problem with Mr. Blair's incompetency to stand trial

7              representing himself.  I wish I had said something about

8              how unprepared and incapable he was during the trial, and

9              how a psychiatrist was needed to examine him and say what

10             was wrong with him.  I did bring it up after the guilt phase.

11             At that time I said, as far as scheduling, that I wanted Mr.

12             Blair to see a psychiatrist, and that this was one of the

13             reasons we needed the time we were asking for to prepare

14             for the mitigation phase.  I said then that I guessed that if a

15             psychiatrist had talked to him they "might have found him

16             really not capable of standing trial here to some extent."  I

17             still believe that.

18   *(Id.* ¶ 20.)

19             Blair's inability to comprehend Lucas's suggestion about investigating, let

20   alone presenting, possible affirmative defenses is particularly relevant to the

21   competency inquiry because, as the Supreme Court has recognized, the *Dusky*

22   standard requires that a defendant be able, in consultation with counsel, "decide,

23   among other things, whether (and how) to put on a defense and whether to raise one

24   or more affirmative defenses."  *Godinez v. Moran*, 509 U.S. at 398 (citing the "*Dusky*

25   standard.").  These statements from Lucas show, at a minimum, that state habeas

26   counsel presented enough evidence to show that Blair could not effectively

27   communicate with advisory/stand-by counsel to prepare an effective defense.  Blair's

28

1   decision not to pursue this line of inquiry cannot be seen as rational conduct, just like

2   Edward Drope's conduct, whom the Sunday before his trial "tried to choke [his wife]

3   to death." *Drope*, 420 U.S. at 907.  "For a man whose fate depended in large measure

4   on the indulgence of his wife, who had hesitated about pressing the prosecution, this

5   hardly could be regarded as rational conduct.  *Id*.  Like the lower court in *Drope*, so

6   too here the CSC gave "too little weight" to Lucas's testimony that Blair refused

7   Lucas's suggestion to investigate possible defenses where Blair's fate, and his life,

8   depended in large measure on casting doubt on the prosecution's case.  Lucas

9   declaration make clear that Blair was incapable of "perceiving accurately,

10  interpreting, and/or responding appropriately to the world around him." *Lafferty*, 949

11  F.2d at 1551.  Blair thus lacked the rational understanding required for a finding of

12  competence.  *Id*. at 1555 (granting competency claim where petitioner was "unable to

13  make decisions on the basis of a realistic evaluation of his own best interests");

14  *United States v. Hemsi*, 901 F.2d 293, 296 (2d Cir. 1990) (defendant incompetent

15  where "his impaired sense of reality prevented him from focusing on his legal needs

16  and from acting effectively on his intellectual understanding"); *Deere v. Woodford*,

17  339 F.3d 1084, 1086 (9th Cir. 2003) (remanding capital habeas case for evidentiary

18  hearing on competence.

19       Because the state court completely failed to consider counsel's own description

20  of Blair's inability to consult with counsel, the CSC summary decision resulted in a

21  decision that involved an unreasonable application of clearly established federal law

22  as well as an unreasonable determination of facts in light of the evidence presented to

23  the CSC proceedings.  *See, e.g, Doody*,  649 F.3d at 1002 (finding the state court's

24  conclusion as an unreasonable application of clearly established federal law when the

25  state court had "completely failed to consider" evidence to the contrary before the

26  state court.)

27

28

The CSC denied Blair's claim that he was incompetent to represent himself at trial summarily, without issuing an order to show cause and without providing Blair a mechanism to further develop the facts.  Because Blair's claim made a prima facie case that he was incompetent to stand trial, the CSC's summarily denial of this claim resulted in a decision contrary to and an unreasonable application of clearly established federal law.  Further, to the extent that the CSC made any factual determinations, because Blair was precluded from developing the record before the CSC, those factual determinations constitute an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  *Winston v. Pearson*, 683 F.3d 489, 502 (4th Cir. 2012) (*Winston II*) (state court's refusal to allow petitioner to develop record, combined with material nature of evidence to be produced rendered decision "unbefitting of classification as an adjudication on the merits").  *See also, e.g.*, *Hurles v. Ryan*, 706 F.3d 1021 (9th Cir. 2013) (finding that the state court fact-finding process was fundamentally flawed when it makes factual determinations or credibility findings without granting the petitioner an evidentiary hearing or other opportunity to develop his claim); *Milke v. Ryan*, 2013 WL 979127, *8  (9th Cir. 2013) (finding that when the record is incomplete not because of "anything petitioner did or failed to do," the defects in the process satisfy (d)(2)); *David Williams v. Woodford*, 859 F. Supp. 2d 1154, 1161 (E.D. Cal. 2012) (Kozinski, Chief Circuit Judge, sitting by assignment) ("*Pinholster* isn't relevant where, as here, Petitioner surmounts section 2254(d) because he was not allowed to develop the record in state court").  *Hurles*, *Milke*, and *Williams* were decided after *Pinholster*, and all three affirmed that *Pinholster* left intact the long-standing Ninth Circuit precedent that where, as here, "a state court makes factual findings without an evidentiary hearing or other opportunity for the Petitioner to present evidence, 'the fact-finding process itself is deficient' and not entitled to [§ 2254(d)(2)] deference."

1     *Hurles*, 706 F.3d at 1038 (citing and quoting *Taylor v. Maddox*, 366 F.3d 992, 1001

2     (9th Cir. 2004)).

3         Because the CSC's decisions, both on direct appeal and state habeas,

4     unreasonably applied clearly established federal law, and those decision were based

5     on the unreasonable determinations of facts in light of the evidence presented in the

6     state proceedings, 2254 (d) does not bar relief on Blair's claims based on his lack of

7     competency to stand trial and to waive counsel and represent himself.

8         **4.**     **Blair was not competent to waiver counsel nor was he**

9             **competent to represent himself at his capital trial**

10         Under the Sixth Amendment, a defendant in a criminal case has a right to

11     counsel at all critical stages in the proceedings. *Mempa v. Rhay*, 389 U.S. 128, 134,

12     88 S. Ct. 254, 19 L. Ed. 2d 336 (1967). Under certain circumstances, a defendant

13     who wishes to represent himself may waive that constitutional right to counsel.

14     *Faretta v. California*, 422 U.S. 806, 807, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975).

15     "The Sixth Amendment, when naturally read, thus implies a right of

16     self-representation." *Faretta*, 422 U.S. at 821. However, any defendant's waiver of

17     his right to counsel must be done "knowingly and intelligently." *Id*. at 835 (quoting

18     *Johnson v. Zerbst*, 304 U.S. 458, 464-65, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938)).

19         In *Godinez v. Moran*, 509 U.S. 389, the Supreme Court emphasized that

20             [a] finding that a defendant is competent to stand trial . . . is

21             not all that is necessary before he may be permitted to plead

22             guilty or waive his right to counsel. In addition to

23             determining that a defendant who seeks to plead guilty or

24             waive counsel is competent, a trial court must satisfy itself

25             that the waiver of his constitutional rights is knowing and

26             voluntary.

27

28

1   509 U.S. at 400; *Faretta*, 422 U.S. at 835 (exercise of right to self-representation

2   must be made knowingly, intelligently, voluntarily and competently).  The validity of

3   waiver is a legally separate question from competence to waive counsel.  *Shafer v.*

4   *Bowersox*, 329 F. 3d 637, 642 (8th Cir. 2003).

5          By the time of Blair's capital trial,

6                 It is reasonably clear under our cases that waivers of counsel

7                 must not only be voluntary, but must also constitute a

8                 knowing and intelligent relinquishment or abandonment of a

9                 known right or privilege, a matter which depends in each

10                case "upon the particular facts and circumstances

11                surrounding that case, including the background,

12                experience, and conduct of the accused." *Johnson v. Zerbst*,

13                304 U.S. 458, 464, 58 S. Ct. 1019, 1023, 82 L. Ed. 1461

14                (1938).  *See Faretta v. California*, 422 U.S. 806, 835, 95 S.

15                Ct. 2525, 2541, 45 L. Ed. 2d 562 (1975); *North Carolina v.*

16                *Butler*, 441 U.S. 369, 374–75, 99 S. Ct. 1755, 1758, 60 L.

17                Ed. 2d 286 (1979); *Brewer v. Williams*, 430 U.S. 387, 404,

18                97 S. Ct. 1232, 1242, 51 L. Ed. 2dd 424 (1977); *Fare v.*

19                *Michael C.*, 442 U.S. 707, 724–25, 99 S. Ct. 2560, 2571–72,

20                61 L. Ed. 2d 197 (1979).

21   *Edwards v. Arizona*, 451 U.S. 477, 482-83, 101 S. Ct. 1880, 68 L. Ed. 2378 (1981).

22   Further, "the information a defendant must possess in order to make an intelligent

23   election depends on a range of case-specific factors, including his education or

24   sophistication, the complex or easily grasped nature of the charge, and the stage of

25   the proceeding." *Iowa v. Tovar*,  541 U.S. 77, 78, 124 S. Ct. 1379, 158 L. Ed. 2d 209

26   (2004).

27

28

The courts are to "indulge every reasonable presumption" against the waiver of counsel. *Johnson v. Zerbst*, 304 U.S. 458, 464, *overruled in part on other grounds*, *Edwards v. Arizona*, 451 U.S. at 482. An "inquiry into whether a waiver of rights is knowing, voluntary, and intelligent requires examination of 'the particular facts and circumstances surrounding that case, including the background and experience . . . of the accused.'" *Shafer*, 329 F.3d at 650 (quoting *Edwards*, 451 U.S. at 482). It is clearly established that "[a] judge can make certain that an accused's professed waiver of counsel is understandably and wisely made only from a penetrating and comprehensive examination of all the circumstances under which such a plea is tendered." *Von Moltke v. Gillies*, 332 U.S. 708, 724, 68 S. Ct. 316, 92 L. Ed. 2d 309 (1948). Evidence of the defendant's mental condition is relevant to the waiver inquiry. *Shafer*, 329 F.3d at 650; *Wilkins v. Bowersox*, 145 F.3d 1006, 1012 (8th Cir. 1998) ("In the waiver of counsel context, we have explained that a defendant's background and personal characteristics are highly relevant in determining the validity of such a waiver."); *Buhl v. Cooksey*, 233 F.3d 783, 789 (3d Cir. 2000) (citing *Johnson v. Zerbst*, 304 U.S. at 464). As noted in *Buhl v. Cooksey*:

> The trial court's determination that the waiver is knowing, voluntary and intelligent must be based upon a penetrating and comprehensive examination of all the circumstances . . . . A purported waiver of counsel can be deemed effective only where the [trial judge] has made a searching inquiry sufficient to satisfy him that the defendant's waiver was understanding and voluntary. The entire procedure requires not only an intricate assessment of the defendant's intent, knowledge, and capacity, but a strong measure of patience as well.

*Buhl v. Cooksey*, 233 F. 3d at 799 (internal citations and quotations deleted).

The court's inquiry into a defendant's waiver of counsel should address three specific elements:  an understanding of the charges, the possible penalties, and the dangers of self-representation.  *Moran v. Godinez*, 57 F.3d at 698; *United States v. Balough*, 820 F.2d 1485, 1488 (9th Cir. 1987).  "The purpose of the 'knowing and voluntary' inquiry, by contrast, is to determine whether the defendant actually *does* understand the significance and consequences of a particular decision and whether the decision is uncoerced. . . ."  *Godinez v. Moran*, 509 U.S. at 401 n.12 (emphasis in original).  The defendant's waiver must be made "with eyes open." *Faretta*, 422 U.S. 806 at 835.

By the time of Blair's capital trial and during Blair's state habeas proceedings however, it was clearly established federal law that "the right of self-representation is not absolute." *Indiana v. Edwards*, 554 U.S. 164 (citing *Faretta*, 422 U.S. at 835, n.46 (no right "to abuse the dignity of the courtroom"); (no right to avoid compliance with "relevant rules of procedural and substantive law"); *id*., at 834, n.46 (no right to "engag[e] in serious and obstructionist misconduct," referring to *Illinois v. Allen*, 397 U.S. 337, 350–51, 90 S. Ct. 1057, 25 L. Ed. 2dd 353 (1970) (Brennan, J., concurring); *McKaskle v. Wiggins*, 465 U.S. 168, 178–79, 104 S. Ct. 944, 79 L. Ed. 2dd 122 (1984) (appointment of standby counsel over self-represented defendant's objection is permissible)*; Martinez v. Court of Appeal of Cal., Fourth Appellate Dist*., 528 U.S. 152, 163, 120 S. Ct. 684, 145 L. Ed. 2dd 597 (2000) (no right of self-representation on direct appeal in a criminal case); *Savage v. Estelle*, 924 F.2d 1459,1463 n.8 (9th Cir. 1991).

Self-representation and other Sixth Amendment rights, such as the right to counsel of choice, are subordinate to the paramount "interest in the rendition of just verdicts in criminal cases." *Wheat v. United States*, 486 U.S. 153 (1988).  Similarly, in *Estes v. Texas*, 381 U.S. 532, 85 S. Ct. 1628, 14 L. Ed. 2dd 543 (1965), the Supreme Court found that the Sixth Amendment's guarantee of a right to a public

76

1  trial was subordinate to the right to a fair trial.  Indeed, the court held that "the
2  criminal trial under our Constitution has a clearly defined purpose, to provide a fair
3  and reliable determination of guilt, and no procedure or occurrence which seriously
4  threatens to divert it from that purpose can be tolerated."  *Id*. at 564 (emphasis added).

5      It was clear from the beginning that Blair could not understand the
6  proceedings.  He improperly filled out the "*Faretta* form" and the court initially
7  denied his request to represent himself because he had trouble reading and writing
8  plain English.  (I Suppl. CT 5.)  However, in the superior court, the prosecutor
9  repeatedly sought to aid Blair in his self-representation requests by pointing out to the
10 court that Blair had represented himself in the earlier attempted murder case, without
11 revealing, however, that then appointed counsel had declared doubt as to Blair's
12 competency.[18]  (1 RT 1-5.)  Later in the proceedings, the prosecutor implied that the
13 case was not complicated and falsely implied that Blair was "a college graduate, that
14 he's taken graduate courses . . . ."[19]  (2 RT 1010-11.)

15     When Blair first sought self-representation in the municipal court, the court
16 found that he lacked an "educational background" and did "not read and understand
17 simple English," and denied his request.  On October 1, 1986, when Blair again
18 requested to represent himself, the court decided that the questions asked on the
19 "*Faretta* form" were no longer necessary and that Blair had a "perfect right" to
20

21    [18]  In Claim D of the Amended Petition, Blair alleges the prosecution denied
22 Blair his constitutional right to a fair trial by suppressing evidence of his mental
   illness when Blair requested to represent himself under *Brady v. Maryland*, 373 U.S.
23 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).  (Amended Petition at 135.)  On
   January 31, 2011, Blair filed this claim before the CSC in order to provide the state
24 with the opportunity to address this claim in the first instance.  Ex. C.  On February
   10, 2011, the CSC ordered an informal response.  Blair's exhaustion petition is now
25 fully briefed.  This Court should also grant a stay of these proceeding in order to
   allow the state the first opportunity to consider this claim under *Rhines v. Weber*, 544
26 U.S. 269, 125 S. Ct. 1528, 161 L. Ed. 2d 440 (2005).

27    [19]  As the record shows no such information, it is fairly certain the prosecutor
28 knew these assertions to be false.

1   represent himself if he wanted to do so.  (I Suppl. CT 16-17.)  The court conducted no

2   inquiry of any kind.  It had to explain to Blair what it meant by "a lawyer who tries

3   his own case has a fool for a client."  The court simply relieved the public defender

4   and Blair proceeded in *propria persona*.  When Blair appeared for the preliminary

5   hearing on October 3, 1986, the court merely asked if he had been told earlier of the

6   "pain and pitfalls of self-representation and the warnings about it."  (I CT 3.)  When

7   Blair responded that he had, the court again granted him self-representation.  (*Id*.)

8       Never during any of the municipal court proceedings did the court conduct any

9   kind of inquiry, let alone a "searching inquiry" or "penetrating and comprehensive

10  examination," before granting Blair self-representation.  The court did not attempt to

11  determine whether Blair understood the "significance and consequences" of his

12  decision.  The court's inquiry of Blair was short and perfunctory.  No valid *Faretta*

13  waiver was thus obtained.

14      The proceedings in the superior court were similarly inadequate.  The

15  prosecutor repeatedly emphasized to the court that Blair had represented himself in a

16  prior trial concerning the same incident.  That fact, however, carried no weight in

17  determining whether a criminal defendant can waive his right to counsel.  As the

18  court pointed out in *Buhl v. Cooksey*, 233 F.3d at 800:  "street smarts and prior pro se

19  representation were no substitute for a careful and thorough inquiry."  The colloquy

20  between Blair and the court consisted almost entirely of yes or no questions.  Such

21  colloquy sheds little, if any, light on Blair's ability to knowingly and intelligently

22  waive his right to counsel.  *See e.g, Von Moltke v. Gillies*, 332 U.S. at 724;  *Wilkins*,

23  145 F.3d at1012 (8th Cir. 1998);  *Miles v. Stainer*, 108 F.3d 1109, 1112 (9th Cir.

24  1997) ("state-court plea colloquy consisted almost entirely of yes or no questions

25  which shed little light on complex reasoning ability.").

26      Here, no state court considered Blair's competency to represent himself until

27  May 4, 1987, when Blair's case was transferred to Judge Nelson's courtroom.  Judge

28

78

1   Nelson had presided over Blair's attempted murder case in 1985.  At the beginning of

2   the May 4 proceedings, Judge Nelson remarked:  "The defendant is acting in pro per,

3   as I understand."  (1 RT 142.)  Later, after a dispute arose over the status of Newman

4   as either advisory counsel or associate counsel, Judge Nelson stated:  "So let's make a

5   decision Mr. Blair . . . . Do you want to be pro per, or do you want a lawyer

6   representing you?"  Blair replied:  "I'm pro per."  Judge Nelson remarked:  "All right.

7   Then, Mr. Newman, you may remain as advisory counsel."  (1 RT 146-47.)

8         In denying the claim that Blair had been unconstitutionally allowed to represent

9   himself, the CSC found the trial court had not erred in allowing Blair to decide

10   whether to request the appointment of a psychiatrist.  *People v. Blair*, 36 Cal. 4th at

11   719.  It reasoned that since the "court did not find reason to doubt defendant's

12   competence, it properly deferred to defendant's wishes on that score."  *Id*.  Because

13   the California Supreme Court's adjudication that it was proper to defer to Blair was

14   dependent on an antecedent unreasonable application of federal law, the state court's

15   adjudication of Blair's competency to stand trial involved an unreasonable

16   application of the relevant federal law.  *Panetti v. Quarterman*, 551 U.S. 930 (2007).

17         "Under the rule of *Pate v. Robinson*, a due process evidentiary hearing is

18   constitutionally compelled at any time that there is "substantial evidence" that the

19   defendant may be mentally incompetent to stand trial.  *Moore v. United States*, 464

20   F.2d 663, 666 (9th Cir. 1972) (internal citations omitted).

21                   'Substantial evidence' is a term of art.  'Evidence'

22                   encompasses all information properly before the court,

23                   whether it is in the form of testimony or exhibits formally

24                   admitted or it is in the form of medical reports or other

25                   kinds of reports that have been filed with the court.

26                   Evidence is 'substantial' if it raises a reasonable doubt about

27                   the defendant's competency to stand trial.  Once there is

28

1    such evidence from any source, there is a doubt that cannot

2    be dispelled by resort to conflicting evidence.  The function

3    of the trial court in applying *Pate*'s substantial evidence test

4    is not to determine the ultimate issue:  Is the defendant

5    competent to stand trial?  Its sole function is to decide

6    whether there is any evidence which, assuming its truth,

7    raises a reasonable doubt about the defendant's competency.

8    At any time that such evidence appears, the trial court *sua*

9    *sponte* must order an evidentiary hearing on the competency

10   issue.  It is only after the evidentiary hearing, applying the

11   usual rules appropriate to trial, that the court decides the

12   issue of competency of the defendant to stand trial.

13   *Id*.

14       And as explained above, evidence of the defendant's mental condition is

15   relevant to the waiver inquiry to determine if the waiver is made knowingly,

16   intelligently, voluntarily and competently.  *Godinez v. Moran*, 509 U.S. 389 (1993);

17   *Shafer*, 329 F.3d at 650; *Wilkins*, 145 F.3d at 1012.  Here, both Lucas and Newman

18   repeatedly voiced their concern that Blair was not competent to stand trial,

19   mentioning that Blair had been incarcerated at Atascadero, a state institution for those

20   who are found incompetent to stand trial;[20] that Blair did not want "other people

21   involved" in the penalty phase; that he had refused to be examined by psychiatrist

22   when Lucas broached the subject, and that Blair had spent almost all his time writing

23   writs as opposed to preparing for trial.  (May 10, 1989 *in camera* hearing.)  They also

24   argued, in detail, Blair's incapacity to comprehend the need to investigate viable

25   ──────────────

26       [20]  To the extent the California Supreme Court's decision was based on Lucas
     and Newman's failure to make the Atascadero records part of the record on direct
27   appeal, *People v. Blair*, 36 Cal. 4th at 729, such failure constitutes ineffective
     assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052,
28   80 L. Ed. 2d 674 (1984) and its progeny.

1    defenses.  (*Id.*)  There was more than enough evidence to indicate to any reasonable

2    judge that there was a bona fide doubt as to Blair's competence.  Because the

3    California Supreme Court adjudication that it was proper to defer to Blair to decide

4    whether to appoint a psychiatrist was based on that court's antecedent unreasonable

5    application of federal law as to whether the court should have conducted a

6    competency determination, this Court must resolve Blair's claims regarding his

7    competency to stand trial and to act as his own counsel *de novo*.

8          Further, the CSC issued its last decision in August 9, 2009.  By then, it was

9    clearly established under that competency for self-representation required a higher

10   degree of mental competency than that required by the *Dusky* standard.[21] *Indiana v.*

11   *Edwards*, 554 U.S. at 178.  Therefore, the CSC's decision that the trial court had not

12   mistakenly assumed such right was absolute resulted in a decision that was both

13   contrary to, or involved an unreasonable application of, clearly established federal

14   law.

15         The evidence presented in Blair's state habeas proceeding showed the

16   unreasonableness of the state court's determination.  As Dr. Woods explained in his

17   declaration filed in support of Blair's state habeas petition, Blair was then, and at the

18   time of his trial, a paranoid schizophrenic.  (*In re Blair on Habeas Corpus*, Case No.

19   S144759, Ex. 76, G. Woods Decl. ¶ 39.)  Blair did not seek self representation

20   because he thought he could a better job or present a better defense than appointed

21   counsel.  In fact, as advisory counsel informed the trial court and the CSC in habeas,

22   Blair did almost nothing to prepare for trial and presented no coherent defense.  (*In re*

23   *Blair on Habeas Corpus*, Case No. S144759, Ex. 52, R. Newman Decl.; Ex. 90, L.

24   Lucas Decl.)  Blair sought, indeed demanded, self-representation because it was the

25

26        [21] "As we explained, § 2254(d)(1) requires federal courts to focus on what a
     state court knew and did, and to measure state-court decisions against this Court's
27   precedents *as of the time the state court renders its decision*." *Greene v. Fisher*, 132
     S. Ct. 38, 45,  181 L. Ed. 2d 336 (2011) (citing *Cullen v. Pinholster*, 131 S. Ct. 1388,
28   1399, 179 L. Ed. 2dd 557 (2011) (emphasis in original).

81

1    only way in which he could prevent counsel from investigating and exposing his

2    mental illness.  In short, Blair obtained self-representation, then did virtually nothing

3    to avoid a death sentence, just to avoid having his mental health called into question.

4    Permitting Blair to represent himself under these circumstances does not constitute a

5    knowing or intelligent waiver of his right to counsel.  These facts clearly establish

6    that Blair was not mentally competent to waive his right to counsel and did not

7    knowingly and intelligently waive his right to counsel.

8         Thus, even if this Court finds that the CSC met the AEDPA standards pursuant

9    to *Faretta*, *Faretta* is inapplicable to Blair's situation.  In *Indiana v. Edwards* the

10   Supreme Court held that, "*Faretta* does not answer the question" of "the relation of

11   the mental competence standard to the right of self-representation," 554 U.S at 170,

12   "because [*Faretta*] did not consider the problem of mental competency . . . , and

13   because *Faretta* itself and later cases have made clear that the right of

14   self-representation is not absolute."  *Id.* at 171.  Because the CSC denied Blair's

15   habeas petition on August 9, 2009, this Court must apply, as the relevant clearly

16   established federal law at that time, *Indiana v. Edwards*, which was issued in 2008.

17   *Greene v. Fisher*, 132 S. Ct. 38, 44 (2011)

18        In *Indiana v. Edwards*, the Supreme Court recognized that competency for self-

19   representation requires that in addition to meeting *Dusky*'s mental competence

20   standard, an individual be able "to carry out the basic tasks needed to present his own

21   defense without the help of counsel."  *Indiana v. Edwards*, 554 U.S. at 175-76 (citing

22   N. Poythress, R. Bonnie, J. Monahan, R. Otto, & S. Hoge, Adjudicative Competence:

23   The MacArthur Studies 103 (2002) ("Within each domain of adjudicative competence

24   (competence to assist counsel; decisional competence) the data indicate that

25   understanding, reasoning, and appreciation [of the charges against a defendant] are

26   separable and somewhat independent aspects of functional legal ability"); *McKaskle*,

27   465 U.S., at 174 (describing trial tasks as including organization of defense, making

28

82

motions, arguing points of law, participating in voir dire, questioning witnesses, and addressing the court and jury).  *Indiana v. Edwards* also recognize that:

> The American Psychiatric Association (APA) tells us (without dispute) in its amicus brief filed in support of neither party that "[d]isorganized thinking, deficits in sustaining attention and concentration, impaired expressive abilities, anxiety, and other common symptoms of severe mental illnesses can impair the defendant's ability to play the significantly expanded role required for self-representation even if he can play the lesser role of represented defendant.

*Id*. at 176, (citing Brief for APA *et al*. as *Amici Curiae* 26.)

As the Edwards court recognized, a higher standard than the Dusky's basic mental competence standard is required for self-representation because a "trial will not 'affirm the dignity' of a defendant who lacks the mental capacity to conduct his defense without the assistance of counsel." *Id*. at 177 (citing *McKaskle*, 465 U.S. at 176–77.

> To the contrary, given that defendant's uncertain mental state, the spectacle that could well result from his self-representation at trial is at least as likely to prove humiliating as ennobling.  Moreover, insofar as a defendant's lack of capacity threatens an improper conviction or sentence, self-representation in that exceptional context undercuts the most basic of the Constitution's criminal law objectives, providing a fair trial.  As Justice Brennan put it, '[t]he Constitution would protect none of us if it prevented the courts from acting to preserve

83

1      the very processes that the Constitution itself prescribes.'

2      *Allen*, 397 U.S., at 350, 90 S. Ct. 1057 (concurring opinion).

3      *See Martinez*, 528 U.S., at 162, 120 S. Ct. 684 ("Even at the

4      trial level . . . the government's interest in ensuring the

5      integrity and efficiency of the trial at times outweighs the

6      defendant's interest in acting as his own lawyer"). *See also*

7      *Sell v. United States*, 539 U.S. 166, 180, 123 S. Ct. 2174,

8      156 L. Ed. 2dd 197 (2003) ("[T]he Government has a

9      concomitant, constitutionally essential interest in assuring

10     that the defendant's trial is a fair one").

11  *Id*. at 177.  "The proceedings must not only be fair, they must 'appear fair to all who

12  observe them.'"  *Id*.  (citing *Wheat v. United States*, 486 U.S. at 160 (1988).

13        Even assuming Blair met Dusky's basic mental competence standard to stand

14  trial, it is clear from both the record at trial and the evidence presented to the CSC

15  during habeas proceedings that Blair was far from being competent to conduct trial

16  proceedings by himself.  Ray Newman, associate and standby counsel, declares that

17  Blair "simply ignored" Newman and "anything [he] suggested when Newman would

18  meet Blair to discuss pretrial issues and trial strategy.  (*In re Blair on Habeas Corpus*,

19  No. S144759, Ex. 52, R. Newman Decl. ¶ 3.)  Newman reports that during their

20  meetings, "[m]ore often than not [Blair] would simply say nothing to [Newman]

21  about the case."  *Id*.  Newman further declares:

22        What was clear to me, based upon the discussions I did have

23        with him, was that Mr. Blair didn't want to go to trial and,

24        as far as I could tell, was not preparing for trial. . . .

25         [Although] I was not present in court for most of the trial

26        proceedings in Mr. Blair's case[,] I did see him in the

27        evening after court as the central jail on a few occasions.  It

28

84

became apparent to me, based upon what I saw in court

when I was present in court and what Mr. Blair told me at

the jail, that Mr. Blair had done nothing to prepare for trial.

It was also clear to me that Mr. Blair was not preparing in

the evening, after court, for the next day's proceedings.

Both before and during the guilt phase trial he was

preparing and filing a number of writs in a number of

different courts.  Mr. Blair focused only on his writs and not

on the trial proceedings.  It was clear to me that he had no

trial strategy of any kind and believed that his writs were the

only things of any importance.  At the end of the guilt phase

case he told me that he was exhausted.  Given his schedule

of being in court all day and working on his writs when he

got back to the central jail at night, I was not surprised.  He

asked me to give the guilt phase closing argument, which I

did despite not being present for most of the trial.

On May 10, 1989, after the guilt phase verdicts had been

returned, I informed the trial court that I thought Mr. Blair

was not competent to proceed.  This was based in part on

my belief that despite the fact that he was now fighting for

his life, Mr. Blair had no interest and no plan for preparing

for the penalty phase.  He continued to focus only on his

writs.  He refused to permit me to investigate any mitigation

evidence.  He specifically directed Mr. Lucas, who was

appointed as co-advisory counsel, and I not to contact any

of his friends or family members.  He refused to discuss his

friends or family with me or provide any information about

85

them.  He refused to even discuss meeting a psychiatrist or
psychologist and refused to consider any investigation of
any kinds into his mental or social history.  He had not
strategy or plan for the penalty phase and was only
concerned about his writs.

(*In re Blair on Habeas Corpus*, Case No. S144759, Ex. 52, R. Newman Decl. ¶¶ 3, 4-
5.)

Lucas similarly, states Blair was not competent to represent himself.  (*Id*., Ex.
90.)   In his declaration submitted to the CSC, Lucas declares:

I believed from reading the files I was given that Mr. Blair
certainly was not competent to represent himself.  In
particular I remember reading what Judge Nelson said when
he sentenced him in the attempted murder case, about how
he probably was mentally ill. . . . I had represented clients
with mental illnesses over the years.  I thought Mr. Blair
was the kind who was sick, but faking wellness.  It was not
obvious immediately.  However, as I sat watching him
fumble through his trial, with him not realizing that he was
making mistakes and not seeming to care what was
happening, I became even more convinced that there was
something wrong with him mentally.

(*Id*. ¶ 5.)

Further, Lucas states Blair would ignore suggestions to investigate viable
defenses, not just in mitigation, but also during the guilt phase, including issues of
causation and other cases involving adulterated bottles of alcohol.  (*Id*. ¶ 6.)  Lucas
states Blair could not conduct voir dire, and indeed may have been unable to grasp
the importance of the voir dire process, since it seemed Blair was not even reading the

86

1    jury questionnaires.  (*Id*. ¶ 7-10. )  Lucas described how Blair could not prepare for

2    cross-examining witnesses, let alone had a cohesive plan to elicit useful information

3    from such witnesses.  (*Id*. ¶ 11.)  Lucas describes how even during breaks, Blair was

4    busy writing legal pleadings and making sure they would be filed, even when such

5    pleadings, like an unlawful detainer eviction had nothing to do wit his case.  (*Id*. ¶

6    13.)  Lucas described how it was so painful for him to watch Blair fumbling through

7    the trial that Lucas had to walk away from the court room, only to have the trial court

8    call him back.  (*Id*. ¶ 12.)

9        Lucas's observations of Blair fumbling are reminiscent of the dangers

10   identified by the *Edwards* court.  According to Lucas, it seemed to him the jury at one

11   point notice that "something was wrong with Mr. Blair."  (*Id*. ¶ 14.)  "They looked at

12   him oddly.  I recall one juror inquiring whether Blair was a lawyer, in a way that

13   sounded like she wondered why he was being allowed to represent himself."  (*Id*.)  As

14   the *Edwards* court observed,

15           An amicus brief reports one psychiatrist's reaction to having

16           observed a patient (a patient who had satisfied *Dusky*) try to

17           conduct his own defense: "[H]ow in the world can our legal

18           system allow an insane man to defend himself?" Brief for

19           State of Ohio *et al.* as *Amici Curiae* 24 (internal quotation

20           marks omitted).

21   *Edwards*, 554 U.S. at 177.

22       And as the *Edwards* Court cautioned, "[n]o trial can be fair that leaves the

23   defense to a man who is insane, unaided by counsel, and who by reason of his mental

24   condition stands helpless and alone before the court." *Id*. at 177 (citing *Massey*, 348

25   U.S., at 108.)

26       Consequently, because in denying this claim, the CSC treated the right to self-

27   representation as absolute, and failed to apply federal rule that the right to self-

28

87

1    representation is subordinate to the paramount "interest in the rendition of just

2    verdicts in criminal cases," under 28 U.S.C. § 2254 (d), the CSC's denial resulted in a

3    decision that was both contrary to, and involved an unreasonable application of,

4    clearly established federal law, as determined by the Supreme Court in *Faretta*, and

5    *Indiana v. Edwards*.   Thus, § 2254 (d) does not bar habeas relief.

6    **B.      Amended Petition Claim B.**

7    Claim B of Blair's Amended Petition alleges that Blair did not form the intent

8    necessary to commit the charged crimes.[22]   (Amended Petition at 119-121.)

9              **1.      AEDPA Does Not Bar Relief on this Claim**

10             In his First Amended Petition, Blair argued that he is entitled to habeas relief

11   on his claim that he did not form the necessary specific intent to commit first-degree

12   murder or for the special circumstance of murder-by-poisoning.   (Amended Petition at

13   119-121.)   Blair raised this claim in his state habeas petition, and the CSC denied it

14   on the merits in a summary dismissal.   Because the CSC's denial of this claim was

15   unreasonable under § 2254(d), Blair is entitled to relief on this claim.

16             In his state petition, Blair made a "persuasive demonstration of 'actual

17   innocence'" warranting federal habeas relief.   *Herrera v. Collins*, 506 U.S. 390, 417,

18   113 S. Ct. 853, 122 L. Ed .2d 203 (1993).   Based on "newly discovered evidence and

19   the entire record before the jury that convicted him, 'no rational trier of fact could

20   [find] proof of guilt beyond a reasonable doubt.'"   *Herrera*, 506 U.S. at 429 (White, J.

21   concurring) (quoting *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781, 61 L.

22   Ed. 2d 560 (1979)).

23             Legal innocence constitutes evidence of actual innocence.   *Jaramillo v.

24   Stewart*, 340 F.3d 877, 882-84 (9th Cir. 2003) (new evidence that killing was in self-

25   defense under Arizona law would, if credible, constitute evidence of actual

26   _____

27         [22]   This claim was presented as Claim One in Blair's petition for writ of habeas
     corpus.   The CSC summarily denied this claim, without issuing an order to show
28   cause.   The CSC summarily denied this claims on the merits.

1   innocence).  Blair's claim of innocence rests on evidence that he could not have

2   formed the required mental state to either commit first-degree murder or the special

3   circumstance alleged in this case.

4       Under California law, murder is defined as the unlawful killing of a human

5   being with malice aforethought.  Penal Code § 187.  Malice may be express or

6   implied.  An express malice theory requires proof that Blair had the specific intent to

7   kill the victim.  *People v. Mattison*, 4 Cal. 3d 177, 183, 481 P.2d 193, 93 Cal. Rptr.

8   185 (1971).  An implied malice theory requires proof that Blair "had full knowledge

9   that his conduct endangered the life of decedent, but that he nevertheless deliberately

10  administered the poison with conscious disregard for that life."  *Id.* at 183-84.  The

11  only special circumstance alleged in this case was that Blair killed the victim by

12  poisoning her.  This required proof that Blair "intentionally killed the victim by the

13  administration of poison."  Penal Code § 190.2(a)(19).

14      At the time of Blair's trial, evidence of mental disease, mental defect, or

15  mental disorder is admissible "on the issue of whether or not the accused actually

16  formed a required specific intent, premeditated, deliberated, or harbored malice

17  aforethought, when a specific intent crime is charged."   Penal Code § 28(a).

18  Evidence of Blair's mental condition is thus relevant and admissible to rebut the

19  intent element, required for both the underlying murder conviction and for the special

20  circumstance allegation.  *People v. Williams*, 16 Cal. 4th 635, 941 P.2d 752,677, 66

21  Cal. Rptr. 2d 573 (1997).

22      A defendant is not guilty by reason of insanity when he was incapable of

23  knowing or understanding the nature and quality of his act or was incapable of

24  distinguishing right from wrong at the time of the commission of the offense.  Penal

25  Code § 25(b); *People v. Skinner,* 39 Cal.3d 765, 777, 704 P.2d 752, 217 Cal. Rptr.

26  685, (1985).

27

28

a.      The California Supreme Court's Denial of this Claims Was

Based on an Unreasonable Determination of the Facts

Blair made a prima facie showing of his lack of requisite intent in the CSC, based on both newly discovered evidence regarding his mental condition and the trial record.  Nonetheless, that court never allowed Blair to further develop the facts in support of his claim by issuing an order to show cause.  Because Blair made a prima facie of his innocence, the CSC should have issued an order to show cause on this claim.  *See People v. Duvall*, 9 Cal. 4th 464, 474-75, 37 Cal. Rptr. 2d 259, 886 P.2d 1252 (1995).  Blair satisfies § 2254(d)(2), because the CSC's fact-finding procedures were deficient.  *Hurles v. Ryan*, 706 F.3d 1021 (9th Cir. 2013); *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004).

For purposes of review under section 2254(d), the state court record "includes both the allegations of [the] habeas corpus petition . . . and . . . any matter of record pertaining to the case."  *Cullen v. Pinholster*, 131 S. Ct. 1388, 1402 n.12, 179 L. Ed. 2d 557 (2011) (internal quotation marks omitted).  In his state habeas petition, Blair alleged that he had suffered from Schizophrenifrom Spectrum Disorder since late childhood and was suffering from it at the time of the alleged capital offense.  (*In re Blair on Habeas Corpus*, No. S144759, Ex. 52, R. Newman Decl.¶ 104.)  His offense – poisoning a woman who may or may not owed him money – was thus a product of his paranoid ideation and obsessive-compulsive thoughts.  (*Id*. ¶ 104.)   He alleged that, had his mental illness been properly investigated and presented, it would have either provided a meritorious mental state defense at trial or would have supported a finding of not guilty by reason of insanity.  (*Id*. ¶ 89.)

Blair's allegations were supported by voluminous evidence of his mental illness, before, during, and after his trial.  Blair manifested symptoms of mental illness at a very young age, including his paranoia about germs and dirt, and his

90

1 tendency to stare off into space as if in a trance.  (*Id*. ¶¶ 29-31.)  Blair also informed

2 the CSC that in 1971, he had been found legally insane and committed to Atascadero

3 State Hospital.  (*People v. Blair*, Ex. 18 (CR8672), ¶¶ 107, 110.)  Dr. Walker

4 Pelatson, who was appointed to evaluate Blair at the time, reported that Blair's

5 "impairment is so global and appears of such long duration and chronicity" that his

6 diagnosis was likely "Chronic psychosis of schizophrenic proportion . . . ."  (*Id*, ¶

7 107.)  Dr. Pelatson found that Blair's "mental disability is of so chronic a nature that

8 he was also insane at the time of offense, i.e. that he was unable to distinguish

9 between right and wrong and to appreciate the nature and quality of his acts."  (*Id.*)

10 None of this evidence regarding Blair's mental condition was introduced at his trial to

11 show that he could not have formed the intent to kill or that he was legally insane.

12 Even though evidence of Blair's mental illness did not come out at trial, the

13 count record also indicates that Blair lacked the intent to kill.  On the day of the

14 incident, September 24, 1984, Blair said nothing to anyone indicating that he wanted

15 to kill Green.  There was nothing in Blair's reported conduct which distinguished his

16 intent as intent to kill rather than intent to cause injury or illness.  When Blair left

17 Michelle Du Bois' apartment, while Rhoda Miller was still at Green's apartment, he

18 told William Miller that he would be by to see Michelle Du Bois the next day or the

19 day after.  (11 RT 3242.)  Certainly, if Blair expected Green or Miller to be dead from

20 poisoning he would not have told William that he would be returning to the apartment

21 the very next day.

22 Blair was arrested on October 2, 1984, outside the apartment complex where

23 both Green and Rhoda Miller lived.  As he had told William, he returned to the

24 apartment complex to see Du Bois.  Before he was arrested, Blair again spoke to

25 William.  He asked William where his mother, Rhoda Miller, was.  William replied

26 that he did not know.  (11 RT 3222.)

27

28                                                          91

1     Clearly, when Blair returned to the complex on October 2, 1984, he expected to

2  find Rhoda Miller alive and well.  While he did not mention Green by name, there

3  was nothing in his conduct that showed that he expected to find her dead.  When he

4  spoke to William Miller, he certainly did not expect that William's mother, Rhoda

5  Miller, was dead.  Nor did Blair expect to be arrested for the poisoning of either

6  Miller or Green.  He did not try to conceal his presence at the apartment complex in

7  any manner.

8     Based on the allegations in his petition and the trial record, Blair made a prima

9  facie showing of his innocence.  The CSC nonetheless rejected this claim on the

10  merits, without issuing an order to show cause or otherwise allowing Blair an

11  opportunity for fact development.  Because the CSC improperly precluded Blair from

12  developing the record in support of this claim, any factual determinations made by

13  that court were unreasonable.  *Winston v. Pearson*, 683 F.3d 489, 502 (4th Cir. 2012)

14  (*Winston II*) (state court's refusal to allow petitioner to develop record, combined

15  with material nature of evidence to be produced rendered decision "unbefitting of

16  classification as an adjudication on the merits").  *See also, e.g., Hurles*, 706 F.3d at

17  1021 (finding that the state court fact-finding process was fundamentally flawed

18  when it makes factual determinations or credibility findings without granting the

19  petitioner an evidentiary hearing or other opportunity to develop his claim); *Milke v.*

20  *Ryan*, 2013 WL 979127 (9th Cir. Mar. 14, 2013), at *8  (finding that when the record

21  is incomplete not because of "anything petitioner did or failed to do," the defects in

22  the process satisfy (d)(2)); *David Williams v. Woodford*, 859 F. Supp. 2d 1154, 1161

23  (E.D. Cal. 2012) (Kozinski, Chief Circuit Judge, sitting by assignment) ("*Pinholster*

24  isn't relevant where, as here, Petitioner surmounts section 2254(d) because he was not

25  allowed to develop the record in state court").  *Hurles*, *Milke*, and *Williams* were

26  decided after *Pinholster*, and all three affirmed that *Pinholster* left intact the

27

28                                             92

1    long-standing Ninth Circuit precedent that where, as here, "a state court makes factual

2    findings without an evidentiary hearing or other opportunity for the Petitioner to

3    present evidence, 'the fact-finding process itself is deficient' and not entitled to [§

4    2254(d)(2)] deference." *Hurles*, 706 F.3d at 1038 (citing and quoting *Taylor v.

5    Maddox*, 366 F.3d at 1001 (9th Cir. 2004)).

6              **b.    The California Supreme Court's Denial of this Claim Was an**

7                     **Unreasonable Application of Clearly Established Federal Law**

8              Under clearly established Supreme Court authority, the confinement and

9    execution of an actually innocent person is unconstitutional.  In *Herrera v. Collins*,

10    506 U.S. 390 (1993), the Supreme Court considered the case of a habeas petitioner

11    who asserted a claim of actual innocence based upon newly discovered evidence.

12    The Supreme Court's majority opinion, assuming that actual innocence claims could

13    be asserted, explained that "the threshold showing for such an assumed right would

14    necessarily be extraordinarily high."  *Id.* at 417.  But a separate majority comprised of

15    Justices O'Connor, Kennedy, Blackmun, Stevens, and Souter would have gone

16    further than assumption in order to fully establish the existence of an actual innocence

17    claim.  *See id.* at 419 (O'Connor, J., concurring); *id.* at 430-31 (Blackmun, J.,

18    concurring).  As Justice Powell explained earlier in *Kuhlmann v. Wilson*, 477 U.S.

19    436, 106 S. Ct. 2616, 91 L. Ed. 2d 364 (1986) (plurality opinion):  "Even where, as

20    here, the many judges who have reviewed the prisoner's claims . . . have determined

21    that his trial was free from constitutional error, a prisoner retains a powerful and

22    legitimate interest in obtaining his release from custody if he is innocent of the charge

23    for which he was incarcerated."  *Id.* at 452.

24              The Ninth Circuit has interpreted *Herrera* as establishing a freestanding actual

25    innocence claim.  In *Carriger v. Stewart*, 132 F.3d 463 (9th Cir. 1997) (en banc), the

26    court considered a habeas petitioner's freestanding actual innocence claim but

27

28                                                    93

1    ultimately held that he had failed to meet the "extraordinarily high" threshold for

2    establishing his innocence.  *Id.* at 476-77.  As the Court explained, "a majority of the

3    Supreme Court [in *Herrera*] assumed, without deciding, that execution of an innocent

4    person would violate the Constitution.  A different majority would have explicitly so

5    held."  *Id.* at 476; *United States v. Berry*, 624 F.3d 1031, 1038 n.5 (9th Cir. 2010);

6    ("This circuit recognizes a claim of actual innocence that is cognizable under §

7    2255."); *Haskell v. Harris*, 669 F.3d 1049, 1065 (9th Cir. 2012) ( "[t]here are few

8    greater injustices than the wrongful imprisonment of an innocent person.")

9          By its actions, the Supreme Court has recently acknowledged the existence of

10   freestanding actual innocence claims once again.  In 2009, faced with a petition for

11   writ of habeas corpus raising *only* a claim of actual innocence, the Court transferred

12   the petition to a district court "for hearing and determination."  *In re Troy Davis*, __

13   U.S. __, 130 S. Ct. 1, 174 L. Ed. 2d 614 (2009).  The Court further directed that "[t]he

14   District Court should receive testimony and make findings of fact as to whether

15   evidence that could not have been obtained at the time of trial clearly establishes

16   petitioner's innocence."  *Id.*; *see also id.* (Stevens, J., concurring) (rejecting the idea

17   that courts "must treat even the most robust showing of actual innocence identically

18   on habeas review to an accusation of minor procedural error").  In other words,

19   confronted with a situation analogous to Blair's – that is, the discovery of new

20   evidence potentially demonstrating a habeas petitioner's innocence – the United

21   States Supreme Court ordered a determination of whether the new evidence indeed

22   established innocence.  *Davis*, 130 S. Ct. at 1.

23         Under *Herrera*, habeas relief must be granted, where no rational trier of fact

24   could find proof of guilt beyond a reasonable doubt, based on both newly discovered

25   evidence and the entire record before the jury.  *Herrera*, 506 U.S. at 429 (White, J.

26   concurring) (quoting *Jackson,* 443 U.S. at 324).  The California Supreme Court's

27

28                                            94

1  application of this standard to *Blair*'s case was unreasonable.  Section 2254(d)(1) is

2  satisfied where a state court "unreasonably refuses to extend a legal principle to a

3  context where it should apply."  *Williams*, 529 U.S. at 397, 407.  Had the state court

4  properly applied *Herrera*, it would have concluded that Blair lacked the requisite

5  mental state for both his first-degree murder conviction and for the special

6  circumstance allegation.

7  **C.     Amended Petition Claim C.**

8         Claim C of Blair's Amended Petition alleges that because there is no Sixth

9  Amendment right to self-representation at the penalty phase of a capital trial, Blair's

10  penalty trial was fundamental unfair; alternatively, the trial court erred when it

11  permitted Blair, acting in *propria persona*, to prevent the presentation of mitigating

12  evidence at the penalty phase.[23]  Amended Petition at 122-34,

13         **1.     AEDPA Does not Apply to This Claim.**

14         By the time of Blair's capital trial, it was clearly established federal law that

15  self-representation and other Sixth Amendment rights, such as the right to counsel of

16  choice, are subordinate to the paramount "interest in the rendition of just verdicts in

17  criminal cases."  *Wheat v. United States*, 486 U.S. 153, 160, 108 S. Ct. 1692, 100 L.

18  Ed. 2d 140 (1988).  It was also clearly established that the penalty of death "differs

19  from all other forms of criminal punishment, not in degree but in kind."  *Furman v.*

20  *Georgia*, 408 U.S. 238, 306, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972).  Thus, the

21  Eighth and Fourteenth Amendments require a reliable verdicts in death penalty cases.

22  *See Lockett v. Ohio*, 438 U.S. 586, 603-05, 98 S. Ct.2954, 57 L. Ed. 2d 973 (1978);

23  *Beck v. Alabama*, 447 U.S. 625, 638, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1980).

24

25

26         [23]  This claim was presented to the CSC in the direct appeal as Sections

27  Section XI  and was denied in a published opinion.  *Blair*, 36 Cal. 4th at 736-740.

28                                           95

*Faretta* was a noncapital case and it did not address whether the limited right of self-representation extended to the penalty phase of a capital trial.  Neither *Faretta* nor its progeny addressed the kind of bifurcated proceedings utilized in capital cases in California.

In *Martinez v. Court of Appeal*, 528 U.S. 152, 120 S. Ct. 684, 145 L. Ed. 2d 597 (2000), the Supreme Court addressed whether the *Faretta* right to self-representation extended to appeal.  The Court found that it did not.  In essence, the Court reasoned that *Faretta* extended only to the determination of guilt or innocence and did not extend to appellate proceedings.  That holding clearly compels the conclusion that in a bifurcated capital proceeding the limited *Faretta* right to self-representation stops when guilt is determined and does not extend to the penalty phase where sentence is determined.

The *Martinez* Court noted:  "The status of the accused defendant, who retains a presumption of innocence throughout the trial process, changes dramatically when a jury returns a guilty verdict."  *Id*. at 162.  The court went on and considered the "change in position of the defendant" following the return of a guilty verdict.  It concluded that, "the autonomy interests that survive a felony conviction are less compelling than those motivating the decision in *Faretta*."  *Id*. at 163.  Therefore, after a guilty verdict, the government's interest in ensuring the integrity and efficiency of the proceedings "outweigh an invasion of the appellant's interest in self-representation."  *Id*.

This rationale applies equally to the penalty phase of a capital proceeding.  It has long been recognized that there is a "special need for reliability in the determination that death is the appropriate punishment."  *Johnson v. Mississippi*, 486 U.S. 578, 584, 108 S. Ct. 1981, 100 L. Ed. 2d 575 (1988).  Once a capital defendant has been found guilty of murder and at least one special circumstance, the defendant's

96

1   "autonomy interests" no longer outweigh the state's interest in the integrity of death

2   judgments.  At that point, the competing interests between the defendant's

3   non-absolute right to self-representation and the state's interest in reliable death

4   judgments "tips in favor of the state." *Martinez*, 528 U.S. at 163.  Therefore, once a

5   capital defendant has exercised his right to self-representation at the guilt phase and is

6   convicted, his limited right to self-representation has been honored and must give

7   way at the penalty phase of trial to the state's interest in reliable death judgments.

8        Additionally, the *Martinez* court recognized that the Sixth Amendment created

9   rights that strictly applied "in preparation of trial and trial itself." *Id*. at 160.  Appeal,

10  however, "is purely a creature of statute." *Id*. (*quoting Abney v. United States*, 431

11  U.S. 651, 656, 97 S. Ct. 2034, 52 L. Ed. 2d 651 (1977)).  As such, the Sixth

12  Amendment "does not provide any basis for finding a right to self-representation on

13  appeal." *Martinez*, 528 U.S. at 160.

14       Similarly, the penalty phase proceeding at a bifurcated capital proceeding in

15  California is strictly a creature of statute.  It was created entirely by the Legislature in

16  Penal Code § 190.3.  Therefore, like an appeal, the Sixth Amendment does not

17  provide any constitutional basis for applying a limited right to self-representation at

18  that proceeding.

19       Assuming arguendo that the limited right to self-representation does extend to

20  the penalty phase of a capital proceeding, the trial court erred by permitting Blair,

21  acting as his own attorney, to prevent the preparation and presentation of mitigating

22  evidence.

23       Any capital sentencing scheme must take into account the personal

24  characteristics and background of the defendant.

25            A process that accords no significance to relevant facets of

26            the character and record of the individual offender or the

27

28                                        97

1    circumstances of the particular offense excludes from

2    consideration in fixing the ultimate punishment of death the

3    possibility of compassionate or mitigating factors stemming

4    from the diverse frailties of humankind.

5  *Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S. Ct. 2978, 49 L. Ed. 2d 944

6  (1976).  The state may not "preclude the sentencer from considering any mitigating

7  factor, neither may the sentencer refuse to consider, as a matter of law, any relevant

8  mitigating evidence."  *Eddings v. Oklahoma*, 455 U.S. 104, 113-14, 102 S. Ct. 869,

9  71 L. Ed. 2d 1 (1982); *see also Hitchcock v. Dugger*, 481 U.S. 393, 399, 107 S. Ct.

10  1821, 95 L. Ed. 2d 347 (1987) (sentencing body must consider nonstatutory

11  mitigating circumstances).

12   The issue here is the other side of the coin from *Eddings*: the decision by the

13  defendant, acting as his own attorney, to prevent the investigation and presentation of

14  mitigating evidence.  However, the logic remains the same.  If the balancing test to be

15  performed by the sentencing body is skewed when the state precludes the

16  consideration of mitigating evidence, it is no less skewed when the defendant

17  precludes the consideration of mitigating evidence.  *Schriro v. Landrigan*, 550 U.S.

18  465, 127 S. Ct. 1933, 167 L. Ed. 2d 836 (2007), is inapposite to Blair's situation,

19  because, unlike in Blair's trial, Landrigan was represented by counsel, and the

20  Supreme Court there did not consider whether Landrigan was not competent to either

21  stand trial or represent himself.  *Id*. at 478-79 (finding that Landrigan's failure to

22  present this claim to the state court precluded federal review that his decision not to

23  introduce evidence needed to be "informed and knowing.")

24   Nor is it any argument that the limited right to self-representation as recognized

25  in *Faretta* compels the conclusion that the defendant, acting as his own counsel, may

26  so skew the penalty determination.  *See United States v. Farhad*, 190 F.3d 1097, 1105

27

28           98

1  (9th Cir. 1999) (limited Sixth Amendment right to self-representation cannot negate

2  the "absolute right to a fair trial" under the Fifth Amendment).

3        As shown in Claim A, the trial court allowed Blair to continue representing

4  himself even though advisory counsel had explained to the court Blair's inability to

5  comprehend the need to mount a mitigation defense during the penalty phase of his

6  trial.  Here, in denying Blair's claim, the CSC's concluded that Blair's Sixth

7  Amendment right of self-representation was absolute and paramount to the need for a

8  reliable verdict.  Such a decision was contrary to *Faretta*.  *Indiana v. Edwards*, 554

9  U.S. 164, 128 S. Ct. 2379, 2384, 171 L. Ed. 2d 345 (2008) (finding that *Faretta* itself

10 established no such absolute right).  And contrary to *Furman*, *Lockett* and *Beck*,

11 which establish that the need for a reliable verdict is paramount to even the right for

12 self-representation.  Thus the CSC's decision resulted in a decision that was based on

13 an unreasonable application of clearly established federal law.  *See e.g. Panetti v.*

14 *Quarterman*, 551 U.S. 930, 953, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007) ("AEDPA

15 does not require state and federal courts to wait for some nearly identical factual

16 pattern before a legal rule must be applied.") (internal quotations omitted).  Thus,

17 AEDPA and cases interpreting it do not bar relief on this claim.

18 **D.    Amended Petition Claim E**

19       **1.    The CSC's Rejection of This Claim Was Unreasonable Under §**

20             **2254(d)**

21                  **a.    The CSC's Denial of this Claim was Contrary to Clearly**

22                        **Established Federal Law**

23       A state court decision is "contrary to" clearly established federal law if it

24 arrives at a conclusion opposite to that of the Supreme Court on a question of law, or

25 decides the case differently than the Supreme Court on a set of materially

26 indistinguishable facts.  *Williams (Terry) v. Taylor*, 529 U.S. 362, 405, 120 S. Ct.

27

28                                          99

1495, 146 L. Ed. 2d 389 (2000).  Similarly, "[t]he addition, deletion, or alteration of a factor in a test established by the Supreme Court also constitutes a failure to apply controlling Supreme Court law under the 'contrary to' clause of AEDPA." *Benn v. Lambert*, 283 F.3d 1040, 1051 n.5 (9th Cir. 2002) (citing *Williams,* 529 U.S. at 405-06).

In rejecting Blair's claims of ineffectiveness of counsel, the CSC concluded that *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 2674 (1984), does not apply to this claim.  The CSC instead analyzed this claim under state law.  *People v. Blair*, 36 Cal. 4th 686, 722-25, 115 P.3d 1145, 31 Cal. Rptr. 3d 485 (2006) (citing *People v. Bloom*, 48 Cal. 3d 1194, 774 P.2d 698, 259 Cal. Rptr. 669 (1989).  Because the CSC failed to apply *Strickland* to the facts of this claim, § 2254(d) is no barrier to relief.

The CSC's failure to apply *Strickland* to this claim was based on its finding that Newman functioned solely as Blair's advisory counsel.  Newman's representation was not so limited.  His function throughout pre-trial proceedings was incompatible with the designation "advisory counsel."  Newman received discovery from the prosecution, made arrangements for the appointment of defense experts, and communicated with those experts.  (1 RT 77-78, 254-55.)  He held himself out as Blair's associate counsel, rather than advisory counsel.  He wrote motions on Blair's behalf and signed them as "Attorney for Defendant."  (*See, e.g.*, I CT 190-215.)  When Blair appeared in court on March 11, 1988, at a hearing to determine whether the body of the victim needed to be exhumed, Newman appeared "as advisory counsel and associate counsel for Mr. Blair."  (1 RT 226.)  Newman controlled and managed the hearing for the defense and explained to the court that he had spoken "with two pathologists this past week" both of whom stated that the body did not need to be exhumed.  (1 RT 226-27.)  Newman even gave closing arguments at the end of the

100

1    guilt phase, a telling indication that his duties were not limited to those of advisory

2    counsel.  (IV CT 998.)

3          Even the prosecutor believed that Newman, rather than Blair, was directing the

4    defense.  During a discussion concerning the admissibility of certain evidence, the

5    prosecutor stated:  "One of the things that the defense argued strongly during the guilt

6    phase, Mr. Newman went to great lengths was to show to try to show – create a doubt

7    in the jury's mind that anybody could have put the cyanide in this bottle . . . ." (15

8    RT 4284-85.)  Similarly, Judge Workman referred to Newman as "associate counsel."

9    (1 RT 190.)  Based on this record, it is apparent that Newman did not merely

10   represent Blair as advisory counsel: rather, he had undertaken full representation of

11   Blair as his associate counsel or co-counsel.  In this context, the rule of *Strickland*

12   should apply; the CSC's failure to apply it resulted in a decision that was contrary to

13   clearly established federal law.

14        **2.    The CSC's Denial of this Claim Was Predicated on Its Unreasonable**

15              **Conclusion that Blair was Competent to Waive His Right to Counsel**

16              **and To Represent Himself**

17          As Blair argued in Claim A, the CSC unreasonably concluded that Blair was

18   competent and that he made a valid waiver of his right to counsel.  This reasoning

19   infected the CSC's rejection of his claim, which was predicated on the conclusion that

20   Blair was actually capable of making a valid waiver of his rights and representing

21   himself at trial.  Given Blair's incompetence, Newman and Lucas were the only

22   individuals safeguarding Blair's constitutional rights.  As such, *Strickland* applies to

23   their representation of Blair, and the CSC's failure to apply it to the facts of this case

24   resulted in a decision that was contrary to clearly established federal law.

25

26

27

28                                                    101

1          **3.     Newman and Lucas Were Ineffective**

2                   **a.     Newman Was Absent For Most of the Trial**

3          The CSC's decision was contrary to clearly established federal law, because it

4    failed to apply the rule of *United States v. Cronic*, 466 U.S. 648, 104 S. Ct. 2039, 80

5    L. Ed. 2d 657 (1984), where Blair's counsel Newman was absent during most of the

6    guilt and penalty phase trials.  In *Cronic*, the United States Supreme Court held that a

7    complete denial of counsel at a critical stage of trial violates a defendant's Sixth

8    Amendment right to counsel, and that where such denial of counsel occurs, a

9    defendant need not prove prejudice in order to prevail on his Sixth Amendment claim.

10   *Cronic*, 466 U.S. at 659.  The CSC found that because Newman was only advisory

11   counsel, "there was no requirement that he be present at each court session . . . ."

12   *Blair*, 36 Cal. 4th at 725.  Yet, as explained above, Newman was actually functioning

13   as Blair's associate or co-counsel – as such, these proceedings should not have been

14   held in his absence, per *Cronic*.

15         Newman was simply not present in the court room during most of the trial

16   proceedings.  Newman was not present for most of the jury selection process.  He was

17   absent from the court room on March 23 and 24, as well as April 6, 7, 11, 12, 13 and

18   14.  (III CT 773, 776; IV CT 903, 904, 922, 923, 924, 956.)  Newman was not present

19   on April 17, 1989, the day opening statements were given and the prosecution called

20   it first two witnesses, William and Rhoda Miller, who were the only witnesses to

21   testify concerning the actual poisoning.  (IV CT 969-72.)  Newman was not present

22   more than half of the days guilt phase evidence was presented including April 18, 19,

23   26 and 27.  (IV CT 972, 973, 985, 986.)  The prosecutor stated that Newman was on

24   vacation in Hawaii for at least some portion of the trial.  (14 RT 3973.)  Newman was

25   present on May 1, 1989, when he gave the closing defense argument at the guilt phase

26   of trial.  (IV CT 988.)  Newman was again absent for most of the penalty phase.  He

27

28                                              102

1   was not in court on May 15 or 16, 1989, when the penalty phase evidence was

2   presented or when the penalty phase arguments were made.  Lucas gave the closing

3   defense argument at the penalty phase of trial.  (V CT 1250; 15 RT 4305.)

4          The appointment of Lonza Lucas as co-advisory counsel prior to jury selection

5   did not make up for Newman's absence.  Lucas was appointed on March 21, 1989,

6   the day before jury selection began.  (Ex. 118 ¶ 4; III CT 769.)  The next day, the

7   court was informed that he [Lucas] "does not know anything about the case."  (2

8   RT 1028.)  Lucas had little participation in the trial proceedings.  He even stated that

9   he was so "totally inadequate" to conduct the penalty phase proceedings that he

10  "couldn't discuss scheduling because [he] can't do the penalty phase."  (15 RT 4127.)

11  Nevertheless, Lucas gave the defense closing at the penalty phase of trial only

12  because Newman was not present at trial that day.  (15 RT 4305.)

13         Lucas began his closing argument by reminding the jury that, while he had

14  been before them in court for several weeks, "you haven't heard from me, wondering

15  whether or not I can talk at all."  (15 RT 4348.)  He then told the jury that he would

16  not "beg and plead for mercy and pity and sympathy" for Blair. (15 RT 4348-49.)  In

17  *McKaskle v. Wiggins*, 465 U.S. 168, 173, 104 S. Ct. 944, 79 L. Ed. 2d 122 (1984), the

18  Supreme Court expressly overruled the opinion of the federal court of appeals that

19  stand-by counsel "is to be seen, but not heard."  Yet, that is the role played by Lucas

20  throughout the trial proceedings.  By his own admission he essentially played no role

21  in the case, leaving the jury to wonder if he could talk at all.  He gave the closing

22  argument at the penalty phase of trial after telling the court that he was "totally

23  inadequate" to do the penalty phase.

24         There can be little question that a defendant is deprived of the effective

25  assistance of counsel when counsel is not even present in the court room for more

26  than half of the trial.  Until the eve of trial, Newman was Blair's co-counsel and the

27

28                                              103

1   person primarily responsible for the preparation of the defense.  The court's order

2   forcing Blair to trial in Newman's absence deprived Blair of his right to the effective

3   assistance of the only counsel he had.

4          **b.**    **Had Counsel Investigated Blair's Competence and Requested**

5                  **a Competency Hearing, There is a Reasonable Probability that**

6                  **Blair Would Have Been Found Incompetent**

7        Newman and Lucas were prejudicially ineffective for failing to investigate and

8   present evidence of his incompetence to stand trial (including expert testimony) and

9   to request (and re-request) a competency hearing.  The CSC rejected this subclaim on

10   habeas with a summary denial.  That denial was unreasonable under § 2254(d),

11   because under clearly established federal law, counsel were clearly ineffective in

12   failing to challenge Blair's competency.

13        Blair's ineffective assistance claim is based on *Strickland*, 466 U.S. at 688,

14   which under AEDPA is "clearly established Federal law, as determined by the

15   Supreme Court . . . ." (*Terry*) Williams *v. Taylor*, 529 U.S. 362, 391, 120 S. Ct. 1495,

16   146 L. Ed. 389 (2000). "An ineffective assistance claim has two components: A

17   petitioner must show that counsel's performance was deficient, and that the

18   deficiency prejudiced the defense." *Wiggins*, 539 U.S. at 521. Defense counsel "has a

19   duty to make reasonable investigations or to make a reasonable decision that makes

20   particular investigations unnecessary." *Strickland*, 466 U.S. at 691. "[C]ounsel has a

21   duty to investigate a client's competency to stand trial . . . ."  *Agan v. Singletary*, 12

22   F.3d 1012, 1018 (11th Cir. 1994). Counsel performs deficiently when he fails to

23   move for a competency hearing when "there are sufficient indicia of incompetence to

24   give objectively reasonable counsel reason to doubt the defendant's competency."

25   *Stanley v. Cullen*, 633 F.3d 852, 862 (9th Cir. 2011).

26

27

28                               104

1    To establish prejudice, a petitioner "must show that there is a reasonable
2    probability that, but for counsel's unprofessional errors, the result of the proceeding
3    would have been different.  A reasonable probability is a probability sufficient to
4    undermine confidence in the outcome." *Strickland*, 466 at 694.  In this context,
5    prejudice is established if there is a reasonable probability the defendant would have
6    been found incompetent but for counsel's deficient performance.  *Stanley*, 633 F.3d at
7    862; *Bouchillon v. Collins*, 907 F.2d 509, 595 (5th Cir. 1990); *Deere v. Cullen*, 713 F.
8    Supp. 2d 1011, 1027-28, 1041 (C.D. Cal. 2010).

9    Both Newman and Lucas who represented Blair at trial admit that they believed
10   Blair was mentally ill and incompetent to stand trial.  (*In re Blair on Habeas Corpus*,
11   No. S144759, Ex. 52, R. Newman Decl.; Ex. 90, L. Lucas Decl.) Yet, counsel did not
12   raise Blair's incompetence with the trial court until after the guilt verdicts. Counsel
13   failed to adequately investigate and present evidence of Blair's incompetence and
14   failed to request a competency hearing.  This is all the more remarkable not only in
15   light of counsel's post-trial admissions that they believed Blair was incompetent to
16   stand trial, but also in light of Blair's rejections of their suggestions to mount a
17   defense, consult with experts as to causation and third party culpability. Counsel did
18   not make an informed decision to forego a competency investigation and
19   presentation, but instead, simply failed to do so despite being on notice of Blair's
20   mental illness, impairments and incompetence.  Defense counsel's failures to
21   adequately investigate Blair's competency, request a competency hearing, and alert
22   the court to information showing Blair
23   was incompetent to stand trial constitute ineffective assistance. *Williamson v. Ward*,
24   110 F.3d 1508, 1518-19 (10th Cir. 1997) (defense counsel ineffective for failing to
25   investigate defendant's mental illness and request competency hearing); *Brown v.
26   Sternes*, 304 F.3d 677 (7th Cir. 2002) (counsel aware of defendant's history of
27
28                                      105

1    treatment for mental illness ineffective for failing to request competency hearing).  In

2    *Bouchillon*, the Fifth Circuit held that counsel was ineffective when despite knowing

3    that the defendant had been hospitalized psychiatrically, counsel did not request a

4    competency hearing or arrange for defendant's competence to be evaluated by an

5    expert before defendant entered a guilty plea. 907 F.2d at 590, 595-98. The court

6    explained that the trial court "relies on counsel to bring these matters [i.e.,

7    defendant's mental status] to his or her attention. 'Judges must depend to some extent

8    on counsel to bring issues into focus.'" *Id.* (quoting *Drope v. Missouri*, 420 U.S. 162,

9    176-77, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975)); *United States v. Boigegrain*, 155

10   F.3d 1181, 1188 (10th Cir. 1998) ("Defense counsel should move for evaluation of

11   the defendant's competence to stand trial whenever the defense counsel has a good

12   faith doubt as to the defendant's competence . . . . [C]ounsel should make known to

13   the court and to the prosecutor those facts known to counsel which raise the good

14   faith doubt of competence") (quoting ABA Standards for Criminal Justice, Standard

15   7-4.2(c)).

16       As summarized in Claim A, a wealth of evidence supports the conclusion that

17   Blair was incompetent.  The prejudice from counsel's ineffective performance is thus

18   apparent; had a competency hearing been held, there is a reasonable probability that

19   Blair would have been found incompetent. *Brown v. Stevens*, 304 F.3d 677, 696 (7th

20   Cir. 2002) ("[F]ailure of [client's] trial counsel to supply the court and

21   court-appointed psychiatrists with available documentation of [client's] psychiatric

22   illness prejudiced his defense by providing the trial judge with less than reliable

23   information, thereby contributing to the trial judge's rendering a finding of law based

24   on inaccurate conclusions regarding his competency and sanity"). Blair is entitled to a

25   new trial.  *See Deere*, 713 F. Supp. 2d at 1038-40 (granting relief on claim of

26   ineffective assistance for failure to present evidence of capital defendant's

27

28                                              106

1   incompetence where, as here, defendant had history of suicide attempts and

2   post-traumatic stress disorder). 28 U.S.C. § 2254(d) does not bar relief because, based

3   on the allegations and evidence before it, the state supreme court should have granted

4   the writ or at least issued an OSC and allowed Blair to further establish his

5   entitlement to relief at an evidentiary hearing.  *Miles v. Martel*, 696 F.3d 889 (9th Cir.

6   2012); *see especially id.* at *12 n.9.

7               c.      **Newman and Lucas Were Ineffective Throughout Pre-Trial,**

8                       **Guilt and Penalty Phase Proceedings**

9               As detailed in Blair's First Amended Petition, Newman and Lucas counsel

10  were prejudicially ineffective throughout the proceedings.  They failed to prepare

11  witnesses, such as Dr. Latiffe and Dr. Itabashi, to testify.  (Amended Petition at 160.)

12  They conducted no investigation of Blair's mental health and presented no mental

13  health evidence at either the guilt or the penalty phasees.  (Amended Petition at 160-

14  61.)  Newman accidentally disclosed the fact that the defense had retained Dr. Root as

15  an expert, which led to Dr. Root's damaging trial testimony after he was subpoenaed

16  by the prosecution.  (Amended Petition at 147-50.)  Newman's and Lucas's

17  performance was unreasonable under prevailing professional norms at the time of

18  Blair's trial, and Blair was prejudiced by their deficient performance.  The California

19  Supreme Court's contrary conclusion was unreasonable under § 2254(d).

20  **E.      Amended Petition Claim F**

21              Claim F of Blair's Amended Petition alleges that Blair was denied his

22  constitutional rights when Blair was denied access to reasonable ancillary defense

23  resources.[24]  (Amended Petition at 168-197.)

24

25

---

26          [24]  Blair presented this claim to the CSC in the direct appeal as Section V and
    was denied in a published opinion.  *Blair*, 36 Cal. 4th at 729-36.
27

28                                           107

1      **1.      AEDPA Does Not Bar Relief on this Claim**

2          The Due Process clause of the Fourteenth Amendment and the Sixth

3      Amendment require the state to provide indigent defendants with the ancillary

4      defense resources necessary for the preparation of a defense:

5                  [W]hile the Court has not held that a State must purchase

6                  for the indigent defendant all the assistance that his

7                  wealthier counterpart might buy, *see Ross v. Moffitt*, 417

8                  U.S. 600, 94 S. Ct. 2437, 41 L. Ed. 2d 341 (1974), it has

9                  often reaffirmed that fundamental fairness entitles indigent

10                 defendants to "an adequate opportunity to present their

11                 claims fairly within the adversary system," *id.*, at 612, 94 S.

12                 Ct., at 2444.  To implement this principle, we have focused

13                 on identifying the "basic tools of an adequate defense or

14                 appeal," *Britt v. North Carolina*, 404 U.S. 226, 227, 92 S.

15                 Ct. 431, 433, 30 L. Ed. 2d 400 (1971), and we have required

16                 that such tools be provided to those defendants who cannot

17                 afford to pay for them.

18     *Ake v. Oklahoma,* 470 U.S. 68, 77, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985).

19         The Equal Protection clause of the Fourteenth Amendment likewise requires

20     that state courts place indigent defendants on a general level of equality with non-

21     indigent defendants.  "There can be no equal justice where the kind of trial a man gets

22     depends on the amount of money he has."  *Griffin v. Illinois*, 351 U.S. 12, 19, 76 S.

23     Ct. 585, 100 L. Ed. 891 (1956).  "*Griffin v. Illinois* and its progeny establish the

24     principle that the State must, as a matter of equal protection, provide indigent

25     prisoners with the basic tools of an adequate defense or appeal, when those tools are

26

27

28                                          108

1   available for a price to other prisoners." *Britt v. North Carolina*, 404 U.S. 226, 227,
2   92 S. Ct. 431, 30 L. Ed. 2d 400 (1971).

3       Blair's conviction and sentence must be vacated because he was denied access
4   to reasonable ancillary defense resources.  Dkt No. 48, First Amended Petition at 168-
5   98.  Blair raised this claim in his direct appeal to the California Supreme Court.  The
6   court denied his claim on the merits.  *People v. Blair*, 36 Cal. 4th 686, 729-36, 115
7   P.3d 1145, 31 Cal. Rptr. 3d (2006)  Because the CSC's rejection of this claim was
8   unreasonable under § 2254(d), Blair is entitled to habeas relief.

9       **2.      The State Court Decision Was Based on an Unreasonable**
10              **Determination of the Facts**

11      The state court's decision is unreasonable under § 2254(d)(2) because the state
12   court overlooked or misconstrued the evidence presented in support of this claim.
13   *See Wiggins v. Smith*, 539 U.S. 510, 528, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003);
14   *see also Doody v. Ryan*, 649 F.3d 986, 1012-15) (9th Cir. 2011) (en banc) (granting
15   relief under § 2254(d)(2), where state court mischaracterized the record before it).

16              **a.      The CSC Unreasonably Found That Advisory Counsel**
17                      **Newman and Lucas Were Acting on Blair's Behalf**

18      In rejecting this claim, the California Supreme Court noted:

19              [T]he crucial question underlying all of defendant's
20              constitutional claims is whether he had reasonable access to
21              ancillary services that were reasonably necessary for his
22              defense.  A review of the record reveals that he did.
23              Defendant had advisory counsel Newman and Lucas acting
24              on his behalf, so his Sixth Amendment rights were
25              adequately protected.

26

27

28                              109

1    *Blair*, 36 Cal. 4th at 734.  The CSC reached the conclusion that advisory counsel

2    "adequately protected" Blair's rights by ignoring significant evidence to the contrary.

3    Ray Newman, advisory counsel in this case, was absent for most of the guilt phase

4    and all of the penalty phase.  Lonzo Lucas, his co-advisory counsel, was entirely

5    unfamiliar with Blair's case at the time of trial.  As such, Blair was effectively

6    deprived of advisory counsel at the time of trial.

7          Newman was appointed as stand-by or associate counsel on November 4, 1986.

8    On May 4, 1987, his role changed to advisory counsel.  On March 17, 1989, when

9    Blair and Newman appeared in Norwalk for trial, Newman made clear that he was

10   "engaged in a trial in downtown Los Angeles" that would take another four to six

11   months.  The court insisted that Blair's trial proceed anyway.  The day before jury

12   selection began, the court appointed Lucas as "co-advisory counsel" but Lucas was

13   not familiar with Blair, the case, the discovery, or the witnesses, and had no time to

14   prepare.  Newman was not present for most of jury selection, as well as April 6, 7, 11,

15   12, 13 and 14.  (CT 773, 776, 903, 904, 922, 923, 924, 956.)  Newman was not

16   present on April 17, 1989, when opening statements were given and the prosecution

17   called its first two witnesses.  (CT 969.)  Newman was not present on more than half

18   the days on which evidence was presented, including April 18, 19, 26, and 27.  (CT

19   972, 973, 985, 986.)  He was absent for most of the penalty phase, and was not in

20   court on May 15 or 16, 1989.  Because the CSC neglected these important facts in its

21   analysis of Blair's claim, its finding that advisory counsel "adequately protected"

22   Blair's rights was unreasonable.

23          **b.     The CSC Unreasonably Found That Blair's Access to His**

24                   **Investigator Was Adequate**

25          As detailed in his First Amended Petition, Blair's access to his court-appointed

26   investigator was inconsistent and inadequate.  Even though Blair first requested an

27

28                                          110

1  investigator on October 21, 1986, none was appointed for him until June 10, 1987.

2  He had no investigator in the eight months before jury selection began on March 22,

3  1989, a critical time for the preparation of his defense.  As of April 7, 1989, ten days

4  before opening statements, Blair did not "even know the investigator" and advisory

5  counsel was unable to contact him.  (6 RT 2155; 7 RT 2188.)  On April 18, 1989, the

6  day after the prosecution started calling witnesses, Blair stated on the record that he

7  had not seen his investigator, and advisory counsel indicated that the investigator

8  might be "out of town."  (11 RT 3273-75.)  The court then issued an order,

9  compelling the investigator to meet with Blair.  (11 RT 3275.)

10         These startling facts proved less than compelling to the CSC, which concluded

11  that Blair had adequate assistance from an investigator at his trial:

12                 Although defendant complains of difficulty in contacting

13                 Richards during the trial, as noted above the record reflects

14                 that when defendant brought this matter to the court's

15                 attention, the court ordered Richards to appear in court to

16                 meet with defendant.  There is no indication in the record

17                 that this order was not complied with.

18  *Blair*, 36 Cal. 4th at 734-35.

19         It is highly unusual for defense counsel to seek a court order mid-trial to force

20  his own investigator to meet with him.  Yet, the CSC treats the existence of such an

21  order as proof that Blair had adequate assistance from an investigator during his trial.

22  Blair should not have had to seek a court order merely to have a meeting with the

23  investigator appointed to assist him; the fact that he did indicates that he was not

24  receiving the same level of ancillary support as a non-indigent defendant would.

25

26

27

28                                                    111

1      **c.    The CSC Unreasonably Found That Blair Made No Showing**
2           **That His Budget Was Inadequate**

3           The trial court put significant constraints on Blair's budget to prepare for trial.

4    Blair's budget for incidental expenses in preparation for trial was $40, and he was

5    allocated a maximum budget of $50 for his legal runner, who was to receive $5 a

6    visit.  These constraints are plainly incompatible with the constitutional requirement

7    that indigent defendants such as Blair be put on roughly equal footing with non-

8    indigent defendants.  Nonetheless, the CSC concluded that Blair made "no showing . .

9    . that this budget was inadequate."  *Blair*, 36 Cal. 4th at 734.  The CSC failed to note

10   that even the master calendar judge found Blair's budget to be inadequate:  he noted

11   that a $40 budget was "not nearly sufficient to prepare an adequate defense for a

12   charge of this magnitude."  (1 RT 160.)  The CSC's contrary conclusion was thus

13   unreasonable.  *See Hall v. Dir. of Corrections*, 343 F.3d 976, 982-83 (9th Cir. 2003)

14   (per curiam) (§ 2254(d)(2) satisfied, where California Court of Appeal had before it,

15   but ignored, trial court's implied finding of false evidence).

16   **3.    The State Court Decision Was Based on an Unreasonable**
17        **Application of Clearly Established Federal Law**

18         A state court decision is an "unreasonable application" of clearly established

19   federal law where the state court identified the correct legal rule but unreasonably

20   applied it to the facts at hand.  *Williams (Terry) v. Taylor*, 529 U.S. 362, 407, 120 S.

21   Ct. 1495, 146 L. Ed 2d 389 (2000); *see also Gonzalez v. Duncan*, 551 F.3d 875, 889

22   (9th Cir. 2008).  The state court correctly noted that the "right to counsel guaranteed

23   by both the federal and state Constitutions . . . includes the right to reasonably

24   necessary defense services."  *Blair*, 36 Cal. 4th at 732, quoting *Corenevsky v.*

25   *Superior Court*, 36 Cal. 3d 307, 319-20, 682 P. 2d 360, 204 Cal. Rptr. 165,(1984).

26
27
28                                          112

1    Although the state court identified the correct rule governing this claim, its
2    application of that rule was unreasonable.

3         *Griffin* and *Ake* establish a rule that the state must provide indigent defendants
4    with ancillary defense services.  As demonstrated above, the state court record
5    unambiguously indicates that Blair was not given adequate resources to investigate
6    his case and present a defense.  He was effectively deprived of advisory counsel at
7    trial, and he lacked the assistance of an investigator for significant periods of time,
8    including during his trial.  The budget constraints placed on him – $40 for incidental
9    expenses and $50 for a legal runner – hampered Blair's investigation of his case.  In
10   addition to these errors, Blair was also denied access to expert witnesses in a timely
11   manner and denied timely access to transcripts from his prior attempted murder trial.
12   (Amended Petition at 192-93.)  The CSC's failure to extend clearly established
13   federal law to the context of this case was thus unreasonable.

14   **F.     Amended Petition Claim G**

15        Claim G of Blair's Amended Petition alleges that  the trial court violated
16   Blair's constitutional rights when it denied his request to instruct the jury on
17   second-degree murder.[25]  (Amended Petition at 198-201.)

18        **1.     AEDPA does not apply to this Claim**

19        By the time of Blair's trial in 1989, it was already clearly established that a
20   capital defendant is entitled to a lesser included offense if such an offense is included
21   under state law.  *Beck v. Alabama*,  447 U.S. 625, 638, 100 S. Ct. 2382, 2390, 100 S.
22   Ct. 2382, 65 L. Ed. 2d 392 (1980).  As the Supreme Court has found, because "death
23   is a different kind of punishment," the constitution cannot countenance the risk that
24   "the failure to give the jury the 'third option' of convicting on a lesser included

25

26        [25]  Blair presented this claim to the CSC in the direct appeal as Section VIII and
27   was denied in a published opinion.  *Blair*, 36 Cal. 4th at 744-47.

28                                          113

offense would seem inevitably to enhance the risk of an unwarranted conviction." *Id*. at 637.

In denying this claim, the CSC recognized that while second degree murder is a lesser included offense of first degree murder," it found that Blair was not entitled to such an instruction because "there was no substantial evidence that defendant intended merely to injure Green." *People v. Blair*, 36 Cal. 4th 686, 746.  In reaching this determination, however, the CSC made credibility findings and inferences that should have been left to the jury to make.  For example, it was up to the jury to conclude what weight to give to Miller's testimony that Blair stated he would come by to see Dubois' in a day or two.  *Id*. at 746.  It was up to the jury to decide whether Blair's statement to William Miller that he had come by the apartment to see Dubois indicated that Blair did not expect the victim to die.  *Id*. at 746.  However, because the trial court failed to give the requested instruction, those determination were taken away from the jury, thus increasing the risk of an unwarranted conviction.

The CSC went on to find that even if the instruction had been required, its omission was not harmless because the jury had found that the killing was intentional in finding true the special circumstances instruction.  *Id*. at 747.  That the jury found the killing intentional, when it was only given the option between guilty and not-guilty, turns *Beck* on its head and is precisely the approach rejected by the Supreme Court.  That the jury decided the killing was intentional, when the only options given were guilt or acquittal, does not make the lack of the third option harmless.  To the contrary, as *Beck* recognized, "the unavailability of the third option of convicting on a lesser included offense may encourage the jury to convict for an impermissible reason-its belief that the defendant is guilty of some serious crime and should be punished." *Beck*,  447 U.S. at 626.

114

1    "A decision is contrary to clearly established law if the state court 'applies a

2  rule that contradicts the governing law set forth in Supreme Court cases,'" *Lafler v.*

3  *Cooper*, 132 S. Ct. 1376, 1390,182 L. Ed. 2d 398 (2012) or if it "confronts a set of

4  facts that are materially indistinguishable from a decision of [the Supreme Court] and

5  nevertheless arrives at a result different from [its] precedent." *Early v. Packer*, 537

6  U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) (per curiam).  Here, because the

7  CSC applied a rule that contradicts *Beck*, the CSC denial of this claim is contrary to

8  clearly established federal law and § 2254 (d) does not bar relief on claim.

9  **G.    Amended Petition Claim H.**

10    Claim H of Blair's Amended Petition alleges that the trial court denied Blair's

11 constitutional rights when it failed to excuse for cause jurors who stated that they

12 would always vote for death.[26]  (Amended Petition at 202-06.)

13     **1.    AEDPA Does Not Apply to this Claim**

14    While ostensiblb a record-based claim, this claim too was affected by Blair's

15 incompetence to represent himself at trial, and by the trial court's error to allow him

16 to represent himself at trial.

17    In his declaration submitted to the CSC, Lorenzo Lucas describes the extent of

18 Blair's inability to conduct a constitutionally adequate voir dire.  (*In Re Blair*, Case

19 No. S144759, Ex. 90, L. Lucas Decl., ¶¶ 7-10.)

20       When we started jury selection, I discovered that Mr. Blair

21       had a general idea of what voir dire was, but he did not

22       know *how* to conduct voir dire, such as what questions to

23       ask the jurors. . . .

24       . . . .

25

26    [26]  Blair presented this claim to the CSC in the direct appeal as Section IX and
   was denied in a published opinion.  *Blair*, 36 Cal. 4th at 740-44.
27

28                                   115

1        In this case, however, I had no time to develop any theme

2        for the voir dire and the trial, to discuss with Mr. Blair how

3        to ask questions about a theme, or to discuss with him how

4        to conduct effective follow-up.  Mr. Blair did not know how

5        to develop a theme for the voir dire or the trial, much less

6        prepare initial questions or follow-up questions that would

7        develop such a theme.  As a result, during voir-dire he only

8        asked a few extremely general questions about the jurors'

9        views of the death penalty.  These were somewhat repetitive

10        of Judge Krieger's questions, as the judge reminded him

11        once or twice.

12  *Id.*

13     Viewed in light of Lucas's declaration, it is clear the jurors who indicated they

14  would always vote for death were not screened in a constitutionally adequate manner.

15  In a capital sentencing, jurors must be able to consider and give effect to any and all

16  relevant mitigating evidence.  *See, e.g., Penry v. Johnson*, 532 U.S. 782, 797, 121 S.

17  Ct. 1910, 150 L. Ed. 2d 9 (2001); *Skipper v. South Carolina*, 476 U.S. 1, 4-5, 106 S.

18  Ct. 1669, 90 L. Ed. 2d 1 (1986); *Eddings v. Oklahoma*, 455 U.S. 104, 113-14, 102 S.

19  Ct. 869, 71 L. Ed. 2d 1 (1982); *Lockett v. Ohio*, 438 U.S. 586, 605, 98 S. Ct. 2954, 57

20  L. Ed. 2d 973 (1978).  The Supreme Court stated in *Boyde v. California* that the

21  "[p]resentation of mitigating evidence alone . . . does not guarantee that a jury will

22  feel entitled to consider that evidence."  494 U.S. 370, 384, 110 S. Ct. 1190, 108 L.

23  Ed. 2d 316 (1990).  Jurors' misconceptions that they are precluded from considering

24  relevant mitigation evidence can result not only from improper instructions, "but also

25  as a result of prosecutorial argument dictating that such consideration is forbidden."

26

27

28                              116

1    *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 259 n.21, 127 S. Ct. 1654, 167 L. Ed. 2d

2    585 (2007) (finding state-court denial of relief unreasonable under §2254(d)).

3           In *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S. Ct. 844, 83 L. Ed. 2d 841

4    (1985), the United States Supreme Court held that, "the proper standard for

5    determining when a prospective juror may be excluded for cause because of his or her

6    views on capital punishment . . . is whether the juror's views would prevent or

7    substantially impair the performance of his duties as a juror in accordance with his

8    instructions and his oath."  Because, as Lucas's declaration shows, Blair was unable

9    to conduct a constitutionally adequate voir dire, Blair was unable to preclude that

10   jurors who had already formed an opinion as to whether Blair should received a

11   sentence of death sat in his capital trial.  *Morgan v. Illinois*, 504 U.S. 719, 729, 112 S.

12   Ct. 2222, 119 L. Ed. 2d 492 (1992) ("A juror who will automatically vote for the

13   death penalty in every case will fail in good faith to consider the evidence of

14   aggravating and mitigating circumstances as the instructions require him to do.

15   Indeed, because such a juror has already formed an opinion on the merits, the

16   presence or absence of either aggravating or mitigating circumstances is entirely

17   irrelevant to such a juror.").

18          Because the CSC postponed the finality of Blair's direct appeal once Nickerson

19   filed the competency motion, the CSC had before it records raising doubt as to Blair's

20   competency, including a declaration by Dr. George Woods, opining Blair suffered

21   from a mental disease that impaired his ability to rationally assist counsel, and that

22   Blair may have also been mentally ill at the time of trial.  (*People v. Blair*, Exhibits in

23   Support for Motion to Determine Competency, No. S011636, Ex. 79, Dr. G. Woods

24   Decl ¶ 1051.)  Thus, although ostensibly a record-based claim, because the CSC's

25   'merits' decision is premised on a decision that Blair was competent to represent

26   himself at trial – without an opportunity for Blair to develop the facts before it, §

27

28                                           117

2254 (d) does not apply to this claim. *Panetti v. Quarterman*, 551 U.S. 930, 948, 953, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007) (holding the state court's failure to provide constitutionally required procedures in a competence proceeding, even where "the precise limits that due process imposes" had not been previously defined, was an unreasonable application of clearly established federal law when the "state court's adjudication is dependent on an antecedent unreasonable application of federal law, that requirement is satisfied, and the federal court must then resolve the claim without the deference AEDPA otherwise require").

**H.    Amended Petition Claim I.**

Claim I of Blair's Amended Petition alleges that the trial court violated Blair's constitutional rights when it admitted the testimony of chemistry professor Emily Maverick at the penalty phase.[27]  (Amended Petition at 206-213.)

**1.    AEDPA Does Not Apply to this Claim**

While ostensibly a record-based claim, this claim too was affected by Blair's incompetence to represent himself at trial, and by the trial court's error to allow him to represent himself, including during the penalty phase of trial when both "Newman and Lucas expressed their belief that defendant might not be competent to waive counsel or to represent himself." *People v. Blair*, 36 Cal. 4th 686, 729, 115 P.3d 1145, 31 Cal. Rptr. 3d 485 (2006).  Because the "state court's adjudication is dependent on an antecedent unreasonable application of federal law, the requirement set forth in §2254 (d) is satisfied," the "federal court must then resolve the claim without the deference AEDPA otherwise requires." *Panetti v. Quarterman*, 551 U.S. 930, 953, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007).

---

[27]  Blair presented this claim to the CSC in the direct appeal as Section XII and was denied in a published opinion. *Blair*, 36 Cal. 4th at 747-52.

118

1          On May 2, 1989, the jury returned guilt verdicts.  Immediately after the court

2   recorded the verdicts, advisory counsel asked the court for a continuance of the

3   penalty phase.  Newman stated that there had been "a dispute" between counsel and

4   Blair on how to conduct the penalty phase of trial, but that they were going to resolve

5   that dispute.  (15 RT 4141-42.)  Newman also stated that "we were recently able to

6   get some [penalty] witnesses in on short notice, but it's going to take at least that

7   amount of time to make travel arrangements and secure certain witnesses and records

8   that are going to be needed" at the penalty phase.  (15 RT 4142.)  Newman stated that

9   they were going  to try to at least put together a defense" for the penalty phase.  (15

10  RT 4144.)  Blair's feelings were "to hell with it."  Blair said:  "I know of no witnesses

11  offhand and I haven't even thought about the penalty phase, to be frank."  (15 RT

12  4145.)

13         Newman responded to Blair's penalty phase position by stating:  "I have

14  certain ideas, and Mr. Blair disagrees with me.  Hopefully we can iron that out."  (15

15  RT 4147.)  The court continued the matter to May 8, 1989.

16         On May 8, Blair stated that an investigator was "investigating our defense for

17  the penalty phase . . . he is collecting records and mitigation of the – for the penalty

18  phase."  (15 RT 4169-70.)  Asked what the investigator was getting, Blair replied:

19  "Records from the state prison.  He is interviewing family members.  We might

20  possibly put on family members.  There may – there may be records from Atascadero

21  State Hospital."  (15 RT 4170.)  Lucas added:  "We are at this point preparing to have

22  psychiatrists talk to Mr. Blair and take a look at Mr. Blair."  (15 RT 4171.)  The court

23  continued the penalty phase until May 10.

24         On May 10, during an in camera hearing, Newman stated that they had

25  information that "there might be some benefit from calling family members to testify

26  on behalf of Mr. Blair, particularly as to the penalty phase."  (05/10/1989 RT 2.)

27

28                                          119

1   Newman also have stated that "there are also records from Atascadero that I think

2   would have a bearing . . . ."  Finally, Newman stated that he had advised Blair "that

3   he should be interviewed by a psychiatrist and he should get a confidential report."

4   (05/10/1989 RT 3.)

5        Blair rejected each of these "suggestions."  Blair instructed counsel "not to

6   have any of his family members present, not to contact them, not to even let them be

7   aware of what he's facing here."  Newman did not think that Blair's family even

8   "realize he's on trial in a capital case, completely in the dark as to that."  (05/10/1989

9   RT 2.)

10       Concerning his prison, medical, and psychiatric records, Newman stated that

11  Blair "insisted all along that he did not want anything introduced regarding his mental

12  condition or status and did not want to rely on such."  Blair also refused to be

13  "interviewed or contacted by a psychiatrist."  (05/10/1989 RT 3.)  Finally, Newman

14  stated that he and Lucas had "outlined certain people for him [an investigator] to see

15  and steps that should be taken.  Mr. Blair has cancelled those requests."  (05/10/1989

16  RT 7-8.)  The investigator had "talked to some people and given us quite a bit of

17  background on Mr. Blair . . . and received information.  But Mr. Blair . . . didn't want

18  to get other people involved."  (05/10/1989 RT 8.)

19       Blair agreed with all of Newman's statements, stating that he told "both

20  attorneys that I do not want my family members to become involved.  I instructed

21  them not to – to even bother my family members with my problems."  (05/10/1989

22  RT 6.)  Blair instructed both counsel that he did not want to 'even use those records"

23  from Atascadero State Hospital.  (05/10/1989 RT 7.)  When asked him if was going to

24  present any mitigating evidence at the penalty phase, Blair said he was not sure, he

25  did not exactly know "just what is mitigating evidence."  He said:  "I'm not sure what

26  mitigating evidence would be – there would be.  I do know that the – the insanity or

27

28                                      120

1    diminished capacity is out, and I do know that – that the compelling my family

2    members to – to attend is out."  Blair said his defense would be that the "district

3    attorney shouldn't be allowed to put on aggravating evidence."

4    (05/10/1989 RT 7.)

5       When the court asked Blair if he were making "those decisions" stated by

6    Newman, Blair responded:  "Yes, it's my decision."  (05/10/1989 RT 9.)

7       When the proceedings resumed on the record, the court again asked Blair if he

8    wished to have a psychiatrist appointed.  Blair said, "no."  (15 RT 4233.)  When the

9    court asked Blair if he wished to continue representing himself, Blair responded that

10    he did.  (15 RT 4234.)

11       The penalty phase next resumed on May 15.  The prosecution presented its

12    three witnesses.  The last witness called was Emily Maverick, Blair's chemistry

13    professor.  Blair asked her if he had been a good student.  She said he was "a good

14    student and an intelligent student.  Not a top student."  (15 RT 4294.)

15    In  affirming the judgment on direct appeal, the CSC noted in its opinion,

16         [D]uring hearings held on May 8 and 10, 1989, outside the

17         presence of the jurors and the prosecutor, defendant's

18         advisory counsel Newman and Lucas expressed their belief

19         that defendant might not be competent to waive counsel or

20         to represent himself, and mentioned the existence of records

21         from defendant's confinement at Atascadero State Hospital

22         in 1972.  Nonetheless, neither Newman nor Lucas submitted

23         to the court any records or other evidence to substantiate

24         these claims.

25    *People v. Blair*, 36 Cal. 4th at 729.

26

27

28                           121

1      While the CSC implicitly recognized that both Lucas and Newman had been

2   ineffective in not submitting the records to "substantiate" the claim that Blair was

3   incompetent to waive counsel and to represent himself, in denying this claim, the

4   CSC found Blair had been given "prompt notice"  because the trial court "granted a

5   one-week continuance of the penalty phase.  *People v. Blair*,  36 Cal. 4th at 752.  The

6   CSC further found that

> 7      Defendant does not contend that this continuance was insufficient to
>
> 8      allow him to prepare a defense to Maverick's testimony. Defendant had
>
> 9      ample time to have his investigator meet with Maverick and to prepare
>
> 10     his cross-examination.  Because defendant does not demonstrate that he
>
> 11     was prejudiced by any delay in giving notice, the trial court's refusal to
>
> 12     exclude this testimony was not error.

13  *Id*.

14      Again, the finding that Blair was not prejudiced by the delay in giving notice

15  that Maverick would be call as a witness is premised on the CSC finding that Blair

16  was competent to waive counsel, even though both Lucas and Newman raised doubt

17  that Blair was competent, and simultaneously holding Newman and Lucas responsible

18  for failing to further substantiate the claim by failing to secure the Atascadero

19  records.  Thus, the CSC denial of this claim is also tainted by its  antecedent

20  unreasonable application of federal law that Blair was competent to waive counsel,

21  and the determination, contrary to clearly established federal law, that there was not

22  enough evidence before the trial court to carry a constitutionally adequate inquiry as

23  to Blair's competence – even though both Lucas and Newman raised the issue.  As

24  the requirement set forth in § 2254 (d) has been met, that provision does not bar

25  relief.

26

27

28                                        122

1    **I.      Amended Petition Claim L.**

2    Claim L of Blair's Amended Petition alleges that Blair was not mentally competent to

3    assist state counsel and has been mentally incompetent to assist federal habeas

4    counsel.[28]  (Amended Petition at 246-253.)

5            **1.      AEDPA Does not Apply to This Claim**

6            Both during direct appeal and state habeas proceedings, state appointed counsel

7    raised doubt that Blair was incompetent to assist counsel in challenging the validity

8    of Blair's conviction and sentence of death.  As state appointed counsel argued,

9                    As a result of Blair's mental illness, present counsel cannot

10                   discuss with Blair what happened at the time of the

11                   homicide.  It is also the case that Blair had potentially

12                   meritorious mental state defense, including insanity, which

13                   were never, and cannot now be, explored due to Blair's

14                   mental condition . . . . To thoroughly present these claims,

15                   counsel needs Blair competent insight into his own prior

16                   mental state, the decisions he made a[s] his own counsel,

17                   and his interaction with court appointed stand-by counsel.

18                   Blair is incompetent to assist counsel regarding his mental

19                   state at trial or Blair's interactions with stand-by counsel.

20                   Were he presently competent, Blair might also be able to

21                   direct his counsel to circumstantial evidence of his own

22                   incompetency.

23   *Blair*, S011636, Motion to Determine Appellant's Competency, at 5-6.

24

25   ─────────────────────

26   [28]  This claim was presented as Claim Four in Blair's petition for writ of habeas
     corpus.  The CSC summarily denied this claim, without issuing an order to show
27   cause  The CSC summarily denied this claims on the merits.

28                                        123

Although state counsel filed records, declarations from lay witnesses and an expert in support of his contention that Blair was incompetent to assist counsel to challenge the validity of his conviction and sentence to death, the CSC summarily denied this claim.  Because the CSC's denial of this claim violated the due process clause of the 14th Amendment, the CSC's decision in denying this claim, without any inquiry whatsoever, resulted in a decision contrary to clearly established federal law.

As state counsel argued before the CSC, Blair would be deprived of due process if he was forced to file his first petition when he was incompetent:

> Respondent would have Blair file his habeas petition *first*, then have the Court address whether Blair *was* incompetent to assist habeas counsel in preparation of that petition. However, such a procedure simply ignores reality. If Blair *is* incompetent to assist counsel, then any habeas petition prepared and filed by counsel would be necessarily incomplete because Blair's inability to assist counsel precludes full factual development of all potentially meritorious claims.  Thus filing such an incomplete petition would contravene both counsel's duty to his client, as well as to the Court.  Such petition would also fail to state a prima facie case.  As Respondent would surely point out after such a habeas was filed, if the petition fails to state a prima facie case this Court should, and presumably would, summarily deny the petition. . . . .  If the petition is summarily denied, this Court would never reach the issue of [ ] Blair's competency to assist habeas counsel.

*Blair*, S011636, Appellant's Reply to Motion at 4.

124

1      As Respondent proposed, the CSC denied the motion on direct appeal citing

2  *People v. Kelly*, and then instructed state habeas counsel to file such motion in his

3  state habeas proceeding.  *Blair*, S011636, Order, 07/28/2005.

4      As the Supreme Court has stated, "[f]ederal habeas courts reviewing the

5  constitutionality of a state prisoner's conviction and sentence are guided by rules

6  designed to ensure that state-court judgments are accorded the finality and respect

7  necessary to preserve the integrity of legal proceedings within our system of

8  federalism." *Martinez v. Ryan*, 132 S. Ct. 1309, 1316, 182 L. Ed 2d 272 (2012).  In

9  *Martinez*, Court went on to recognize that, when under state law, outside the record

10  claims must be brought in the initial-review collateral proceedings, equity mandates

11  that such state proceedings must provide a meaningful opportunity for a petitioner

12  who otherwise cannot challenge his conviction.  *Id*. at 1319-20.

13      Although the CSC led counsel to believe his motion to determine Blair's

14  competency would be entertained during habeas proceedings, the CSC summarily

15  denied the motion, and this claim, even though counsel made a prima facie showing

16  that Blair was not competent to assist counsel in challenging the validity of his

17  conviction and sentence to death.  Contrary to clearly established federal law, the

18  process by which the CSC denied this claim did not satisfy due process.

19      As the Supreme Court has recognized,

20          AEDPA does not require state and federal courts to wait for

21          some nearly identical factual pattern before a legal rule must

22          be applied . . . . Nor does AEDPA prohibit a federal court

23          from finding an application of a principle unreasonable

24          when it involves a set of facts different from those of the

25          case in which the principle was announced . . . .  The statute

26

27

28                                    125

1  recognizes, to the contrary, that even a general standard may

2  be applied in an unreasonable manner.

3  *Panetti v. Quarterman*, 551 US at 953 (internal citation and quotations omitted).

4  The general standard the CSC violated by depriving any process that would

5  ascertain whether Blair was competent to assist counsel was the basic due process

6  clause of the Fourteenth and Eighteenth Amendments.

7  Almost a century ago, the Court held that the Constitution

8  does not require States to grant appeals as of right to

9  criminal defendants seeking to review alleged trial court

10  errors. *McKane v. Durston*, 153 U.S. 684, 14 S. Ct. 913, 38

11  L. Ed. 867 (1894).  Nonetheless, if a State has created

12  appellate courts as "an integral part of the . . . system for

13  finally adjudicating the guilt or innocence of a defendant,"

14  *Griffin v. Illinois*, 351 U.S., 12, 18, 76 S. Ct., 585, 590

15  (1956) the procedures used in deciding appeals must

16  comport with the demands of the Due Process and Equal

17  Protection Clauses of the Constitution.

18  *Evitts v. Lucey*, 469 U.S. 387, 393, 105 S. Ct. 830, 834, 83 L. Ed 2d 821 (1985).

19  Because California has made state habeas proceedings an integral part of its system

20  for finally adjudicating the guilt or innocence by requiring the defendant to file a

21  habeas petition to assert claims outside of the four corners of the record under *People*

22  *v. Kelly*, 1 Cal. 4th 495, 822 P. 2d 385, 3 Cal. Rptr. 2d 677 (1992),  that procedure

23  must also conform with due process.

24  Because the "consequences of an erroneous determination of competence are

25  dire" for any criminal defendant, but in particular for a defendant facing the death

26  penalty, *Cooper v. Oklahoma*,  517 U.S. 348, 364, 116 S. Ct. 1373, 1381-82, 134 L.

27

28  126

1    Ed. 2d 498 (1996), the CSC violated due process when it denied Blair the opportunity

2    to develop the record to constitutionally test that determination.

3        The state court record is not adequately developed because Blair was

4    incompetent throughout state post-conviction proceedings and the state court did not

5    properly inquire into his competence or suspend the proceedings until his competence

6    was restored.  As argued here and elsewhere, because Blair has continued to be

7    incompetent in federal habeas, the Court should stay the federal action until Blair's

8    competence is restored.  If the Court rejects this argument and proceeds to adjudicate

9    Blair's claims, it should not apply 2254(d) to any claims that require Blair's

10   assistance – it would be unfair to "defer" to a state court adjudication based on a

11   record that is incomplete because of a capital petitioner's incompetence and the state

12   court's inadequate response to it.  Rather, if the Court proceeds to rule on the merits

13   of Blair's claims, it should review *de novo* claims that require his assistance and

14   consider whatever additional evidence counsel can muster in support of those claims

15   notwithstanding Blair's incompetence and even if the evidence was not presented in

16   state court.  *See Howard v. Clark*,  608 F.3d 563, 572 -73 (9th Cir. 2010); *Winston v.*

17   *Pearson*, 683 F.3d 489, 502 (4th Cir. 2012) (*Winston II*) (state court's refusal to allow

18   petitioner to develop record, combined with material nature of evidence to be

19   produced rendered decision "unbefitting of classification as an adjudication on the

20   merits").  *See also, e.g., Hurles*, 706 F.3d at 1021 (finding that the state court

21   fact-finding process was fundamentally flawed when it makes factual determinations

22   or credibility findings without granting the petitioner an evidentiary hearing or other

23   opportunity to develop his claim); *Milke v. Ryan*, 2013 WL 979127 (9th Cir. Mar. 14,

24   2013), at *8  (finding that when the record is incomplete not because of "anything

25   petitioner did or failed to do," the defects in the process satisfy (d)(2)); *David*

26   *Williams v. Woodford*, 859 F. Supp. 2d 1154, 1161 (E.D. Cal. 2012) (Kozinski, Chief

27

28                                    127

1   Circuit Judge, sitting by assignment) ("*Pinholster* isn't relevant where, as here,

2   Petitioner surmounts section 2254(d) because he was not allowed to develop the

3   record in state court").

4   **J.      Challenge to Lethal Injection**

5         Blair filed State Petition in 2006.  Since that time, California has adopted new

6   lethal-injection protocol and that protocol has been invalidated.  *See Morales v. Cal.*

7   *Dept of Corrs. & Rehab.*, 168 Cal. App. 4th 729, 85 Cal. Rptr. 3d 724, 733 (2008)

8   (discussing and invalidating the lethal-injection protocol put in place in 2007).  The

9   California Office of Administrative Law approved a revised protocol on July 30,

10  2010, with an effective date of August 29, 2010.  Cal. Code Regs. tit. 15 §§ 3349 et

11  seq. (2010).  On December 16, 2011, the Superior Court of California for the County

12  of Marin granted a motion for summary judgment in favor of the plaintiff's finding

13  that the California Department of Corrections had again failed to comply with the

14  Administrative Procedures Act.  As of the date of filing this brief, the understanding

15  of counsel for Blair is that the California Department of Corrections does not

16  currently have a valid lethal injection protocol in place.  Thus, Blair's lethal-injection

17  claim is currently not ripe.  *Payton v. Cullen*, 658 F. 3d 890, 893 (9th Cir. 2011).

18  Blair does not abandon this claim and preserves it for later review.

19  **K.      Systemic Claims**

20          **1.      The California Statutory Scheme under Which Blair Was Sentenced**

21                  **to Death Is Unconstitutional (Claim K and Claim N)**

22          Claim K of Blair's Amended Federal Petition asserts that the California

23  statutory scheme under which he was sentenced to death is unconstitutional. This was

24  Claim Thirteen in Blair's State Petition. Claim N of Blair's Amended Federal petition

25  asserts that  the penalty of death and execution in California are arbitrarily and

26  capriciously imposed depending on the county in which the defendant is charged, in

27

28                                          128

violation of the right to equal protection of the law.  Claim N was Claim Eleven in Blair's State Petition.  Both claims were summarily denied by the CSC.  The state supreme court did not issue an order to show cause, or permit any avenues for factual development (i.e., discovery, expert studies or an evidentiary hearing).

In Claim K, Blair presented six problematic elements of California's death penalty scheme which resulted in errors of a constitutional magnitude in his case, including:

- The California Death Penalty Statute Is Unconstitutional Because it Fails to Adequately Narrow the Class of Individuals Eligible for the Death Penalty and Creates a Substantial Likelihood That the Death Penalty Will Be Imposed in a Capricious and Arbitrary;

- The California Death Penalty Statute Is Unconstitutional Because it Sets Forth Unconstitutionally Vague Aggravating Circumstances;

- The California Death Penalty Statute Is Unconstitutional Because it Provides for a Death Sentence Which Is De Facto Unreviewable;

- The California Death Penalty Statute Is Unconstitutional Because Trial Courts Do Not Instruct on the Burden of Proof for Consideration of Aggravating Factors;

- The California Death Penalty Statute Is Unconstitutional Because it Allows for the Introduction of Evidence of Facts and Circumstances Underlying Prior Convictions to Be Introduced as Aggravating Factors Justifying the Imposition of the Death Penalty; and,

- The California Death Penalty Statute Is Unconstitutional Because it Allows for Unfettered Prosecutorial Discretion In its Imposition.

Inherent in each of the allegations Blair raised in this claim is the notion that California's death penalty scheme is so inherently flawed that it cannot function in

129

1    accordance with the protections guaranteed by the Fifth, Sixth, Eighth, and

2    Fourteenth Amendments to the United States Constitution and comparable provisions

3    of decisional law.  However, perhaps the most egregious of the California system's

4    deficiencies is its widespread failure—due to a flawed statutory scheme,

5    overly–broad prosecutorial discretion, and improper political considerations—to

6    properly and genuinely narrow the subclass of offenders upon whom a sentence of

7    death may be imposed, as required by *Furman v. Georgia*, 408 U.S. 238, 92 S. Ct.

8    2726, 33 L. Ed. 2d 346 (1972).

9         *Furman* holds that a death–sentencing procedure is unconstitutional if it

10   provides "no meaningful basis for distinguishing the few cases in which [death] is

11   imposed from the many cases in which it is not."  *Id*. at 313 (White, J., concurring);

12   *see also*, *e.g., Maynard v. Cartwright*, 486 U.S. 356, 362, 108 S. Ct. 1853, 100 L. Ed.

13   2d 372 (1988); *Godfrey v. Georgia*, 446 U.S. 420, 427-28, 100 S. Ct. 1759, 64 L. Ed.

14   2d 398 (1980) (plurality opinion).  "*Furman* mandates that where discretion is

15   afforded a sentencing body on a matter so grave as the determination of whether a

16   human life should be taken or spared, that discretion must be suitably directed and

17   limited so as to minimize the risk of wholly arbitrary and capricious action."  *Gregg*

18   *v. Georgia*, 428 U.S. 153, 189, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976) (plurality

19   opinion).  The requisite direction and limitation must be provided by statute, so that

20   the selection of the persons eligible to be sentenced to death is "circumscribed by . . .

21   legislative guidelines."  *Id*. at 207.  "To pass constitutional muster, a capital

22   sentencing scheme must 'genuinely narrow the class of persons eligible for the death

23   penalty and must reasonably justify the imposition of a more severe sentence on the

24   defendant compared to others found guilty of murder.'"  *Lowenfield v. Phelps*, 484

25   U.S. 231, 244, 108 S. Ct. 546, 98 L. Ed. 2d 568 (1988) (quoting *Zant v. Stephens*, 462

26   U.S. 862, 877, 103 S. Ct. 2733, 77 L. Ed. 2d 235 (1983)).

27

28                         130

As Blair argued to the state court, California's death–penalty scheme operates in the precise manner the Supreme Court found to violate the Eighth Amendment in *Furman*.  Rather than providing a "meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not," *Furman*, 408 U.S. at 313 (White, J., concurring), California's statute multiplies the "few" into the many and is therefore unconstitutional.  *See* Shatz & Rivkind, *"The California Death Penalty Scheme: Requiem for Furman?"* ("Shatz & Rivkind, *The California Death Penalty Scheme*"), 72 N.Y.U. L. Rev. 1283, 1286 (1997); *see also Wade v. Calderon*, 29 F.3d 1312, 1319 (9th Cir. 1994) (Eighth Amendment requires a death penalty statute to create a "principled distinction between the subset of murders for which the sentence of death may be imposed and the majority of murders which are not subject to the death penalty."), *overruled on other grounds*, *Rohan ex. rel. Gates v. Woodford*, 334 F.3d 803, 815 (9th Cir. 2003).

The CSC denied Blair the opportunity to factually develop this claim. However, another capital petitioner has been able to present factual support for a similar claim in the Northern District of California.  *See Ashmus v. Ayers*, USDC Case No. CV 93-00594-TEH.  In *Ashmus*, the district court permitted extensive discovery, a five-year state-wide expert statistical study, and an evidentiary hearing to resolve factual disputes and prove the petitioner's claim regarding California's failure to narrow.  *See id.* at Dkt. No. 434-35, 439, 441-44.  At that hearing, the petitioner provided evidence that proved the allegations submitted by the petitioner in state court, which were similar to the allegations presented by Blair in state court.

The evidence presented in *Ashmus* in support of the claim includes the history of the California death–penalty scheme and statistical evidence from the state-wide study by several experts.  (*See* Ex. I, Decl. of S. Shatz Decl.; Ex. G, D. Baldus Decl.; Ex. K, G. Woodworth, Ph.D. Am. Decl.; Ex. J, G. Uelmen Decl.; Ex. H, D. Heller

131

Decl.)  These exhibits, presented by the petitioner in *Ashmus*, merely prove the allegations, which Blair had previously presented to the state court in support of his narrowing claim.  In other words, it is evidence that would have been presented to the state court had the state court provided reasonable factual development of this claim.

The parties in *Ashmus* are fully briefed post-hearing and are awaiting a decision from the district court.[29]  Because the narrowing claim in *Ashmus* is substantially similar to the narrowing claim raised by Blair in his state and federal habeas petitions, Blair requests that this Court defer adjudicating this claim, and whether Section 2254(d) constrains this Court's ability to grant relief on it, until the issue in *Ashmus* has been resolved by the district court in the Northern District.

### 2.   The California Supreme Court's Denial of Blair's Inter-Case and Intra-Case Proportionality Claim was Objectively Unreasonable

Blair also argued that California unconstitutionally fails to provide inter-case proportionality.  In reviewing this claim, the CSC misapplied clearly established Eighth Amendment law in determining that Blair was foreclosed from inter-case proportionality review and unreasonably determined the facts alleged in his inter-case proportionality review arguments.  *Blair*, 36 Cal. 4th at 753.  As such, the state court decision does not warrant deference pursuant to AEDPA, 28 U.S.C. §§ 2254(d)(1) and (2), and this Court should review Blair's claim *de novo* and grant relief.

The Cruel and Unusual Punishments Clause of the Eighth Amendment is directed, in part, "'against all punishments which by their excessive length or severity

---

[29]  Two other capital cases have raised similar claims, have also been permitted to conduct discovery for a state-wide study, are fully briefed on the application of Section 2254(d) and are awaiting a resolution from the court.  *See Frye v. Warden*, No. CV-0628-LKK-CKD (Dkt No. 629 re: Claim 37; discovery for state-wide expert study authorized, and Section 254(d)briefing completed in 2012); *Riel v. Warden*, No. CV-0507-LKK-DAD (Dkt No. 535 re: Claim 36; discovery for state-wide expert study authorized, and Section 2254(d)briefing completed in 2012).

132

are greatly disproportionate to the offenses charged.'" *Enmund v. Florida*, 458 U.S. 782, 788-89, 102 S. Ct. 3368, 73 L. Ed. 2d 1140 (1982) (quoting *Weems v. United States*, 217 U.S. 349, 371, 30 S. Ct. 544, 54 L. Ed. 793 (1910). Thus, imposition of excessive punishment in relation to the crime committed is forbidden by the Eighth Amendment. *See Coker v. Georgia*, 433 U.S. 584, 97 S. Ct. 2861, 53 L. Ed. 2d 982 (1977).

The Supreme Court has held that in assessing culpability through the Eighth Amendment lense, courts must undertake an "individualized consideration" focusing on "relevant facets of the character and record of the individual offender." *Enmund*, 458 U.S. at 798 (quoting *Lockett v. Ohio*, 438 U.S. 586, 605, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978) and *Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976)). The CSC has agreed that "imposition of a death sentence is subject to [intra-case proportionality review], because a sentence grossly disproportionate to the offenses for which it is imposed may violate the prohibition against cruel or unusual punishment." *People v. Crittenden,* 9 Cal. 4th 83, 157, 885 P.2d 887, 36 Cal. Rptr. 2d 474 (1994) (citing Cal. Const., art. I, § 17).

The CSC's denial of this claim amounted to an unreasonable application of established federal law as well as an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. In denying this sub-claim, the CSC concluded that "intercase proportionality review is not required by the due process, equal protection, fair trial, or cruel and unusual punishment clauses of the federal Constitution. Blair, 36 Cal. 4th at 753.

The CSC's truncated and perfunctory assessment of this constitutional issue was objectively unreasonably, even as distinguished with its application of these principles in other cases. *See, e.g*., *Crittenden*, 9 Cal. 4th at 158 (in undertaking the required intra-case proportionality review, evaluating the mitigating evidence of

133

1   defendant's family background and history, defendant's age and absence of prior

2   criminal records, evidence of defendant's potential brain damage, as well as the

3   circumstances of the offense); *People v. Melton*, 44 Cal. 3d 713, 771, 750 P. 2d 741,

4   244 Cal. Rptr. 867 (Cal. 1988) (CSC's intra-case  proportionality review included

5   evaluation of defendant's positive adjustment while incarcerated, defendant's positive

6   traits such as kindness and concern towards others, as well as the  circumstances of

7   the crime).

8          The circumstances of the incident in which Rhoda Miller died do not warrant

9   the death penalty.  Miller died almost two years after Blair was arrested for the

10  underlying incident.  Moreover, the evidence of premeditation was highly suspect.

11  There was only circumstantial evidence that Blair had put the poison in the bottle, let

12  alone that he had intended to kill Miller.  A death sentence is not warranted under

13  such circumstances.  *See Enmund*, 458 U.S. at 798-99 (recognizing that as the threat

14  of the death penalty will not measurably deter individuals who "have no intention or

15  purpose that life will be taken," imposition of the death penalty in such a case "is

16  nothing more than the purposeless and needless imposition of pain and suffering,' and

17  hence an unconstitutional punishment").

18         The CSC determined that Blair was not entitled to inter-case proportionality

19  review.  *Blair*, 14 Cal. 4th 753-54.  In making this determination, the CSC relied upon

20  *Pulley v. Harris*, 465 U.S. 37, 51-54, 104 S. Ct. 871, 79 L. Ed. 2d 29 (1984), which

21  held that California's 1977 death-penalty statute was constitutional "on its face"

22  despite the absence of an appellate proportionality review component.  *Blair*, 14 Cal.

23  4th at 812 (citing cases that rely on *Harris* for this proposition).  Especially in light of

24  studies demonstrating the constitutional infirmities of the 1978 California death-

25  penalty statute as set forth above, *Harris* cannot be read to foreclose the issue of

26

27

28                                                         134

1    whether the 1978 California death-penalty scheme survives constitutional scrutiny

2    despite the absence of an appellate proportionality review component.

3        First, *Harris* addressed the 1977 California death-penalty statute, and not the

4    1978 statute under which Blair was sentenced.  Moreover, the Supreme Court in

5    *Harris* acknowledged that "there could be a capital sentencing system so lacking in

6    other checks on arbitrariness that it would not pass constitutional muster without

7    comparative proportionality review."  *Harris*, 465 U.S. at 51.  *See also McCleskey v.*

8    *Kemp*, 481 U.S. 279, 306, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987) (interpreting

9    *Harris* as holding that "w*here* the statutory procedures adequately channel the

10   sentencer's discretion, such proportionality review is not constitutionally required")

11   (emphasis added) (citing *Harris*, 465 U.S. at 50-51).

12       As set forth above, the 1978 death-penalty statute is so lacking in other checks

13   on arbitrariness that it fails to pass constitutional muster, the precise situation *Harris*

14   describes.  Studies undertaken since *Harris* was decided demonstrate that California's

15   death-penalty system, under which Blair was sentenced, fails to adequately challenge

16   or guide sentencer discretion, rendering it unconstitutionally arbitrary.  The *Harris*

17   Court itself explicitly distinguished the two laws, noting that the special

18   circumstances in the 1978 California death-penalty law are "greatly expanded" from

19   those in the limited 1977 law.  *Harris*. 465 U.S. at 53 n.13.

20       The California Supreme Court's misinterpretation and misapplication of *Harris*

21   renders its decision in Blair's case objectively unreasonable.[30] "Mistakes in reasoning

22

         _____

         [30]

23       The CSC has demonstrated its fundamental misunderstanding of *Harris* in

24   other contexts, rendering its reliance on *Harris* objectively unreasonable.
     Specifically, the CSC denied claims that the 1978 California death penalty statute

25   fails to adequately narrow the class of death eligible offenders in violation of the
     Eighth Amendment based upon its misunderstanding that *Harris* foreclosed the issue.

26   *See, e.g.*, *People v. Bacigalupo*, 467, 862 P.2d 808, 24 Cal. Rptr. 2d 808 (1993).
     However, *Harris* addressed the 1977 statute and not the 1978 statute, and the issue in

27

28                                                    135

1    or in predicate decisions of the type in question here—use of the wrong legal rule or

2    framework—do constitute error under the 'contrary to' prong of § 2254(d)(1)."

3    *Frantz v. Hazey*, 533 F.3d 724, 734 (9th Cir. 2008).  Accordingly, Section 2254(d)

4    does not bar relief on this claim and the Court should consider the merits of the claim

5    *de novo*.

6                                     **VI.**

7                             **CONCLUSION**

8          Because counsel need Petitioner's assistance in prosecuting the claims in the

9    Amended Petition, and because Section 2254(d) does not bar relief on the claims, as

10    detailed below, this Court should stay the proceedings and address Petitioner's

11    competence.

12

13

14                                  Respectfully submitted,

15                                  SEAN K. KENNEDY
                                     Federal Public Defender

16

17   DATED:  April 1, 2013         By   */S/ Statia Peakheart*
                                     STATIA PEAKHEART

18                                  C. PAMELA GOMEZ
                                     Deputy Federal Public Defenders

19

20                                  Attorneys for Petitioner
                                   James Nelson Blair

21

22

23

24

25 _____

26   *Harris* was a facial challenge to the 1977 statute, which explicitly did not address
   how the statute operated to meet the *Furman* narrowing requirement, the question at
27   issue in the failure-to-narrow challenges.

28                                  136

1                                       **PROOF OF SERVICE**

2         I, the undersigned, declare that I am a resident or employed in Los Angeles

3 County, California; that my business address is the Office of the Federal Public

4 Defender, 321 East 2nd Street, Los Angeles, California  90012-4202, Telephone No.

5 (213) 894-2854; that I am over the age of eighteen years; that I am not a party to the

6 action entitled below; that I am employed by the Federal Public Defender for the

7 Central District of California, who is a member of the Bar of the State of California,

8 and at whose direction I served a copy of the attached **PETITIONER'S BRIEF IN**

9 **RESPONSE TO COURT ORDER, DKT. NO. 73** on the following individuals by:

10

11 Interoffice Delivery:            Mailing via the United States Post Office:
     Death Penalty Law Clerk        James N. Blair, CDCR# D-13027

12 United States Courthouse, Rm 801    San Quentin State Prison
     312 North Spring Street          San Quentin, CA 94964

13 Los Angeles, CA 9001

14

15         This proof of service is executed at Los Angeles, California, on April 1, 2013

        I declare under penalty of perjury that the foregoing is true and correct to the

16 best of my knowledge.

17

18

19

20                                *De Anna Dove*
                               DE ANNA DOVE

21

22

23

24

25

26

27

28